**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

**ROCK HILL DIVISION**

| | | |
|---|---|---|
| Vickie J. McCree, as Personal Representative of the Estate of Ariane L. McCree, | ) ) ) ) | Civil Action No. 0:20-0867-JMC-PJG |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| City of Chester; Nicholas A. Harris, in his individual capacity; Justin M. Baker, in his individual capacity; Walmart Inc.; and Walmart Stores East, L.P., | ) ) ) ) ) | **MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF DEFENDANT NICHOLAS HARRIS** |
| Defendants. | ) ) ) | |

## STATEMENT OF THE CASE

This action arises out of the officer-involved shooting of the decedent Ariane McCree in the Wal-Mart parking lot in Chester, South Carolina, on November 23, 2019.  The Defendant Nicholas Harris was scheduled to perform work as a security guard for Wal-Mart that morning.  Before he arrived for that duty, the decedent Ariane McCree visited the Wal-Mart to make a purchase of a door lock costing $45.87.  The cashier (Joshua Stevenson) rang up the purchase, placed it in a bag, and McCree took the bag without paying, and left the store, while making the comment for the cashier to "put it on my tab."  *See*, Stevenson Depo. pp. 29-30.  This was reported to loss prevention, and two other Chester police officers who were present at the Wal-Mart that morning began to investigate.  Officer Lavar Richardson examined the security footage and witnessed the shoplifting through those means.  *See*, Richardson Depo., pp. 51-52.  Officer

1

Richardson did not know the suspect, but Officer Makeesharia Williams-Tobias, another Chester officer, identified Ariane McCree from a still photograph copied from the security video. *See*, Williams-Tobias Depo., p. 53. Later that morning, Ariane McCree returned to the store. The reasons for his return are unknown.

At approximately the same time as McCree returned to the store, the Defendant Nicholas Harris reported for his employment that morning at Wal-Mart. Sgt. Harris was summoned to the front of the store, where he met with Officers Richardson and Williams-Tobias. From Harris' observation, McCree was approaching the store and then returned briefly to his vehicle. *See*, Harris Depo., pp. 178-179. Upon entering the store, McCree was approached by the officers, and a discussion ensued. Sgt. Harris noticed that McCree smelled of marijuana at the time. McCree admitted to leaving the store that morning without paying for the door lock. *See*, Harris Depo., pp. 179, 194-195. During the discussion, McCree indicated he would pay for the lock, at which time loss prevention for Wal-Mart was consulted and the officers were advised that Wal-Mart wished to prosecute McCree for the shoplifting. Thereafter, McCree was placed under arrest, and Officer Richardson placed him in handcuffs. *See*, Harris Depo., pp. 179, 194-195.

McCree was acting in a strange manner, what Sgt. Harris described as giving a "thousand-yard stare" which was indicative of a person contemplating fight or flight. *See*, Harris Depo., pp. 179-180. A decision was made to move McCree to the Loss Prevention Office to prevent any disturbance, to remove him from the vicinity of other customers, and to await transport to the detention center for processing. *See*, Harris Depo., p. 180. A request for transport had been made to the Chester Police Department, and the Defendant Justin Baker was dispatched for that purpose.

McCree was moved in handcuffs to the Loss Prevention Office by Officer Richardson and Sgt. Harris. While in the Loss Prevention Office, Richardson stepped out, and at that point,

McCree charged Sgt. Harris, attacked him, shoved him out of the way, and escaped from the office. McCree is a former Division 1 football player at Jackson State University. He was much larger and stronger than Sgt. Harris. Thus, McCree, while still handcuffed, fled from the store and into the parking lot. *See*, Harris Depo., pp. 180-181. Sgt. Harris was in pursuit on foot. Sgt Harris chased McCree through the parking lot. There was another encounter near the Taco Bell at the edge of the Wal-Mart parking lot, where McCree stopped, turned towards Sgt. Harris, and attacked him by head butting him several times. *See*, Harris Depo., pp. 181-182.

During the course of the pursuit through the Wal-Mart parking lot, McCree made his way to his Chevy Impala. McCree was seen by eyewitnesses entering the vehicle and emerging with a firearm. *See*, Jeffrey Wallace Aff., ¶ 3; Diane Smith Aff., ¶ 3. Although McCree was still handcuffed, he was sufficiently limber to hold the weapon in his right hand and point it forward around his right torso. *See,* Baker Body Camera Footage. Upon encountering McCree with the firearm pointed in his direction, Sgt. Harris for the first time unholstered his weapon. He subsequently fired numerous shots at McCree although his firearm jammed several times. McCree was struck twice by Harris, once in the right arm and also in the left hip. *See*, Harris Depo., pp. 182-184. Those wounds were not fatal. *See*, Collins Depo., p. 63. Additionally, those wounds did not stop McCree from getting to his feet and continuing walking towards Officer Baker who had arrived on the scene and provided support to Sgt. Harris who was out of ammunition. Officer Baker was wearing a body cam which captured his interaction with McCree and the fatal shot. The video shows McCree continuing to walk toward Baker with the firearm at his side pointed towards Baker. Baker gave commands for him to stop, while he fired several rounds, one of which struck McCree in the chest and dropped him. McCree's firearm was then pulled from his hand, which is reflected on the body cam video. *See,* Baker Body

Camera Footage. EMS was summoned, and McCree died a short time later from the fatal shot to the chest.

The Plaintiff Vickie McCree, as the Personal Representative, filed suit initially against the City of Chester, the Chester Police Department, and Wal-Mart. Later, an Amended Complaint was filed adding Nicholas Harris and Justin Baker as Defendants. The Plaintiff has asserted both federal and state claims against the Defendant Harris. The federal claims brought pursuant to 42 U.S.C. § 1983 include claims under the Fourth Amendment for the use of excessive force, an unlawful seizure (false arrest), and bystander liability. The state law claims brought against Harris include negligence/gross negligence and false arrest. The Plaintiff also brought separate state law causes of action labeled as "survival action" and "wrongful death." Those causes of action merely incorporate the other state law claims as alleged.

The Defendant Nicholas Harris has moved for summary judgment as to all federal and state law claims on the grounds discussed below.

## SUMMARY JUDGMENT STANDARD

In deciding a summary judgment motion, the Court must determine whether there exists a genuine issue of material fact. *See*, Rule 56, FRCP. Under Rule 56(c), FRCP, a party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. However, "Rule 56 does not require the moving party to *negate* the elements of the nonmoving party's case." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 885 (1990). (Emphasis in original). In *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the United States Supreme Court found "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." 477 U.S. at 323. (Emphasis in original).

In *Cray Communications, Inc. v. Novatel Computer Systems, Inc.*, 33 F.3d 390 (4th Cir. 1994), the Fourth Circuit Court of Appeals explained that "the moving party on a summary judgment motion need not produce evidence, but simply can argue that there is an absence of evidence by which the nonmovant can prove his case." 33 F.3d at 393. "[T]he burden on the moving party may be discharged by 'showing' –- that is, pointing out to the district court –- that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

The summary judgment inquiry "scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, in the form of admissible evidence, that could carry the burden of proof of [her] claim at trial." *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993). "[T]he summary judgment procedure allows the court to forecast the proof at trial to determine whether consequential facts are in dispute, and if not, to resolve the case without a trial." *Id.* In fact, the Supreme Court in *Celotex* recognized that "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex*, 477 U.S. at 323-24. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." 477 U.S. at 327.

Under the summary judgment standard, "the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion." *Taylor v. Lowe's Home Centers, LLC,* 2018 WL 1431560, *2 (D.S.C. 2018). "Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion." *Id.* "Only disputes over facts that might affect the outcome of the

suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

## LEGAL ANALYSIS

### I.    Federal Claims

The Plaintiff has brought claims under 42 U.S.C. § 1983 against the Defendant Nicholas Harris for an unlawful seizure in violation of the Fourth Amendment, the use of excessive force in violation of the Fourth Amendment, and bystander liability. The Defendant Harris is entitled to summary judgment as to each of those claims both on the merits and by application of qualified immunity.

### A.    Unlawful Seizure/False Arrest

"The Fourth Amendment prohibits law enforcement officers from making unreasonable seizures, and seizure of an individual effected without probable cause is unreasonable." *Brooks v. City of Winston-Salem*, 85 F.3d 178, 183 (4th Cir. 1996). The United States Supreme Court has explained that "[t]o determine whether an officer had probable cause for an arrest, we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 138 S.Ct. 577, 586 (2018). "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is 'a fluid concept' that is not readily, or even usefully, reduced to a neat set of legal rules." *Id.* Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Id.* Thus, the Supreme Court has described probable cause as not being "a high bar." *Id.* "Probable cause must

be supported by more than a suspicion, but evidence sufficient to convict is not required." *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996).  *See also*, *Baker v. McCollan*, 443 U.S. 137, 145 (1979) ("[t]he Constitution does not guarantee that only the guilty will be arrested").

To avoid summary judgment on a Fourth Amendment unlawful seizure claim, the plaintiff "must allege a set of facts which make it unjustifiable for a reasonable officer to conclude [he] violated [the law]."  *Brown v. Gilmore*, 278 F.3d 362, 368 (4th Cir. 2002).  The information available to the Chester police officers, Harris included, at the time of the arrest demonstrated clearly that probable cause existed for Ariane McCree's arrest on the charge of shoplifting, or at the very least, on the alternative charge of petit larceny.[1]  The officers knew that McCree had proceeded to the cash register with a door lock priced at $45.87, and after the Wal-Mart cashier (Joshua Stevenson) rung up the sale, McCree took the bag with the merchandise and left the store without paying for it.  *See*, Stevenson Depo., pp. 29-30.  That information was relayed to the officers by Stevenson or other Wal-Mart employees.  In addition, Officer Lavar Richardson had reviewed the security video of the transaction, and Officer Makeesharia Williams-Tobias had identified McCree from a still photograph taken from the video because she was familiar with him.  *See*, Richardson Depo., pp. 51-52; Williams-Tobias Depo., p. 53. Thereafter, when McCree returned to the Wal-Mart approximately two hours later, he admitted to having taken the merchandise without paying for it.  *See*, Harris Depo., pp. 194-195.  That

---

[1]     Under South Carolina law, larceny involves the "taking and carrying away of the goods of another, which must be accomplished against the will or without the consent of the other."  *State v. Brown*, 274 S.C. 48, 260 S.E.2d 719, 720 (1979).  Petit larceny, which involves the taking of goods with a value of less than $2000, is a misdemeanor.  *See*, S.C. Code Ann. § 16-13-30.

information provided the officers with sufficient probable cause to reasonably believe that a crime had been committed.[2]

The Plaintiff takes the position that the arrest was unlawful because the misdemeanor was not committed in the officers' presence.  Under South Carolina law, an officer "may arrest without warrant any and all persons who, within their view, violate any of the criminal law of this State if such arrest be made at the time of such violation of law or immediately thereafter." *See*, S.C. Code Ann. § 17-13-30.  South Carolina law recognizes an exception to the "in the presence" requirement where the crime is "freshly committed." *See*, S.C. Code Ann. § 23-13-60. This exception was made applicable as well to municipal police officers. *See*, *State v. Retford*, 276 S.C. 657, 281 S.E.2d 471 (1981); *State v. Clark*, 277 S.C. 333, 287 S.E.2d 143 (1982). Thus, a police officer has "the right to make a warrantless arrest for a misdemeanor not committed in his presence, if the facts and circumstances observed by the officer provided probable cause to believe a crime had been freshly committed." *Clark*, 287 S.E.2d at 144.

Notwithstanding the requirements for arrest under South Carolina law, the requirement that the misdemeanor be committed in the officer's presence or "freshly committed" is not a requirement for a lawful arrest and seizure under the Fourth Amendment.  The officer need only have probable cause to believe that a misdemeanor offense was committed.  In *Street v. Surdyka*,

---

[2]     It is well settled that probable cause may be based on uncharged conduct. *Devenpeck v. Alford*, 543 U.S. 146, 154-56 (2004); *Jackson v. City of Abbeville*, 366 S.C. 662, 623 S.E.2d 656 (Ct. App. 2005).  In other words, as the United States Supreme Court has held, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause.  That is to say, his subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." *Devenpeck*, 543 U.S. at 153 (2004).  At the time that McCree returned to the Wal-Mart, he also smelled of marijuana. *See*, Harris Depo., pp. 179, 205-206.  McCree could have also been arrested on that basis as well. *See*, *United States v. Humphries*, 372 F.3d 653, 659-660 (4th Cir. 2004) ("the odor of marijuana emanating from Humphries was sufficient to provide Officer Venable with probable cause to believe that marijuana was present on Humphries' person.  And because Officer Venable had probable cause to believe Humphries was presently possessing marijuana, he had probable cause to arrest him for the crime of possession").

492 F.2d 368 (4th Cir. 1974), the Fourth Circuit explained: "We do not think the fourth amendment should now be interpreted to prohibit warrantless arrests for misdemeanors committed outside an officer's presence." 492 F.2d at 371. Later, in 2004, in *United States v. Humphries*, 372 F.3d 653 (4th Cir. 2004), the Fourth Circuit cited *Street* for the "holding that a warrantless arrest may be made in a public place even if the crime for which the arrest was made was a misdemeanor committed outside an officer's presence." 372 F.3d at 657.[3] In the interim, the United States Supreme Court had not reached that issue in *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001), where the Court wrote: "We need not, and thus do not, speculate whether the Fourth Amendment entails an 'in the presence' requirement for purposes of misdemeanor arrests." 532 U.S. at 341, n. 11. However, as the Tenth Circuit has recognized, "it is widely recognized that the Fourth Amendment does not impose an in-presence requirement." *Hartz v. Campbell*, 680 Fed. Appx. 703 (10th Cir. 2017). *See also*, *Graves v. Mahoning County*, 821 F.3d 772, 778-779 (6th Cir. 2016 (citing cases from numerous circuits). Thus, the law was clearly established in 2019 that the Fourth Amendment does not include an "in the presence" requirement for a warrantless arrest on a misdemeanor charge.[4]

It is anticipated that the Plaintiff will attempt to argue that the probable cause for the shoplifting charge was "negated" when McCree returned to the Wal-Mart in an alleged attempt

---

[3]     *See also*, *Myers v. Shaver*, 245 F.Supp.2d 805, 811, n. 2 (W.D. Va. 2003) ("Section 1983 redresses violations of federal not state law. Therefore, in accordance with the Fourth Circuit, the arresting officer cannot be liable under § 1983 unless he also violated the federal constitutional law governing warrantless arrests") (citing *Street v. Surdyka*, 492 F.2d 368 (4th Cir. 1974), and *Clark v. Link*, 855 F.2d 156 (4th Cir. 1988)).

[4]     Nonetheless, even if federal law did include an "in the presence" or "freshly committed" requirement, as South Carolina law requires, the Defendant Harris submits that the evidence supports the legality of the arrest. The "in the presence" requirement is discussed in detail below. Moreover, if that requirement is now being recognized as part of the Fourth Amendment analysis, the law was not clearly established as such in November 2019, and that would be a basis, among others, for qualified immunity.

to pay for the merchandise he had stolen.  The Plaintiff offers no factual or legal support for that position.[5]  In *James v. Fast Fare, Inc.*, 685 F.Supp. 565 (D.S.C. 1988), this Court addressed an analogous scenario involving the utterance of a fraudulent check.  Although the statute created a "safe harbor" for the merchant that probable cause was presumed if payment of the bad check is not made within fifteen days of notice, payment during that period did not negate the crime.  As Judge Anderson wrote, "payment within the grace period does not prevent a prosecution for issuing a fraudulent check."  685 F.Supp. at 567.  Similarly, in *Mazurkiewicz v. New York City Transit Authority*, 810 F.Supp. 563 (S.D.N.Y. 1993), the district court dismissed a § 1983 claim for false arrest.  The court ruled that the crime for theft of services was committed when the arrestee jumped a subway turnstile, and his attempt to pay the fare after he was stopped by a police officer "does not negate the fact that he admittedly broke the law."  810 F.Supp. at 568-569.  *See also*, *Davis v. Pavlik*, 2020 WL 7489011 (D. Md. 2020) (district court found that probable cause for false arrest was not "negated" by subway passenger's excuses for not paying subway fare).  Thus, even if McCree did return to the Wal-Mart to pay for the stolen merchandise, that would not undo the crime or "negate" the existence of probable cause for his arrest for shoplifting or petit larceny.

In sum, based upon the information known to the Chester police officers, including the Defendant Harris, when the arrest of Ariane McCree was made, there existed probable cause to believe that McCree had committed the crime of shoplifting or petit larceny when he left the Wal-Mart with the merchandise without making payment on the morning of November 23, 2019.

Additionally, even if the Court were to find that probable cause did not exist initially for an arrest for shoplifting or petit larceny, Ariane McCree's conduct after he was in the Loss Prevention Office and his subsequent conduct in the parking lot provided probable cause for his

---

[5]     Notably, the evidence does not show that McCree had sufficient cash on his person or any other means of payment to pay the full price for the stolen door lock.

arrest and apprehension. The record includes a video recording of what transpired after McCree was taken to the Loss Prevention Office, at which time the Defendant Harris was assaulted by McCree, who then fled from the room and out of the building into the parking lot.[6] McCree's conduct provided probable cause for his arrest on the charge of assaulting a police officer.

On this issue, the Fourth Circuit's decision in *United States v. Sprinkle*, 106 F.3d 813 (4th Cir. 1997), is controlling. In *Sprinkle,* the Fourth Circuit addressed the intervening-crime doctrine: "If a suspect's response to an illegal stop [or unlawful detention] is itself a new, distinct crime, then the police constitutionally may arrest the suspect for that crime." 106 F.3d at 619. As the Fourth Circuit explained, "[t]here is a strong policy reason for holding that a new and distinct crime, even if triggered by an illegal stop, is a sufficient intervening event to provide independent grounds for arrest. … a contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." *Id*. In *Sprinkle,* the suspect fled from the officer after being briefly detained. The suspect pulled a firearm and shot at the officer. The Fourth Circuit ruled that "[w]hen Sprinkle drew and fired his gun at the officer, he committed a new crime that was distinct from any crime he might have been suspected of at the time of the initial stop." *Id*. The Court cited the South Carolina statutory offense for pointing and presenting a firearm. *See*, S.C. Code Ann. § 16-23-410 ("It is unlawful for a person to present or point at another person a loaded or unloaded firearm"). As the Court concluded, "[a]t this point, Officer Riccio had probable cause to arrest

---

[6]     The United States Supreme Court's decision in *Scott v. Harris*, 550 U.S. 372 (2007), is instructive on the controlling effect of video evidence over any inconsistent witness testimony. In that case, the Supreme Court had the benefit of a videotape of the high-speed police pursuit at issue. The Court concluded that the videotape contradicted the version of events presented by the plaintiff. As a result, the Court held as follows: "Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." 550 U.S. at 380-381. The same standard is equally applicable in the case at bar.

Sprinkle because the new crime purged the taint of the prior illegal stop." *Id.*  Similarly, in *United States v. Swindell*, 139 Fed. Appx. 532 (4th Cir. 2005), an officer detained the suspect, and ultimately the suspect assaulted the officer during the course of the detention.  Citing *Sprinkle*, the Fourth Circuit concluded that "[e]ven if we were to presume that the police officer illegally detained Swindell, Swindell's assault on the officer constituted a new crime."  139 Fed. Appx. at 534.

Based on *Sprinkle* and *Swindell*, it is clear that McCree's assault of the Defendant Harris in the Loss Prevention Office provided probable cause for a new and distinct crime, separate from the shoplifting and petit larceny offenses.  Thereafter, during the pursuit in the parking lot, McCree attacked Harris at least one additional time.  Finally, after proceeding to his vehicle and retrieving a firearm, McCree committed an additional offense of pointing and presenting a firearm at a police officer.  While that conduct towards the Defendant Harris is not captured on video, McCree's approach to Officer Justin Baker with his gun presented and pointed in the Defendant Baker's direction is depicted on Baker's body camera footage.  In short, there existed probable cause for subsequent offenses by McCree that justified the attempts to apprehend him and the use of deadly force.

For these reasons, the Plaintiff's Fourth Amendment claim for an unreasonable seizure or false arrest should be dismissed as a matter of law.

**B.**     **Excessive Force**

**1.**     **Overview of Applicable Law**

A claim of excessive force by a law enforcement officer implicates the constitutional rights of an individual to be free from unreasonable seizure under the Fourth Amendment. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011).  Whether an officer has used excessive

force is analyzed under a standard of objective reasonableness, and the court cannot consider the officer's underlying intent or motivation. *Graham v. Connor*, 490 U.S. 386, 397 (1989). The critical inquiry then is "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996). *See also*, *Tennessee v. Garner*, 471 U.S. 1, 9-10 (1985) (explaining the question is "whether the totality of the circumstances justified a particular ... seizure").

This objective reasonableness standard is "not capable of precise definition or mechanical application" but instead "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. In applying this objective standard, the court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id*. Yet, as the Supreme Court has observed, "[o]ur Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id*. The relevant facts and circumstances include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting seizure or attempting to evade seizure by flight." *Id*. In undertaking this analysis, the court must remain cognizant that "a particular use of force must be judged from the perspective of a reasonable officer on the scene" and not "with the 20/20 vision of hindsight." *Id*.

2.     **Analysis of *Graham* Factors**

A review of the three factors set forth by the United States Supreme Court in *Graham* establishes that the use of force at issue in the case at bar was reasonable.

### a.    <u>Severity of Crime at Issue</u>

As to the first factor concerning the severity of crime at issue, although Ariane McCree was originally charged with misdemeanor-level conduct, the seriousness and gravity of his actions at the time deadly force was used exposed the officers as well as the general public in the Wal-Mart parking lot to serious bodily harm.  Under the prevailing circumstances, once McCree fled from the Loss Prevention Office, his conduct became felonious.  He assaulted a law enforcement officer in order to flee from custody.  He then committed an additional assault of the Defendant Harris in the parking lot during the pursuit on foot.  But most critically, McCree made his way to his vehicle and made no attempt to drive away (which itself would have posed grave danger because he was handcuffed), but instead, he obtained a firearm from the vehicle. McCree then posed a serious danger to the general public with that weapon, including persons in the parking lot, persons arriving to shop, and persons leaving.  These events occurred on a Saturday late morning the weekend before Thanksgiving, which is a busy pre-Christmas shopping period.  By all accounts, the Wal-Mart was very busy.  *See*, Harris Depo., p. 258. When McCree emerged from his vehicle with a weapon, that altered the gravity of the public safety scenario dramatically.  Eyewitnesses saw him with a weapon.  Persons yelled out that there was an armed gunman.  *See*, Harris Depo., pp. 258-262.  The officers, including the Defendant Harris, were faced with a critical public safety issue.

### b.    <u>Resisting or Evading Arrest</u>

The facts are undisputed that Ariane McCree was resisting and evading arrest and then his subsequent apprehension.  As indicated, McCree was in custody and assaulted the Defendant Harris to escape from custody.  He then led Harris and other officers on a chase on foot through

the large Wal-Mart parking lot. Finally, he obtained a weapon from his vehicle which elevated the public safety hazard he posed.

### c.        Immediate Threat to the Safety of Officers or Others

The Fourth Circuit has explained that "[b]efore employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others." *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996). "Officers need not be absolutely sure, however, of the nature of the threat or the suspect's intent to cause them harm – the Constitution does not require that certitude precede the act of self-protection." *Id*. In effect, "the Fourth Amendment does not require omniscience." *Id*.

As already discussed at length, the threat posed by Ariane McCree was real. He was pointing and presenting a firearm in a parking lot at a busy store on a Saturday shopping day. He was evading police and was not acting rationally. The Plaintiff will likely argue that McCree, although he was armed, never fired his weapon. However, as the Fourth Circuit has aptly explained, "[t]he Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists." *Elliott*, 99 F.3d at 643. The Plaintiff may also be critical of the number of shots taken by the Defendant Harris. Yet, in *Plumhoff v. Rikard*, 572 U.S. 765 (2014), the United States Supreme Court rejected a similar position and explained: "if police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." 572 U.S. at 777. The Plaintiff may also suggest that McCree was not a threat because he was still handcuffed, but in reality, that made him a greater threat. If he had fired the weapon, he would not have been able to take careful aim, making it more likely that he could hit an innocent bystander either directly or on an unintended ricochet. The Plaintiff may also argue that, after McCree was struck twice –

in the arm and hip, that he was less of a threat, but his actions, as shown on Officer Baker's body cam, indicated otherwise. He continued to point and present the firearm and move towards Baker.

In effect, the Fourth Circuit's words from *Elliott* ring particularly true in this case: "No citizen can fairly expect to draw a gun on police with risking tragic circumstances. And no court can expect any human being to remain passive in the face of an active threat on his or her life." *Elliott*, 99 F.3d at 644.

In sum, the Fourth Amendment does not prohibit the use of reasonable force; it only prohibits the use of an unreasonable amount of force under the prevailing circumstances. Given the totality of the circumstances and the appropriate analysis of the *Graham* factors, an objectively reasonable officer in the same position as the Defendant Harris would conclude that deadly force was necessary to protect himself and the general public from the deadly threat posed by Ariane McCree. The Defendant Harris is entitled to summary judgment on the excessive force claim.

### C.     <u>Bystander Liability</u>

In her Fifth Cause of Action, the Plaintiff has also alleged a bystander claim under § 1983. Under the theory of bystander liability, a law enforcement officer may be liable only if he "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall v. Prince George's County*, 302 F.3d 188, 204 (4th Cir. 2002). However, the Fourth Circuit recognized that only "in certain limited situations, bystanding officers are obliged to act." *Id.* Generally, "an officer possesses an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers;" however, "such a duty attaches when an officer observes or has reason to know that a constitutional violation is being committed

by other officers and possesses a realistic opportunity to intervene to prevent the harm from occurring."  302 F.3d at 203-204.

Moreover, a bystander liability claim is derivative in nature.  Given the first element's requirement of an underlying constitutional violation, a § 1983 failure-to-intervene claim is, by nature, concomitant with a plaintiff's other § 1983 claims.  *See*, *Hinkle v. City of Clarksburg*, 81 F.3d 416, 420 (4th Cir. 1996) (observing that bystander liability claim was "derivative" of excessive force claim and holding that claim failed "[i]n the absence of any underlying use of excessive force").  In the case at bar, there were no underlying deprivations of federal rights. The Plaintiff has been unable to prove his excessive force claim alleged against Defendant Baker, and even if he were, the Plaintiff cannot show that Harris had any reasonable opportunity to intervene between McCree and Baker because Harris was not in Baker's vicinity and thus was not a "bystander."[7]

### D.     Qualified Immunity

The United States Supreme Court in *Harlow v. Fitzgerald*, 457 U.S. 800 (1982), set forth objective standards for the utilization of the qualified immunity defense and gave specific benchmarks to the judiciary in determining when to protect public officials from undue interference with the exercise of their official duties.  In setting forth its guidelines, the Supreme Court ruled that "government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate a clearly established statutory or constitutional right of which a reasonable person should have known." 457 U.S. at 818.  The Court further held that "[r]eliance on the objective reasonableness of an official's conduct is

---

[7]     The Plaintiff has not alleged any federal constitutional claims against any other police officers and did not bring a municipal liability claim against the City of Chester.

measured by reference to clearly established law, and should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Id*.

Subsequently, the Supreme Court held in *Anderson v. Creighton*, 483 U.S. 635 (1987), that a court must look for the "'objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken." 483 U.S. at 639. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. ... [This] is to say that in the light of preexisting law the unlawfulness must be apparent." 483 U.S. at 640.

The Fourth Circuit has explained that qualified immunity protects government officials from liability for "bad guesses in gray areas" and "ensures that they will be held liable only for violating bright-line rules." *Hill v. Crum*, 727 F.3d 312, 321 (4th Cir. 2013). Qualified immunity "operates to ensure that before they are subjected to suit, [officials] are on notice that their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 731 (2002). In other words, as the Supreme Court phrased the standard, the unlawfulness of the conduct must be "beyond debate." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011).

In determining whether an individual defendant is entitled to qualified immunity, courts typically engage in a two-step process as set forth in *Saucier v. Katz*, 533 U.S. 194 (2001). A court must first determine "whether a constitutional right would have been violated on the facts alleged." 533 U.S. at 200. If the facts viewed in a light most favorable to the plaintiff do not establish a constitutional violation, the inquiry ends and the plaintiff cannot prevail. *Parrish v. Cleveland*, 372 F.3d 294, 301 (4th Cir. 2004). "Next, assuming that the violation of the right is established, courts must consider whether the right was clearly established at the time such that it would be clear to an objectively reasonable officer that his conduct violated that right." *Bailey v. Kennedy*, 349 F.3d 731, 739 (4th Cir. 2003).

In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court left it to the court's discretion which of the two prongs of the qualified immunity analysis may be addressed first. 555 U.S. at 236. This Court has recognized that the second prong inquiry presents a "purely legal question" which is "always capable of decision at the summary judgment stage." *Willingham v. Crooke*, 412 F.3d 553, 559 (4th Cir. 2005). Likewise, the second prong is always appropriate for adjudication by way of an interlocutory appeal. In *Behrens v. Pelletier*, 516 U.S. 299 (1996), the Supreme Court found that an interlocutory appeal was available even though the district court denied summary judgment "on the ground that 'material issues of fact remain.'" 516 U.S. at 312. The Supreme Court confirmed that "summary judgment determinations *are* appealable when they resolve a dispute concerning an abstract issue of law relating to qualified immunity – typically the issue of whether the federal right allegedly infringed was 'clearly established.'" 516 U.S. at 313. (Emphasis in original).

The standard for determining whether an officer is entitled to qualified immunity is one of objective reasonableness: "whether a reasonable officer could have believed [the conduct at issue] to be lawful, in light of clearly established law and the information the ... officers possessed." *Anderson v. Creighton,* 483 U.S. 635, 641 (1987). In other words, the Court must ascertain whether the Appellants' actions (or inactions) in their dealings with the Decedent constitute a "reasonable mistake[] as to the legality of [their] actions." *Saucier*, 533 U.S. at 206. Put differently, the question is "whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." 533 U.S. at 194-95. Applied in this manner, the test "operates ... to ensure that before they are subjected to suit, [officials] are on notice their conduct is unlawful." 533 U.S. at 206.

In sum, the second prong requires the court to determine "whether the conduct alleged by the plaintiff violates clearly established statutory or constitutional rights of which a reasonable

person would have known." *Owens v. Lott*, 372 F.3d 267, 279 (4th Cir. 2004). In *Edwards v. City of Goldsboro*, 178 F.3d 231 (4th Cir. 1999), the Fourth Circuit stressed the importance in this Circuit that there be controlling authority within the circuit demonstrating that the challenged action was unconstitutional:

> In determining whether a right was clearly established at the time of the claimed violation, courts in this circuit ordinarily need not look beyond the decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose. If a right is recognized in some other circuit, but not in this one, an official will ordinarily retain the immunity defense.

178 F.3d at 251. (Citations and internal quotes omitted). Similarly, in *Wilson v. Layne*, 141 F.3d 111 (4th Cir. 1998), the Fourth Circuit held that "[t]he law is clearly established such that an officer's conduct transgresses a bright line when the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state." 141 F.3d at 114. *See also*, *Doe ex rel. Johnson v. South Carolina Dept. of Social Services*, 597 F.3d 163, 176-177 (4th Cir. 2010) (granting qualified immunity where no precedent from Supreme Court or the Fourth Circuit clearly established existence of constitutional right); *Lefemine v. Wideman*, 672 F.3d 292, 298 (4th Cir. 2012) ("we have long held that it is case law from this Circuit and the Supreme Court that provide notice of whether a right is clearly established").

Thus, the qualified immunity inquiry must focus on the specific factual situation in this case to determine whether the Defendant Harris enjoys immunity. *See Parrish*, 372 F.3d 294, 301 (4th Cir. 2004). "If the right was not clearly established in the specific context of the case -- that is, if it was not clear to a reasonable [official] that the conduct in which he allegedly engaged was unlawful in the situation he confronted -- then the law affords immunity from suit." *Clem v. Corbeau*, 284 F.3d 543, 549 (4th Cir. 2002). The Fourth Circuit has explained that the nature of the right violated must be defined "at a high level of particularity." *Edwards*, 178 F.3d at 250-251.

20

"[W]hen the legality of a particular course of action is open to reasonable dispute, an [official] will not be subjected to trial and liability." *Figg v. Schroeder*, 312 F.3d 625, 636 (4th Cir. 2002).

### 1.    <u>Unlawful Seizure/False Arrest</u>

In *Orem v. Gillmore*, 813 Fed. Appx. 90 (4th Cir. 2020), the Fourth Circuit wrote: "Even if Gillmore did not have probable cause to arrest John Orem on the circumstances present in this case, the question is not 'beyond debate,'" thereby entitling the law enforcement officer to qualified immunity. 813 Fed. Appx. at 92. The Fourth Circuit explained that "[q]ualified immunity applies if there is arguable probable cause, which exists even where an officer mistakenly arrests a suspect believing it is based in probable cause if the mistake is objectively reasonable." 813 Fed. Appx. at 92. *See also*, *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) ("[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity"); *Smith v. Reddy*, 101 F.3d 351 (4th Cir. 1996) (in qualified immunity context, "[t]he reasonableness of [defendant's] conduct does not turn on whether probable cause was, in fact, present"). To receive qualified immunity, an officer need not have actual probable cause, but only arguable probable cause. *See, Gomez v. Atkins*, 296 F.3d 253, 261-62 (4th Cir. 2002) ("In our assessment of whether Atkins is entitled to qualified immunity, however, the question is not whether there actually was probable cause for the murder warrant against [Gomez], but whether an objective law officer could reasonably have believed probable cause to exist").[8]

---

[8]    *See also*, *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010) ("To receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause"); *Kuehl v. Burtis*, 173 F.3d 646, 650 (8th Cir. 1999) ("The issue for immunity purposes is not probable cause in fact but arguable probable cause"). This is true because it is "inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable." *Brown*, 608 F.3d at 734-35.

The first prong of the qualified immunity analysis is addressed above. The Chester officers had probable cause to arrest Ariane McCree for shoplifting or petit larceny. There is no "in the presence" requirement under the Fourth Amendment, and certainly, there is no authority from the United States Supreme Court, the Fourth Circuit, or a "robust consensus of authority" from other circuits applying an "in the presence" requirement. Indeed, the opposite is true. The Supreme Court explained in *Atwater, supra* that it was not deciding that issue. The Fourth Circuit has rejected an "in the presence" requirement for many years starting with *Street v. Surdyka*, 492 F.2d 368 (4th Cir. 1974). Lastly, the "robust consensus of authority" from other circuits rejects the requirement as well. Thus, if this Court were to now hold that an "in the presence" requirement exists for a misdemeanor arrest under the Fourth Amendment, the law was not clearly established in November 2019, thereby entitling the Defendant Harris to qualified immunity. Moreover, for the reasons discussed below with respect to the state law claims, an objectively reasonable officer in Harris' position would believe that the arrest was lawful under the "in the presence" requirement and "freshly committed" exception, as currently interpreted by the South Carolina appellate courts. For these reasons, if the Court reaches the second prong or, under *Pearson*, chooses to start the analysis with the second prong, the Defendant Harris is entitled to qualified immunity on the unreasonable seizure/false arrest claim under § 1983.

## 2.    **Excessive Force**

The first prong of the qualified immunity analysis for the excessive force claim is addressed above. Applying the three factors from *Graham v. Connor*, the use of force was objectively reasonable, including the use of deadly force after Ariane McCree retrieved a firearm from his vehicle and began pointing and presenting the weapon at the officers, thereby causing a

serious threat of harm to the officers and members of the public within the Wal-Mart parking lot. However, if the Court reaches the second prong or, under *Pearson*, chooses to start the analysis with the second prong, the Defendant Harris is entitled to qualified immunity.  Based on the analysis of the three *Graham* factors, an objectively reasonable police officer in Harris' position would believe that the use of deadly force against McCree under the prevailing circumstances was legally justified and did not constitute excessive force under the Fourth Amendment and the clearly established authorities cited above.  If the facts of this case do not present an objectively reasonable officer with a sound reason to conclude that McCree posed a serious threat to the safety of the officers and the public, then the law in this area was not clearly established in 2019, thereby entitling the Defendant Harris to qualified immunity.

In sum, as indicated above, qualified immunity protects governmental officials from bad guesses in gray areas and ensures that they are liable only for transgressing bright lines.  *Maciarello v. Sumner*, 973 F.2d 295 (4th Cir. 1992).  Certainly no "bright lines" were crossed by the Defendant Harris.  Consistent with the existing authority, Harris' actions were objectively reasonable, and for these reasons, he is entitled, at a minimum, to qualified immunity as to all federal claims, including the bystander liability claim as well.

## II.     State Claims

### A.     <u>False Arrest/False Imprisonment Claim</u>

In her Tenth Cause of Action, the Plaintiff alleges a state law cause of action for false arrest or false imprisonment.  Under South Carolina law, the causes of action for false arrest and false imprisonment are the same.  *See*, *Carter v. Bryant*, 429 S.C. 298, 838 S.E.2d 523, 527 (Ct. App. 2020) ("[f]alse arrest in South Carolina is also known as false imprisonment").  "The elements of the tort are intentional restraint of another without lawful justification." *Id*.  "In

order to establish a cause of action, the evidence must prove: (1) that the defendant restrained the plaintiff; (2) that the restraint was intentional; and (3) that the restraint was unlawful." *Andrews v. Piedmont Air Lines*, 297 S.C. 367, 377 S.E.2d 127, 130 (Ct. App. 1989).

The Defendant Harris is entitled to summary judgment on this claim because there was probable cause for the arrest. In effect, the existence of probable cause makes the restraint lawful, and hence, the claim fails. South Carolina courts have consistently ruled that the absence of probable cause is also an essential element for the state law causes of action for false arrest and false imprisonment. *See, Jackson v. City of Abbeville*, 366 S.C. 662, 623 S.E.2d 656, 665, n. 4 (Ct. App. 2005). Therefore, for the same reasons probable cause exists under the Fourth Amendment analysis above, the state law claim for false arrest/false imprisonment should likewise be dismissed.

As discussed above, South Carolina law requires that a misdemeanor, such as shoplifting or petit larceny, be committed in the officer's presence or otherwise that the crime be "freshly committed" in order for the officer to be authorized to arrest. That requirement has been satisfied based upon the uncontradicted evidence in the record. At the time Ariane McCree was arrested, the officers investigating the offense were still on the scene. Officers Richardson and Williams-Tobias were advised by Wal-Mart employees that McCree did not pay the cashier for the merchandise and told him to place it "on his tab." Officer Richardson had observed the incident on the security footage, and Officer Williams-Tobias was able to identify McCree with whom she was personally familiar. *See*, Richardson Depo., pp. 51-52; Williams-Tobias Depo., p. 53. While that investigation was ongoing, McCree returned to the Wal-Mart and admitted that he had taken the merchandise without paying for it. *See*, Harris Depo., pp. 194-195. In *State v. Sawyer*, 283 S.C. 127, 322 S.E.2d 449 (1984), the South Carolina Supreme Court held that the subject's "admission should be treated as part of the officer's sensory awareness of the

commission of the offense which satisfies the *presence* requirement."  322 S.E.2d at 449.  In *Sawyer*, the officer arrived at the scene fifteen minutes after the accident and observed the subject's eyes were bloodshot and his speech was slurred.  The subject admitted to driving the vehicle.  The Supreme Court concluded that the admission by the subject satisfied the "in the presence" requirement.  In the present case, the same is true.  McCree's admission that he left the Wal-Mart with merchandise without paying for it satisfies the "in the presence" requirement.[9]

Moreover, the scenario at issue in this case also falls within the "freshly committed" exception to the "in the presence" requirement.  The applicable case law sets no temporal limits on what is considered "freshly committed."  In *Fradella v. Town of Mount Pleasant*, 325 S.C. 469, 482 S.E.2d 53 (Ct. App. 1997), the South Carolina Court of Appeals extended the original rule set forth in *State v. Martin*, 275 S.C. 141, 268 S.E.2d 105 (1980), so that an officer was not even limited to observing the facts and circumstances at the scene itself but includes the investigation that proceeded beyond the scene.  In *Fradella*, the subject who was later arrested had left the scene of the accident before law enforcement arrived, and he went home.  At the scene, the officers began to investigate and learned that Fradella had been given a ride home.  The officers were told that he had smelled of alcohol.  They traveled to his residence, spoke to Fradella, observed his bloodshot eyes and slurred speech, and obtained an admission that he was driving.  The officers placed Fradella under arrest, and the court concluded that the arrest was lawful because the crime had been freshly committed.

As indicated, the arrest of Ariane McCree falls with the "freshly committed" exception. The Chester officers were on the scene immediately after the crime was committed and engaged in an investigation that determined that McCree had left the store with merchandise without

---

[9]     *See also*, *Reynolds v. State*, 130 Md.App. 304, 323 (1999) (recognizing that an arrest was lawful where subject's "admission amounted to commission of a misdemeanor in the presence of the officer").

paying.  This was verified by reference to security video footage, and McCree was identified from a still photograph taken from the security video as the subject.  He then returned to the scene shortly thereafter, at which time he admitted to taking merchandise without paying.  He offered to make payment prior to his arrest.  The totality of those facts and circumstances, which were known to the officers at the scene, demonstrated that the crime was freshly committed and allowed for a lawful arrest for a misdemeanor under state law.

Moreover, while McCree was detained in the Loss Prevention Office at the Wal-Mart after his arrest, it is undisputed that he physically assaulted the Defendant Harris and then fled from custody.  During his flight through the Wal-Mart parking lot, he committed additional offenses, including felonies under state law.  In *In re Jeremiah W.*, 361 S.C. 620, 606 S.E.2d 766 (2004), the South Carolina Supreme Court adopted the intervening-crime doctrine and cited favorably to the Fourth Circuit's decision in *United States v. Sprinkle*, 106 F.3d 813 (4th Cir. 1997), which is discussed at length above.  In *Jeremiah*, an off-duty police officer working security for an apartment complex arrested the suspect for breach of peace.  The Supreme Court concluded that the conduct did not constitute a breach of peace and ruled that the arrest was illegal.  However, after his arrest, while being transported to jail, the suspect made threats against the officer, saying he had a gun and was "going to come blow my 'f-ing head off."  606 S.E.2d at 768.  Citing to *Sprinkle*, the State Supreme Court ruled:  "While it is true the second offense would not have arisen but for the unlawful arrest for the first offense, … there is a strong policy reason for holding that a new and distinct crime, even if triggered by an unlawful arrest, is a sufficient intervening event to provide independent grounds for arrest."  *Id*.  The State Supreme Court ruled that probable cause existed for the subsequent charge of threatening a public official.

As discussed above, the same is true in the present case.  Under state law, there was probable cause for the Defendant Harris to pursue Ariane McCree after he fled from the Loss

Prevention Office and to attempt to apprehend him. Regardless of whether the initial arrest was unlawful as the Plaintiff alleges, under the rationale of *Jeremiah* and *Sprinkle*, there was probable cause to arrest and apprehend McCree for additional offenses, including felonies, arising from his assault on a police officer and his pointing and presenting a firearm toward Harris, Baker, and members of the public in his immediate vicinity after McCree retrieved his firearm from his vehicle.

For all of these reasons, the Defendant Harris is entitled to summary judgment on the Plaintiff's state law false arrest/false imprisonment cause of action.

### B.       Negligence/Gross Negligence Claim

In addition to the cause of action for false arrest or false imprisonment, the Plaintiff also alleges a claim for negligence or gross negligence which is premised on the same allegations of false arrest and excessive force addressed above. The Defendant Harris is entitled to summary judgment on this claim on several bases.

First, South Carolina jurisprudence does not allow for an intentional tort to be converted into a negligence claim. In a related context, the South Carolina Supreme Court has ruled that a defamation claim may not be converted into a negligence claim. Instead, any allegation that a statement is false or otherwise defamatory must be brought as a defamation cause of action. In *Erickson v. Jones Street Publishers, LLC*, 368 S.C. 444, 629 S.E.2d 653 (2006), the Supreme Court affirmed the Rule 12(b)(6) dismissal of a negligence claim that was based on the same factual allegations as a defamation claim. The Supreme Court explained that "[a] claim that a statement constitutes libel or slander must be brought in a defamation cause of action, which is grounded in and affected by both common law and constitutional law." 629 S.E.2d at 674. *See also*, *McGlothlin v. Henneley*, 370 F.Supp.3d 603, 620 (D.S.C. 2019) (citing *Erickson* in dismissing negligence claim

for defamation). The same is true in the case at bar. The Plaintiff cannot re-allege or convert her Fourth Amendment claim or her false arrest claim into a negligence or gross negligence cause of action. Thus, the Plaintiff's attempt to do just that should be dismissed consistent with what occurred in *Erickson*.

Second, and as a corollary of the foregoing point, under South Carolina law it is well settled that an unreasonable use of force is actionable as an intentional tort, specifically assault and battery. In *Moody v. Ferguson*, 732 F.Supp. 627 (D.S.C. 1989), this Court explained: "Although a law enforcement officer is privileged to use lawful force, he is nevertheless liable for assault if he uses force greater than is reasonably necessary under the circumstances." 732 F.Supp. at 632. Having found that "the force employed by the defendant in shooting at the plaintiff's car was unreasonable under the circumstances," this Court in *Moody* entered judgment in favor of the plaintiff on the state law assault claim. *Id. See also*, *Roberts v. City of Forest Acres*, 902 F.Supp. 662, 671 (1995) ("if a police officer uses excessive force, or 'force greater than is reasonably necessary under the circumstances,' he may be liable for assault or battery").[10]

Moreover, South Carolina law recognizes that intentional torts may not be committed in a negligent manner. In other words, negligence and battery are mutually exclusive; there is no such cause of action for a negligent assault and battery. *See*, *State Farm Fire & Cas. Co. v. Barrett*, 340 S.C. 1, 530 S.E.2d 132, 137 (Ct. App. 2000) (recognizing that "an intentional tort … by definition cannot be committed in a negligent manner"); *Restatement (Second) of Torts*, § 262, cmt. d ("The definition of negligence given in this Section includes only such conduct as

---

[10]    Under South Carolina law, a law enforcement officer has the legal right to use such force as is reasonably necessary to place the suspect under arrest and take him into custody. *See, State v. Weaver*, 265 S.C. 130, 217 S.E.2d 31, 34 (1975). *See also*, *Roberts v. City of Forest Acres*, 902 F.Supp. 662, 671-672 (D.S.C. 1995) ("[a] police officer who uses reasonable force in effectuating a lawful arrest is not liable for assault or battery"). Therefore, a law enforcement officer who uses reasonable force in effectuating a lawful arrest cannot be held liable for assault or battery.

creates liability for the reason that it involves a risk and not a certainty of invading the interest of another. It therefore excludes conduct which creates liability because of the actor's intention to invade a legally protected interest of the person injured or of a third person"). Thus, to the extent that the Plaintiff is bringing a state law tort claim for the unreasonable use of force, the cause of action is one for assault and battery – not for negligence or gross negligence. The Plaintiff, however, did not allege a state law claim for assault and battery against the Defendant Harris.

Third, a cause of action for "negligent arrest" is not recognized under South Carolina law. In *Gist v. Berkeley County Sheriff's Department*, 336 S.C. 611, 521 S.E.2d 163 (Ct. App. 1999), the South Carolina Court of Appeals held that "[f]alse imprisonment is an intentional tort; negligence is not an element." 521 S.E.2d at 167. Accordingly, the Court of Appeals concluded that "the gross negligence standard is not applicable" to claims for intentional torts. *Id*. Similarly, in *Wyatt v. Fowler*, 326 S.C. 97, 484 S.E.2d 590 (1997), the South Carolina Supreme Court ruled that a sheriff and his deputies were entitled to judgment as a matter of law on a negligence action arising out of the execution of an arrest warrant. The Supreme Court concluded that "the state does not owe its citizens a duty of care to proceed without error when it brings legal action against them." 484 S.E.2d at 592. The Supreme Court explained that "police owe a duty to the public at large and not to any individual." *Id*. Consequently, the *Gist* and *Wyatt* cases demonstrate that South Carolina does not recognize a cause of action for negligent arrest.

Fourth, as discussed above, there was probable cause for the arrest of Ariane McCree on numerous charges. The existence of probable cause would be a bar to a cause of action for negligent arrest, assuming such a cause of action exists under South Carolina law.

Fifth, S.C. Code Ann. § 15-78-60(6) provides for absolute immunity for the "method of

providing police protection."[11]  Thus, even if South Carolina were to recognize a cause of action for negligent arrest or the negligent use of force, which it does not, the manner by which a law enforcement officer conducts an investigation, effects an arrest, and the method of force used to take apprehend an armed suspect so as to protect the general public are immune functions.  In *Huggins v. Metts*, 371 S.C. 621, 640 S.E.2d 465 (Ct. App. 2006), the South Carolina Court of Appeals affirmed summary judgment for the Lexington County Sheriff based upon S.C. Code Ann. § 15-78-60(6) in a case where a suspect was shot by law enforcement.  The Court of Appeals explained that the Tort Claims Act "specifically exempts the Police from liability concerning the methods which they choose to utilize to provide police protection."  640 S.E.2d at 467. *See also*, *Jones v. Lott*, 379 S.C. 285, 665 S.E.2d 642 (Ct. App. 2008).  This case does fall within the scope of S.C. Code Ann. § 15-78-60(6) to the extent the Plaintiff alleges negligence for methods used to apprehend the suspect and to protect the public in the Wal-Mart parking lot whose safety was put in jeopardy by McCree's conduct.  Thus, the Defendant Harris enjoys absolute immunity for the methods used by the officers to apprehend McCree.

For each of these reasons, the Defendant Harris is entitled to summary judgment on the negligence and gross negligence claim.[12]

---

[11]      In *Wells v. City of Lynchburg*, 331 S.C. 296, 501 S.E.2d 746 (Ct. App. 1998), the South Carolina Court of Appeals noted the omission of the word "or" as a scrivener's error and explained that S.C. Code Ann. § 15-78-60(6) provides immunity for "the failure to provide [or] the method of providing police or fire protection."

[12]      The Defendant Harris reserves the right to move for dismissal, if necessary at a later stage of the ligation, based on the employee immunity defense under the Tort Claims Act, including S.C. Code Ann. § 15-78-70(a).  The Defendant Harris recognizes at this stage that the issue may not be ripe for adjudication because it requires a determination as to whether Harris was employed by and/or acting on behalf of the City of Chester, Wal-Mart, or both, on November 23, 2019.

### C.    Wrongful Death Claim

The Plaintiff alleged a separate cause of action for wrongful death under the South Carolina wrongful death statute. The wrongful death claim incorporates the Plaintiff's prior allegations of negligence and gross negligence. *See*, Amended Complaint, ¶¶ 100-101. (Dkt. #41). The Defendant Harris, however, offers an additional defense based on the absence of evidence of proximate cause. Specifically, the Plaintiff alleges that the fatal shot was fired by the Defendant Baker. That is demonstrated by the body cam footage from Officer Baker. When Baker began firing at McCree, the Defendant Harris was out of ammunition and had stopped firing. The fatal shot was not fired by Harris. Instead, the Plaintiff's pathology expert opines that the shots from Harris caused the non-fatal wounds to the right arm and left hip. *See*, Collins Depo., p. 63. There is no evidence that those wounds were fatal, i.e., resulted in death. *See*, *Lopez v. City of Los Angeles*, 196 Cal. App. 4th 675, 126 Cal. Rptr. 3d 706 (2011) ("It was undisputed Gallegos, Perez, or Sanchez fired the fatal shot. Therefore, appellant cannot establish negligence or wrongful death based on O'Sullivan's shot"); *Shannon v. County of Sacramento*, 2018 WL 3861604, *9 (E.D. Cal. 2018) ("Here, the only shots relevant to this claim are the second set of fatal shots. Jones' initial shot, although potentially unreasonable, did not cause Mr. Shannon's death and so cannot be the basis for his wrongful death claim"). For this reason, the Defendant Harris' conduct did not proximately cause the death of Ariane McCree, and he cannot be liable for the alleged wrongful death.[13]

---

[13]    This proximate cause defense is also applicable to the § 1983 claim for excessive force. The Defendant Harris cannot be held liable for the death of Ariane McCree under either state or federal theories of liability.

## CONCLUSION

Based on the foregoing discussion and analysis, the Defendant Nicholas A. Harris respectfully requests that the Court grant his motion for summary judgment and dismiss the Plaintiff's Amended Complaint with prejudice.

Respectfully submitted,

LINDEMANN & DAVIS, P.A.


BY:   _s/ Andrew F. Lindemann_
    ANDREW F. LINDEMANN    #5070
    5 Calendar Court, Suite 202
    Post Office Box 6923
    Columbia, South Carolina 29260
    (803) 881-8920
    Email: andrew@ldlawsc.com

    RICHARD J. DOLCE    #575
    Post Office Box 4403
    Irmo, South Carolina 29063
    (803) 772-7411
    Email: rjdolce@sc.rr.com

    *Counsel for Defendant Nicholas A. Harris*

April 25, 2022