**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA**

**ROCK HILL DIVISION**

| | |
|---|---|
| VICKIE J. MCCREE, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF ARIANE MCCREE. | ) Civil Action No.: 0:20-cv-00867-JMC-PJG |
| | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CITY OF CHESTER; NICHOLAS A. HARRIS, in his individual capacity; JUSTIN M. BAKER, in his individual capacity; WALMART INC.; and WAL-MART STORES EAST, L.P., | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF'S CONSOLIDATED MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………………...1

STATEMENT OF FACTS……………………………………………………………………..2

    A. McCree's Early Morning Visit to Walmart………………………………………………..3

    B. McCree Returns to Walmart and Tries to Pay for the Lockset……………………………6

    C. Inside the Walmart Loss Prevention Room……………………………………………….8

    D. Harris Chases Handcuffed McCree Through the Walmart Parking Lot…………….……9

    E. Defendant Baker Orders McCree to Put His Hands Up, Then Shoots Him……….…..10

    F. Minutes After the Shooting, Defendant Baker Falsely Claims He Saw
        McCree Shooting…………………………………………………………………...11

    G. Defendant Nicholas Harris………………………………………...……………..14

    H. SLED Could Not Rule Out Harris's DNA On the Gun Found Next
        to McCree……………………………………………………………..…………15

    I. Lavar Richardson………………………………………………………………..18

    J. Walmart Hired Harris, Richardson, and Williams-Tobias as
        Private Security Guards…………………………………………………………….20

    K. Walmart's Shoplifting Policies Are Not Followed by Walmart Security………………..23

    L. Walmart Made the Decision to Arrest McCree, Not Law Enforcement…………………24

PROCEDURAL HISTORY………………………………………………………………..27

    A. Civil Litigation………………………………………………………………..27

    B. Criminal Investigation…………………………………………………...…………27

LEGAL STANDARD……………………………………………………………………27

ARGUMENT…………………………………………………………………….…29

    I.    THERE IS A GENUINE DISPUTE OF FACT WHETHER IT WAS OBJECTIVELY
        REASONABLE FOR HARRIS AND BAKER TO SHOOT HANDCUFFED

MCCREE IN THE WALMART PARKING LOT………..………………………………..29

    A.  Harris's Self-Serving Testimony and Selective Memory Impairments Raise Serious Credibility Issues for the Jury to Resolve at Trial……………...…....…30

    B.  Evidence from the Gun Shot Wounds and Shell Casings Suggest McCree was Shot Before Harris Claims He Had a Weapon…………………………………38

    C.  Baker's Changing Narrative of His Shooting McCree Raise Serious Credibility Issues for the Jury to Resolve at Trial………..………39

    D.  Witness Affidavits Do Not Justify Harris and Baker's Use of Deadly Force…………………………………………………….…..50

    E.  Williams-Tobias's Testimony Does Not Justify Harris and Baker's Use of Force………………………………………………….53

    F.  McCree Had the Lawful Right to Resist His Unlawful Arrest…………………54

    G.  Harris and Baker Each Face Bystander Liability………………………………56

    H.  Plaintiff's Fourth Amendment False Arrest Claims Made Pursuant To 42 U.S.C. § 1983 Survive Summary Judgment Because Defendants Lacked Probable Cause To Arrest…………………………………………………………57

III.   THERE ARE GENUINE AND MATERIAL FACTUAL DISPUTES AS TO WALMART'S LIABILITY AS A STATE ACTOR AND FOR IT'S CONDUCT GIVING RISE TO PLAINTIFF'S STATE LAW CLAIMS……………………………………..59

    A.  Walmart Is Subject to § 1983 Liability…………………………………………59

    B.  Walmart Is Liable for the Acts of Its Private Security Guards…………………62

    C.  Walmart Is Liable for Negligence……………………………………………64

    D.  Walmart Is Liable for False Arrest…………………………………………67

    E.  Plaintiff Is Entitled to Recover Punitive Damages From Walmart………………69

IV.   PLAINTIFF'S STATE LAW CLAIMS SURVIVE SUMMARY JUDGMENT………..71

    A.  The Immunities Provided Within the SCTCA are Inapplicable and Do Not Afford Protection to Defendants Harris, Baker, or the City of Chester…………………71

    B.  Plaintiff's State Law False Arrest Claims Survive Summary Judgment Because there is a Genuine and Material Dispute as to Probable Cause…………76

    C.    Plaintiff's State Law False Arrest Claim Survives Summary Judgment Because, the Alleged Misdemeanor Arrest Was in Violation of South Carolina Statutory Limits on the Power to Arrest…………………………………………………………..81

    D.    Plaintiff's Claims for Negligent Hiring, Supervision, And Training Survive Summary Judgment Because there Exists a Genuine Dispute of Material Fact………………………………………………………………….84

    E.    Plaintiff's derivative wrongful death claim survives summary judgment based on the factual disputes precluding summary judgment as to Plaintiff's other state law claims……………………………………………………………………………86

**V.**       **QUALIFIED IMMUNITY DOES NOT SHIELD DEFENDANTS HARRIS AND BAKER FROM LIABILITY**…………………………………………………………...89

    A.    Harris and Baker's Use of Deadly Force was Objectively Unreasonable……...90

    B.    McCree's Fourth Amendment Rights to be Free from Unlawful Seizure and Unreasonable Force Were Clearly Established…………………………….94

    C.    Qualified Immunity Does Not Shield Harris's Actions as a Private Walmart Security Guard…………………………………………………………………...95

    D.    Qualified Immunity Is Inconsistent with the Text and History of Section 1983………………………………...……………………………………97

**CONCLUSION**…………………………………………………………………………………100

Plaintiff Vicki J. McCree, as Personal Representative of the Estate of Ariane McCree, respectfully submits her consolidated memorandum in opposition to the motions for summary judgment filed by Defendants Justin Baker (ECF No. 139); Walmart, Inc. and Wal-Mart Stores East, L.P. (collectively "Walmart") (ECF No. 140); City of Chester (ECF No. 143); and Nicholas Harris (ECF No. 144).[1]  For the reasons set forth below, Defendants' motions should be denied in their entirety and this case should proceed to trial.

## **INTRODUCTION**

What began as a simple mistake or misunderstanding in the Walmart checkout line on a Saturday morning could have been reasonably resolved by accepting Ariane McCree's effort to rectify the misunderstanding by returning to the store make payment.  Instead, it ended in the customer's tragic shooting death.  Twenty-nine bullets were fired at 28-year-old Ariane McCree while he was handcuffed with his arms behind his back.   McCree, a father of a three-year old boy,[2] was shot a total of three times.  He died within an hour of returning to pay for the $45 combination door lock he was alleged to have shoplifted, leaving many to question how such a minor misunderstanding over payment for a low dollar item could result in a horrific loss of life.

This action seeks to provide answers.  Discovery in this case is complete, and there is overwhelming evidence establishing Defendants' liability.  The inferences from the facts are just as powerful.  There is abundant evidence for a jury to conclude that McCree's experience in the checkout line was the result of a cashier error rather than shoplifting.  That a handcuffed McCree

---

[1] As discussed during the April 29, 2022 telephonic hearing, because liability against all Defendants arises from the same common set of facts, Plaintiff is submitting a single, consolidated memorandum in opposition to the four motions for summary judgments to address all arguments within the combined page limits provided under Local Civil Rule 7.05(B).

[2] *See* Ex. 1

never pointed a weapon at Defendants Nicholas Harris or Justin Baker in the Walmart parking lot, and never posed a threat to the safety of anyone there. Indeed, contrary to what Defendants maintain in their supporting memoranda, there is *no sign of a gun* appearing in McCree's hands in the video footage from two cameras that captured the shooting of McCree by Baker. Rather, as Defendant Harris told Baker minutes later, a gun was "in his ass."

What is clear, however, is that under no circumstance should McCree have been shot to death over a non-violent, misdemeanor offense he did not even commit. Under any fair review of the facts, there was never any justification for the use of deadly force and to the extent Defendants argue otherwise, their efforts merely establish a genuine dispute of material fact on the key issues. Summary judgment in these circumstances is as improper as Defendants' motions are futile. The only way to resolve these critical material issues, and to provide justice to the McCree family, is to allow Plaintiff's claims to proceed to trial. For these reasons, and the reasons detailed below, Defendants' motions for summary judgment should be denied in their entirety.

## STATEMENT OF FACTS

At 11:34 a.m. on Saturday, November 23, 2019, Ariane Lamont McCree ("McCree") was gunned down by Defendants Harris and Baker in a Walmart parking lot in Chester, South Carolina, while his hands were cuffed behind his back. He died an hour later at the local hospital. So many bullets were fired at McCree by Harris and Baker that the South Carolina Law Enforcement Division ("SLED") could not determine the total amount but estimated the pair fired a combined 29 rounds in the busy parking lot based on the shell casings found in the lot. (Ex. 2, SLED Report at 34-35.) Three of those bullets hit McCree—one on the back of his right arm, one on the back side of his left hip, and one in his upper right chest. (Ex. 3, Autopsy Report). The other bullets

riddled other shoppers' cars or traveled across the busy J.A. Cochran Bypass, including one car that was reportedly struck by eight bullets.[3]

Defendants' motions for summary judgment offer a highly truncated version of the facts—often without any citation to the record and other times by reference to inadmissible evidence. As set forth below, however, there are numerous disputes of material fact arising at virtually every step that preclude summary judgment on any of Plaintiff's claims. These disputes of material fact arise at every point of the timeline from the moment McCree first arrived at the Walmart store on November 23, 2019, until after he was shot and killed.

### A. McCree's Early Morning Visit to Walmart

Earlier that morning, around 8:45 a.m., McCree arrived at the Walmart store to purchase a combination doorknob and door lock set. McCree and his brother Michael had planned to help their grandfather, who was hospitalized, run his junk hauling business later that day. (Ex. 5, M. McCree, Jr. Tr. 80:14 – 81:1, 83:8 – 84:13.) When McCree arrived at Walmart, store surveillance video shows him greeting friends and hugging a Walmart employee. (Ex. 6, Att 95, Cust Srvs Overview, at 1:05). McCree was no stranger to Walmart. His grandmother worked for Walmart for 25 years—at the former Chester store and at the newer store where the events in this case took place. As a boy, he would visit her at the store and sit and have lunch with her. As he grew older, he would drive himself to the store to visit and eat lunch with her at work. (Ex. 7, V. McCree Tr. 117:20 – 120:6.)

---

[3]   *See* Ex. 4 at 15-16; *see also* Brandon Smith, FOX 46 CHARLOTTE, *Man's car riddled with bullets during deadly police shooting at Chester Walmart*, Nov. 25, 2019, *available at* https://www.fox46.com/news/mans-car-riddled-with-bullets-during-deadly-police-shooting-at-chester-walmart/

According to a Walmart employee, McCree "came in smiling and speaking and asking where were the locks for a home door. He was pointed in the direction and then he said thank you." (Ex. 8.) Store video shows McCree browsing the aisles, talking with a Walmart employee stocking some shelves, and then following that employee to another part of the store—ostensibly to find what he was shopping for. (Ex. 9.) A few minutes later, McCree brought a Brinks door lock set to the front cash registers and stood in line in lane number five. (Ex. 10.) When it was his turn, he placed the door lock set on the conveyor belt. (*Id.*) The Walmart cashier, Joshua Stevenson, immediately picked up the lock set from the belt and scanned it. After scanning it, McCree and Stevenson exchanged pleasantries. (Ex. 11.) It is disputed what, if anything, was said next. According to Stevenson, McCree told him words to the effect of "put it on my tab." (Ex. 12, Stevenson Tr. 33:2-6.) According to Evelyn McManus, Walmart's Loss Prevention Manager, McCree told Stevenson he was going to the bank. (Ex. 13.) Whatever words were spoken, surveillance video shows Stevenson not collecting money from McCree but instead pushing a button on his cash register, bagging the lock set, and then handing it back to McCree. (*Id.*) Stevenson told Richardson he handed the bag to McCree "out of habit." (Ex. 14.) McCree then walked towards the front entrance of the store to leave.

Stevenson initially claimed in his deposition that he tried to "come up to [McCree] and I say, hey, man, you – you forgot to pay for your stuff," but then admitted that "I didn't actually walk up to him." (Ex. 12, Stevenson Tr. 33:7-19.) The store surveillance video does not depict Stevenson approaching McCree at all; rather, it shows Stevenson standing in place at the register gesturing to McCree who at that time was *facing away* from Stevenson and walking towards the exit. (Ex. 10.) Additional video from the Walmart exit does not show Stevenson or any other Walmart employee approaching or speaking to McCree, despite Stevenson's claim that his cash

4

register was located just five to seven feet away from the exit. (Ex. 15; Ex. 12, Stevenson Tr. 38:8-11, 39:2-6). Indeed, no one from Walmart, such as a door greeter, stopped McCree as he was leaving. No one approached him and said, "excuse me sir, we forgot to ring up your purchase" or "there has been a mistake." Rather, store surveillance video shows McCree walking out of the store alongside other shoppers, including an older man and a woman with a child in her cart, all proceeding normally and none reacting to anyone calling out. (Ex. 16 at 8:58:47; *see also* Ex. 17.) Had Stevenson called out to McCree as he claimed or had any other Walmart employee called out to him, there would have been some reaction from anyone present in the immediate vicinity, such as a head turn. But there was none.

It is not known why no money changed hands between McCree and Stevenson or why Stevenson bagged the door lock set and handed it to McCree without first collecting payment. Perhaps McCree was still tired after having woken up very early that morning and simply forgot to swipe his credit card before leaving the register. Or perhaps, like Stevenson handing the bag to McCree "out of habit," McCree took the bag out of habit believing the transaction was over. Or perhaps, as Stevenson has claimed, McCree asked to put the item on a tab, Stevenson hit a button on his register to void the sale, and then handed the item to McCree on the promise that he return later to pay for it, which is a reasonable inference given that, according to Walmart's Loss Prevention Manager, Evelyn McManus, McCree told Stevenson that "he was going to the bank." (Ex. 13.)

What is known and undisputed is that Stevenson ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5

**B.  McCree Returns to Walmart and Tries to Pay for the Lockset**

McCree returned to Walmart around 11:00 a.m. and offered to pay for the $45 door lock set.  Walmart surveillance video shows Ariane just after he arrived at the store walking in the parking lot towards the front entrance of the store before briefly returning to his car as he calls out and waives hello to a Walmart employee.  (Ex. 20 at 1:40.)  Once inside, he ran into Makeesharia Williams-Tobias, who a private security guard for Walmart and an off-duty Chester Police Department officer.  Williams-Tobias testified that she knew McCree and his family well— McCree's nephews attended the same day care as Williams-Tobias's children and she testified that McCree would wash her and her husband's cars on Saturdays.  (Ex. 21, Williams-Tobias Tr. 54:01-

13, 173:19 – 174:03; *see also* Ex. 22.) Video shows McCree and Williams-Tobias walking together through the Walmart store and, at one point, Williams-Tobias stopped to hug another shopper as McCree stood beside her. (Ex. 23 at 11:17:33; *see also* Ex. 24 11:16:56).

Before McCree had returned to the store, Williams-Tobias had been approached by Lavar Richardson, who was another private Walmart security guard but unlike Harris and Williams-Tobias, he was not a Class I law enforcement officer but an evidence technician. (Ex. 94). Richardson told Williams-Tobias "about a guy that had come in Walmart, made a purchase, and told the cashier to, 'put it on his tab.'" (Ex. 25 at 2.) Williams-Tobias was provided a photo, which she recognized as McCree, and told them his name. (Ex. 21, Tr. 53:11 – 54:04.)

According to Williams-Tobias, when she ran into Ariane in the front of the store, he told her he was going to pay for the door lock set. (Ex. 21, Tr. 55:24 – 56:18.) She testified that "he had cash money in his hand." (Ex. 21, Tr. 59:07-08; *id.* 55:24 – 56:08.) In fact, there is no dispute that McCree returned to the store with $45.27 in his pocket. (Ex. 26 at 2.) Williams-Tobias testified that she got on the store security walkie-talkie she was issued at the beginning of her shift and asked either Walmart's store manager Ann Curtsinger or loss prevention manager, Evelyn McManus, if they would let him pay for it. The response she received was an unequivocal "no." (Ex. 21, Tr. 59:03-12; *see also* 44:21 – 45:02).) Williams-Tobias testified that she believed McCree's offer to pay for the lock set was reasonable, (Ex. 21, Tr. 59:17 – 60:03), but at that moment, Walmart security guard Lavar Richardson placed McCree in handcuffs and arrested him. No one told McCree was he was under arrest. (*Id.* 41:09 – 42:05; 68:19 – 69:03; Ex. 27.) Further, neither Richardson, nor Williams-Tobias, nor Defendant Harris *Mirandized* McCree or otherwise informed him of any of his legal rights. (Ex. 27, Richardson Tr. 86:14 – 87:4.) But McCree was cooperative at this time. (Ex. 28, Harris Tr. 204:16 – 205:01; *see also* Ex. 29.) Harris claimed

7

that McCree was restrained in handcuffs because "he had a thousand yard stare, he was looking out for the outside exits, he was sizing up everybody, he was flexing and loosening his muscles," and giving "indicators that people do when they're about to cause harm to somebody." (Ex. 28, Harris Tr. 205:02 – 206:23.). Yet video evidence of the interaction Harris described shows none of this. (Ex. 29.) Rather, the video shows McCree acting normally and cooperative, not giving "a thousand yard stare" or any other indicator that Harris described. And it shows Harris with his hands in his pockets, alternatively staring down at the floor aimlessly or looking away from McCree, all the while several customers, including children, are walking next to them without any effort by Harris or Richardson to keep them away from McCree. (Ex. 29.) Richardson told SLED investigators, "Mr. McCree was compliant with everything he was asked and advised of while I was present." (Ex. 30 at 8.) McCree was then taken inside Walmart's loss prevention room. (Ex. 31 at 11:24:04.)

### C. Inside the Walmart Loss Prevention Room

Once inside the loss prevention room, Richardson and Defendant Harris searched McCree for weapons and emptied his pockets. (*Id.*; *see also* Ex. 32; Ex. 28, Harris Tr. 212:09 – 213:09; 307:3-15.) Richardson then left the room to speak with Walmart's loss prevention manager, Ms. McManus, to "to let her know that he was here" and to "find out what she wanted to do" with McCree, (Ex. 27, Richardson Tr. 107:03-10; 109:02-07) and "to tell [her] to come take [McCree's] picture and put him in the system," (Ex. 33 at 11:50:53). Richardson was referring to having McCree notified that he was being trespassed from the store. (Ex. 27, Richardson Tr. 107:11 – 108:23.) This is reflected in the Chester County dispatch calls. (Ex. 34.)

McCree likely understood he was being held unlawfully inside the store and against his will. Defendant Harris claims he told McCree that he was going to be transported to jail. (Ex. 28,

8

Harris Tr. 198:03-21.)   Surveillance video shows Harris looking up directly into the surveillance camera before turning back to McCree.  (Ex. 35.)  While there is no audio recording of what was then said to McCree by Defendant Harris, McCree was not naïve to the potential for unprovoked police violence as he had been hit in the head with a gun by a white police officer while attending a local Chester football game just one year prior.  (Ex. 36, K. Davis Tr. 62:8 – 66:19.)  McCree then ran out of the security room towards the safety of the busy Walmart parking lot.  (Ex. 37.)  Being handcuffed, McCree had nowhere to go and no opportunity to leave the store premises other than on foot.  Yet Defendant Harris quickly gave chase.

### D.  Harris Chases Handcuffed McCree Through the Walmart Parking Lot

What exactly transpired in the parking lot between Defendant Harris and McCree is highly disputed.  Defendant Harris, who had been repeatedly disciplined for failing to use his bodycam, again failed to do so that morning and was again disciplined for it.  (Ex. 28, Harris Tr. 280:09 – 281:05; Ex. 38.)  Defendant Harris admitted that McCree was running away from him.  (Ex. 28, Harris Tr. 222:03-07; 244:14 - 245:13.)  Walmart's surveillance video of the parking lot confirms this.  Harris, claimed, however, that after giving chase, McCree allegedly stopped, turned, and ran back to Harris and headbutted him. According to Harris, they separated again but McCree allegedly ran towards Harris and headbutted him again—an act that requires the person doing it to hold another person firmly in place while striking their head with their own.  Yet, surveillance videos from Walmart contradict Harris's claim.  The videos show Harris twice catching up to McCree momentarily and McCree continuing to run *away from Harris*.  (Ex. 39; Ex. 40 at 11:32:01).  None of the surveillance videos of the parking lot corroborate Harris's headbutting claims; rather, the videos show McCree running past Harris to get away from him.  (*Id.*; *see also* Ex. 41.)  Baker's dashboard camera recorded while he was driving through the Walmart parking lot likewise does

9

not show any of alleged headbutting and does not corroborate any of Harris's other claims. (Exs. 42, 43, and 44.)

Defendant Harris subsequently opened fire on McCree. After his first round of shooting, Harris said McCree fell to the ground. (Ex. 28, Harris Tr. 264:18 – 265:09; Ex. 45 at 3-4.) Harris said a nearby Walmart customer then told him that he was "keeping an eye on [McCree]" for him and subsequently alerted Harris that McCree was getting up. (Ex. 28, Harris Tr. 265:10-20; Ex. 45 at 3-4.) SLED later sent photographs to Harris, through his criminal defense attorney, to identify this customer. (Ex. 46, Ex. 47.) Harris confirmed it was Jeffrey Wallace. (*Id.*) SLED subsequently interviewed Wallace about Harris's claim, but he denied it. (Ex. 48.) Wallace submitted an affidavit in this case, but it too omits any mention of speaking to Harris and telling him McCree was getting up. (ECF No. 143-9.)

In total, Harris fired his gun at McCree approximately 16 times (Ex. 2 at 34-35) during which he called out on his police-issued radio "Shots fired! Shots fired" (Ex. 27, Richardson Tr. 117:02-07; Ex. 34.) Harris, of course, was the only one shooting and McCree never fired a gun. (Ex. 28, Harris Tr. 264:15-17.)

### E. Defendant Baker Orders McCree to Put His Hands Up, Then Shoots Him

Defendant Baker was traveling to the Walmart store to pick up McCree and to transport him to jail when he received a call on his police radio indicating that McCree ran away from Walmart. (Ex. 50 at 2.) When Baker arrived at the Walmart store, he circled the perimeter of the parking lot, and eventually pulled up to the front of the store and exited his car. (Ex. 51, Baker Tr. 264:25-265:15; Ex. 43.) After exiting with his gun drawn, he saw McCree, who was visibly injured and struggling to walk. (Ex. 33, Baker Bodycam; Ex. 54.) While Baker did not activate his police body worn camera until *after* he shot McCree, his vehicle dashboard camera was recording. Audio

10

from the dashboard camera recorded six gunshots fired by Harris over the course of two seconds. (Ex. 44, Dashcam at 00:10 to 00:12).   Less than thirty seconds later, Baker's called out an order to McCree: "Put your hands up!"  (Ex. 44, Dashcam 3 at 0:38; Ex. 51, Baker Tr. 194:23 – 195:01.) Less than one second after ordering handcuffed McCree to put his hands up, Baker opened fire 13 times.  (*Id.*)  McCree fell to the ground.  (Ex. 33, Baker bodycam.) Three of the at least twenty-nine bullets collectively fired at McCree by Harris and Baker struck him.  He was pronounced dead an hour later at the hospital.

Baker claims that he shot McCree allegedly because he was holding a gun in his right hand and pointing it at him.  Although Baker did not activate his body worn camera until after he shot McCree, the camera was programmed with a pre-record function that captured video, but no audio, of the two-minute period prior to Baker activating it, including his shooting of McCree.  (Ex. 33.) Neither Baker's bodycam nor any other footage shows McCree holding a gun.  And Baker was unable to identify any weapon in McCree's hand in the bodycam video.  (Ex. 51, Baker Tr. 165:13 – 174:10.)

### F.  <u>Minutes After the Shooting, Defendant Baker Falsely Claims He Saw McCree Shooting</u>

Baker's bodycam continued running for 45 minutes after the shooting.  The video captures a number of conversations and telephone calls that took place in the parking lot, including audio of Baker, Harris, and Richardson in the minutes after the shooting discussing what had just transpired.  These conversations took place just a few feet away from McCree as he laid on the pavement while EMS provided life support.

In the first 15 seconds of the bodycam audio, Harris tells Baker: "Check him real good— he had that gun in his ass"—a blatant admission by Harris that the gun found next to McCree was not in his hands pointing or threatening anyone, but "in his ass."  (Ex. 33, Baker Bodycam at

11

11:36:53.)  If the gun found next to McCree was "in his ass," then the shooting of McCree by Harris and Baker could never be justified—civilly or criminally.

Baker's body cam video recorded the time McCree fell to the ground as 11:34:42 a.m. Eight minutes later, Defendant Harris appears in the video and tells Baker, "Me and you both got him." (*Id.* at 11:42:48.)  Three minutes after that, Harris asked Baker to "come over here and chill out, and then pulled out his phone and asked Baker if he had access to a PBA lawyer.  (*Id.* at 11:45:38.)  One minute after Harris asked Baker if he had a lawyer, Baker took a phone call from Chester Police Captain Travis Moore.  Baker told Capt. Moore, "We just had an officer-involved shooting.  Walmart.  Juicy [Lavar Richardson] locked someone up for shoplifting.  He pulled a gun and starting shooting at people.  I got here he was walking towards me with a gun so I shot him." (*Id.* at 11:46:54.)

Regarding the gun found next to McCree, Richardson told Baker, "I don't think he had it on him." (*Id.* 11:49:04.)  Baker then said, "I think he was just ducking between the cars firing at Nick." (*Id.* at 11:49:10.)  Minutes later, Richardson took a telephone call from a Chester police department captain, telling him: "Yes, yes, he was firing at us!  He was shooting at us, Captain!" (*Id.* at 11:50:24.)

Baker's bodycam also shows Richardson gesturing at his own body worn camera and remarking to Baker, "I guess I got to put my camera on." (Ex. 33, at 11:55:00.) Richardson is then seen activating his camera. (*Id.*) The footage from Richardson's camera, however, which would have captured all the conversations Richardson had with Baker, Harris, and others in the parking lot and on the telephone after it was activated, was never located.[4]  (Ex. 2, SLED Report at 26.)

---

[4]    The dearth of bodycam video in this case became the subject of an NBC News *Today Show* investigation.  Eric Piza, a professor at the John Jay College of Criminal Justice in New York, reviewed the body camera video of Ariane's shooting for NBC News and said the following:

These statements were, of course, false. SLED concluded there was no forensic evidence to substantiate any claim that McCree was firing a gun—the gun found next to his body was fully loaded and no shell casings or bullets were found anywhere in the area. (*Id.*, SLED Report at 34-35, 41.) SLED attempted to interview Harris, Baker, and Richardson on the day of the shooting, but in the hours afterward they each retained the same attorney and refused to speak to SLED for days. When it became clear their initial claims that McCree was firing a gun would not hold up, Baker and Richardson changed their stories and admitted they never saw McCree firing a gun. (Ex. 51, Baker Tr. 192:11-15; Ex. 27, Richardson Tr. 91:20-24.) Richardson claimed he had no recollection of telling anyone that McCree had fired a gun. (Ex. 27, Richardson Tr. 91:25 – 92:20.)

After interviewing Baker, Richardson, and Harris, SLED's lead investigator noted the material inconsistencies in their statements. (Ex. 2, SLED Report at 23 ("Agent's note: [Baker's] statement regarding McCree shooting at people was contradictory to the statement Sgt. Baker gave during his interview where he stated that he did not know if McCree fired his firearm."), *id.* at 24 (regarding Baker's statement that he saw McCree "ducking between the cars firing at Nick" statement, SLED wrote: "This contradicted Sgt. Baker's statement where he said he did not know if McCree fired."), *id.* (regarding Baker's statement, "I think he was firing at Nick," SLED wrote: "This contradicted Sgt. Baker's statement where he said he did not know if McCree fired."), *id.*

---

"What stood out to me first and foremost was actually how little I learned about the situation from watching the video," and "We don't hear any of the police officer orders or we have no idea if he was ordered to stop and if he was ordered to drop his gun. We have no idea if the officer even saw a gun," he added. "All of these things are missing in our review of this incident." *See* David Paredes & Vicky Nguyen, *"Police fired 24 shots at a handcuffed man. Why didn't they turn on their body cameras?"* NBC NEWS TODAY SHOW (May 2, 2021), https://www.nbcnews.com/news/us-news/police-fired-24-shots-handcuffed-man-why-didn-t-they-n1264887

(regarding Richardson's statement to Capt. Moore that McCree "was firing at us!" SLED wrote: "This contradicted Ofc. Richardson's statement that he did not observe McCree fire his firearm.").

### G. Defendant Nicholas Harris

Defendant Harris has a history of violence and insubordination. As a teenager, he was arrested and charged with criminal domestic violence for assaulting his stepfather and was convicted of a firearms offense. (Ex. 28, Harris Tr. 108:05 – 112:15.) Following high school, he enlisted in the Army but was discharged after only a few months for "entry level performance and conduct" issues. (Ex. 55.) He was hired by the Chester Police Department, but was subsequently fired by then Chester Chief of Police Andre T. Williams in September 2013 for "behavioral problems," including what the police chief characterized as a problem with "authority" and a record of citizens complaining of disrespectful treatment by him and other disciplinary issues. (See Ex. 56, Chester 0743-0207 ("I believe it is the best interest of The Chester Police Department and The City of Chester to sever all ties with Sgt. Nicholas Harris and to terminated him."); see also Ex. 56, Chester 0743-0247, 0743-0252 to 0253, 0743-0217 – 18.) Harris, a white male, claimed his termination was due to reverse racism by the African-American chief of police. (Ex. 28, Harris Tr. 43:11—50:16 ("Q: And when you say they didn't do anything wrong, who are you referring to? A: The white people on the scene at the time."), *see also id*. 62:11 – 72:11.) Harris was then hired by the Clover, South Carolina police department, but later resigned after receiving multiple written warnings and counseling for failing to follow departmental policies. (Ex. 55, Clover pp 56-58.) He had been disciplined repeatedly for failing to use his police bodycam and dash camera when interacting with the public, including during a late night encounter with a young woman who was alone in a parking lot and crying in her car and got into her car while on duty, and an occasion when he "intentionally turned his video and audio recording off during a prisoner

14

transport." (Id.)  Harris was rehired by the Chester Police Department in May 2017.  (Ex. 57, SCCJA pp. 5.)

### H.  SLED Could Not Rule Out Harris's DNA On the Gun Found Next to McCree

When McCree was gunned down by Defendant Baker, bodycam footage shows Baker pulling a Taurus 9mm pistol from underneath McCree's body, with Baker grabbing it by his hand. Where this gun came from is hotly disputed.  The City of Chester offered an affidavit from a witness who claimed to see a black male enter a car and retrieve a gun, but as discussed *infra* the affidavit lacks sufficient detail to link that person to McCree—including that the obvious defect that the witness did not describe the black male entering and exiting the car as having his hands cuffed behind his back.

In its motion, Defendant City of Chester represented that "[i]t is undisputed that the gun was registered to Ariane McCree."  (City of Chester MSJ, ECF No. 143-1 at 5.)  This is not true. Not only is there no gun registry in South Carolina, but the Firearms Trace Summary provided by the ATF dated December 11, 2019 shows that the gun was traced to its purchaser, Mr. Chad Alley. (Ex. 58.).  SLED interviewed Mr. Alley and asked him if he sold a gun to an African-American man.  Mr. Alley responded, "Oh no, I've never dealt with a black man on a gun.  No sir."  (Ex. 59, Alley recorded interview at 3:15).  SLED then contacted a pawn shop in Rock Hill and an employee there provided a statement that the gun was put on layaway by McCree in April 2016, then picked up in May 2016.

Yet, McCree's former college girlfriend and the mother of his child, testified that McCree was working in Jackson, Mississippi in April 2016, which was the same month she graduated from their alma matter, Jackson State University, and the following month they moved together to Memphis, Tennessee and lived in an apartment while she was pregnant with their son.  (Ex. 36, K.

Davis Tr. 26:18 – 27:13.) They lived there together for two years until 2018. (*Id.* 30:7-16.) In her deposition, Ms. Davis was asked whether McCree owned a gun while they lived together. She described an incident occurring in Memphis two years later while they were living together. Ms. Davis testified that it was her normal practice to call McCree when she arrived home at their apartment complex so he could escort her inside for safety reasons. One evening, she called to let him know she had arrived but at the time he was giving their son a bath. Because their son was still wet from his bath and Ms. Davis did not want him to catch a chill, she told McCree she would come inside on her own. But as she exited her car, she was mugged. She testified that McCree purchased a gun "a couple of weeks after that" to protect her and her son and that to her knowledge the gun he purchased in 2018 was the only gun he owned. (*Id.* 67:7 – 70:20.)

Ms. Davis's testimony establishes (1) that in April and May 2016, McCree was living 600 miles away from the pawn shop in Rock Hill that told police it sold him the gun, and (2) McCree did not own a firearm until after her mugging in 2018. While it may be possible that McCree drove the 600 miles from Jackson or Memphis to Rock Hill, South Carolina to purchase a gun but not take it home in the two years they lived together in Memphis, her testimony raises the strong inference that McCree never owned a firearm until after her mugging in 2018.

One month after Defendant Harris's termination from the Chester Police Department, Chester Police Chief Andrė T. Williams sent a letter to SLED Chief Mark Keel requesting assistance "to do an investigation pertaining to a city employee and a former Law Enforcement Officer. . . . involving a stolen gun with a former employee." (Ex. 56 at 5, Chester 0743-0224.) The letter was placed in Defendant Harris's personnel file after his termination with the handwritten notation "Nick Harris" on its face. (*Id.*)

16

As part of SLED's investigation of the November 23, 2019 shooting of McCree, SLED agents initially collected a DNA buccal swab from Baker and DNA from a dried blood standard from McCree to compare against DNA found on the gun. Baker's bodycam video shows both Baker and McCree's skin in contact with the pistol, so it is no surprise that DNA from Baker and McCree were found on the weapon. However, a third, unidentified source of DNA was found on the trigger, grip, and slide of the weapon. And no DNA—including McCree's—was recovered from the magazine or bullet cartridge headstamps. (Ex. 92 at 2-3.) After discovering the unidentified source of DNA on the weapon, SLED ran a supplemental analysis, this time comparing it with DNA collected from buccal swabs of Defendant Harris and others on the scene. (Ex. 60, Tolbert Tr. 87:1 - 89:09.) The supplemental DNA lab analysis concluded that while "Lavar Richardson and Nicholas Harris are excluded as contributors" to the DNA mixture found on the trigger, Harris was not excluded as the contributing source of the third DNA sample found on the slide of the firearm. (Ex. 95 at 2-5.) Yet, in its Investigative Report of the shooting, SLED stated the following:

> Forensic DNA analysis of the firearm that was removed from McCree's person indicated a profile consisting of McCree, Sgt. Baker, and a third unknown individual. Sgt. Harris, Ofc. Richardson, and Ofc. Williams-Tobias submitted buccal swabs and were eliminated as contributors to the DNA profile developed from the firearm.

(Ex. 2, SLED Report at 41.)

After presented with the supplemental DNA report at his deposition, Special Agent Tolbert, who received the DNA reports and authored the findings in SLED's Investigative Report, retracted the statement above that Harris, Richardson, and Williams-Tobias were "eliminated as contributors to the DNA profile developed from the firearm" and admitted it was incorrect. (Ex. 60, Tolbert Tr. 106:11 – 107:24.) Thus, a disputed issue in this case is how DNA analysis could eliminate

17

Harris' DNA on the gun's trigger, but not on the gun's slide.  Baker's bodycam footage, which continued for 45 minutes after the shooting, does not show Harris touching the gun before the crime scene was secured or anytime afterward, and according to Harris, he was never in close enough proximity to McCree after he claimed McCree allegedly retrieved a gun from a car that his DNA could be transferred to it.  (Ex. 38, Harris WC Depo Tr. 48:9-11.)

### I.  <u>Lavar Richardson</u>

Lavar Richardson, who arrested McCree and placed him in handcuffs, was not a Class 1 law enforcement officer and had no legal authority under South Carolina law to conduct an arrest. *See* S.C. Code Ann. § 23-23-40.  Rather, he was an evidence technician employed by the Chester Police Department who on November 23, 2019, was working a paid, private security shift at Walmart.  The longest period of time Richardson spent at the South Carolina Criminal Justice Academy was two weeks.  (Ex. 27, Richardson Tr. 12:21-24.)  He said he became a "limited duty officer" and described his scope of authority as including "animal control, civil process, [and] court bailiff" duties.  (*Id.* 13:23 – 14:18.)  When asked if he had received *any* training on searches and seizures of persons form any governmental agency prior to being hired by the Chester Police Department, Richardson said he received such training as a "police cadet, which he described as "a program for kids" similar to the Boy Scouts that he attended from ages 14 to 19.  (*Id.* 16:25 – 18:06.)

South Carolina law prohibits any person with less than a Class 1 certification from "enforc[ing] the laws or ordinances of this State or any political subdivision."  S.C. Code Ann. § 23-23-40.  The law provides a one-year safe harbor for newly licensed Class 2 officer to perform the work of a Class I officer under proper supervision while awaiting Class 1 certification.  *Id.* "Should any such person fail to secure certification within one year from his date of employment,

he may not perform any of the duties of a law enforcement officer involving control or direction of members of the public or exercising the power of arrest until he has been certified" and "[h]e is not eligible for employment or appointment by any other agency in South Carolina as a law enforcement officer." *Id.* (*See also* Ex. 61, Richardson Depo Ex. 1 Nov 9 order).

Prior to joining the Chester Police Department, Richardson worked two years as a Class III law enforcement officer at the Chester County Sheriff's Office where he served in animal control. (Ex. 94.) He retained his Class III certification when he joined the Chester Police Department. Richardson admitted that he has never been licensed as a Class I, or full-duty, police officer in the State of South Carolina and confirmed he was not so licensed on November 23, 2019. (*Id.* 14:19 – 15:08.)

Richardson admitted driving around the parking lot during Harris's chase of McCree. He was driving a Chester police vehicle equipped with a dashboard camera. Richardson activated the blue emergency lights inside the vehicle, which also would have activated the dashboard camera. Richardson claimed, however, that his dashboard camera was not working on November 23, 2019. Like his missing body worn camera footage from after the shooting, the recording of the parking lot undoubtedly would have captured images of Harris and McCree in the parking lot. Richardson testified that he had no knowledge of anyone removing the dashboard camera from his vehicle since November 23, 2019 or of any repairs to the camera that he claimed was broken. (Ex. 27, Richardson Tr. 105:09—107:02.)

## J. **Walmart Hired Harris, Richardson, and Williams-Tobias as Private Security Guards**

There is no evidence disputing that Harris, Richardson, and Williams-Tobias were private, paid security guards for Walmart on November 23, 2019—only argument from Walmart. Yet, Walmart cannot credibly dispute that these individuals were paid to provide security services for

19

Walmart on Walmart's property only.  Walmart "advertised" the security job in emails and provided a sign-up sheet for shifts.  (Ex. 28, Harris. Tr. 165:15 – 166:1.)  Although there is no dispute that a violent incident involving a store associate occurred a month prior, that was not the sole reason Walmart hired security.  Harris testified that he was hired "because of being the holidays and a high amount of people and the previous, you know, disturbances as well as shoplifting there" and "to deter crime and to enforce our laws such as shoplifting and stuff like that."  (Ex. 28, Harris Tr. 310:08-24, *see also* 174:06 – 175:02.)  Williams-Tobias testified her role as a Walmart security guard was "[t]o provide security, safety for all citizens publicly that were in the store" and "to provide any assistance as needed."  (Ex. 38, 78:06-78:17.)  Richardson likewise testified that his job was to provide general security within the Walmart store.  (Ex. 27, Richardson Tr. 123:21 – 124:18.)  Harris testified that they were not patrolling the general public, but that, "[w]e were kind of restricted to Walmart property."  (Ex. 28, Harris Tr. 173:22 –174:05.)

Walmart paid each of them $30 an hour to perform the work in the form of money orders converted to cash at the end of each shift, per Walmart's policy.  (Ex. 63, McManus Tr. 52:16 – 56:03.)  On November 23, 2019, Harris and Richardson received $120 each from Walmart for working four hours as private Walmart security guards, while Williams-Tobias received $90 for working three hours as a private security guard.  (Ex. 64.)  Money order receipts establish the payment to each of them for their work on November 23, 2019.  (Ex. 65.)  This time period encompasses the entire incident on November 23, from when McCree first entered the store to buy the door lock set through the time Harris shot him in the parking lot.

Harris, Richardson, and Williams-Tobias performed their jobs according to a shift schedule set by Walmart.  Harris testified that officers could only work at Walmart "on your off time" from the police department.  (Ex. 28, Harris 167:25-03.)  The guards were provided Walmart radios and

20

had a private room to use in the course of their security jobs. (Ex. 28, Harris Tr. 210:23 – 212:06; Ex. 21, Williams-Tobias Tr. 98:05-17.) They reported to Walmart's loss prevention manager, Evelyn McManus. (Ex. 63, McManus Tr. 58:22 – 59:22.) There was no contract between Walmart and the Chester Police Department, as Walmart prohibited the Chester store from entering such contracts with the police. (Ex. 67.) Rather, the only memorialization is a statement on Walmart letterhead and signed by Walmart's store manager, Ann Curtsinger, "to use the services of the Chester Police Department for armed security" for an indefinite period. (Ex. 56, Chester 0743-0001.)[5] Walmart routinely hired security guards to work during the holidays (Ex. 67, WM emails.)

Walmart's McManus was unequivocal about Harris, Richardson, and Williams-Tobias's role at the store. She testified they were at Walmart's "disposal" and "they would do anything . . . that we would ask them inside the building for – if you know, we needed help with anything. I mean, if you have a shoplifter in your store and you have an off duty officer working there, they're not going to refuse not [sic] to help you when you're paying them $30 an hour." (Ex. 63, McManus Tr. 58:22 – 59:22.) McManus stressed that the security guards would do what she directed them to do. (*Id.*)

To be clear, after the shooting, Walmart paid Harris for his time during the entire incident. To resolve any doubt as to who Harris, Richardson, and Williams-Tobias were working for at the time of the shooting, McManus made clear immediately afterward that they were working for Walmart. Just as EMS was pulling up to the scene, McManus walked into the parking lot aisle where McCree lay dying with water bottles in her hands for Harris and Richardson. A Chester County Sheriff's deputy yelled at her to stop, but McManus radioed Williams-Tobias and then

---

[5]     Walmart had initially attempted to hire security guards from two private companies, Signal 88 and Off-Duty Services, but apparently neither was able to fulfill Walmart's request. (Ex. 69.)

21

explained to the deputy, "They're working for me, that's why I'm out here." (Ex. 70.) McManus was turned away, so she walked over to Harris's parked Tahoe. (*Id.*).

That Richardson and Harris had to call dispatch to send an *on-duty* officer to Walmart to transport McCree to jail after his arrest further demonstrates that they could not do so themselves at that time, despite Richardson's police vehicle parked on the curb outside of the Walmart entrance, because they were restricted to Walmart property while working as private security guards. (Ex. 27, Richardson Tr. 94:13 – 95:21, Ex. 71 (Ex. 3 of Richardson Depo); Ex. 28, Harris Tr. 173:22 –174:05.) Even Defendant City of Chester, which employs these individuals, agrees that Richardson "was working private security for Wal-Mart on the day of this event . . . . [and] he was performing off-duty work for Wal-Mart" (ECF No. 143-1 at 19-20.) And the City of Chester further "reserve[d] the right" to argue the same as for Defendant Harris, since he too "was performing off-duty work for Wal-Mart." (*Id.* at 20 n.1.) Thus, there is ample evidence for a jury to conclude that Harris, Richardson, and Williams-Tobias were Walmart's agents on the morning of November 23, 2019.

**K. <u>Walmart's Shoplifting Policies Are Not Followed by Walmart Security</u>**

Walmart has a written policy governing the "Investigation and Detention of Shoplifters" known as the AP-09 policy. (Ex. 72.) The AP-09 policy contains several limitations on interacting with suspect shoplifters that were blatantly disregarded on November 23, 2019. (Ex. 73, Birks Report at 17-22.) The policy prohibits Walmart from, among other conduct, restraining a customer, searching a customer, or pursing a "fleeing Suspect." (*Id.* at 1.) The AP-09 policy also mandates that an "unlawful taking" (i.e. shoplifting) be confirmed by the customer "demonstrat[ing] intent to steal the merchandise." (*Id.* at 2.) In other words, when a customer does not demonstrate intent to steal merchandise, Walmart does not recognize that customer as

shoplifting.    The AP-09 expressly recognizes that "some honest customers may engage in these activities without any intention of stealing." (Ex. 74.) And it recognizes that "all shoplifters share the same objective: to illegally remove merchandise from the facility *without detection*." (*Id.* at 646.) To curtail abuse of the policy, it provides that "[u]nder no circumstances does the word of an associate not fitting the definition of an 'authorized associate' in the AP-09 policy or a customer establish" any of the five required elements of shoplifting. In this incident, there were no 'authorized associates' who witnessed McCree satisfy any of the required elements under the policy. (Ex. 73 at 17.)

Despite the appearance of a robust and restrained shoplifting policy, McManus testified that Walmart had no policies, procedures, or guidance for security guards working in the Chester store. (Ex. 63, McManus Tr. 63:21 – 64:4.) Harris, Richardson, and Williams-Tobias likewise said they were never trained by Walmart on any of its policies, including AP-09. (Ex. 28, Harris Tr. 17:02-20; Ex 27, Richardson Tr. 80:23—81:20, Ex 21, Williams-Tobias Tr. 72:08-24.) McManus further made clear that despite the AP-09 policy's requirement that a customer demonstrate "intent to steal the merchandise," in practice Walmart does not recognize instances of mistakes when customers leave the store with an item that has not been paid for regardless of the circumstances. In McManus's words, "Once people or a shoplifter take something and passes all points of sale without attempting to pay for the merchandise, they don't intend to pay for it." When asked whether this hardline stance was permissible under the AP-09 policy, McManus responded, "I do not know if that is in the AP-09 policy, but we were trained that we do not do that." (Ex. 63, McManus Tr. 23:19 – 24:02.)

**L. <u>Walmart Made the Decision to Arrest McCree, Not Law Enforcement</u>**

McManus repeatedly made clear that in the Chester store, she is the one who makes the determination whether a customer has shoplifted and did so with McCree:

Q:    Who in Store 1603 at that time would make a decision on behalf of Walmart regarding whether a person shoplifted from the store?

A:    I was there, sir.

Q:    Okay.  You're the final say?

A:    Excuse me?

Q:    Are you the final person that makes that decision or do you need to go up one to Ann Curtsinger or up one to Bentonville?

A:    No, I do not.  I can make that decision.  I have the power to make that decision.

Q:    Did you make the decision on November 23rd that Ariane McCree had shoplifted?

A:    Yes, I did.

(Ex. 63, McManus Tr. 14:17 – 15:5.).  McManus admitted that she made the decision to have McCree arrested:

Q:    Did you make the decision that Ariane McCree should be arrested for shoplifting on November 23, 2019, at Store 1603 in Chester, South Carolina?

[objection]

A:    Yes.

(*Id.*, McManus Tr. 15:6 – 17:8.)

McManus further testified that there is nothing a Walmart customer can do once they pass the point of sale to rectify a mistake or error and pay for an item—whether the customer voluntarily returns three minutes later or three hours later:

24

Q:     Had you been made aware that Mr. McCree was attempting to pay for the lock that he had been accused of taking, would you have let him pay for it and not charge him with shoplifting?

[objection]

A:     No, we would not.  He had a chance to pay for that when he took the merchandise.

Q:     Okay.  So is it your position that once Mr. McCree is allegedly outside of the store with the lock after having not paid, that there's nothing he can do to rectify that situation?

A:     No, you -- you come back three hours later after -- after taking something and have a change of heart to pay for that, no, that – we don't -- we don't accept payment after you've already taken the merchandise out of the store.

Q:     Okay.  And so whether it's three minutes later or three hours later, it doesn't matter to Walmart, is that your statement?

[objection]

A:     That's true.

Q:     And is that definitive position set forth in AP-09?

A:     I don't know.

(*Id.*, McManus Tr. 21:22 – 22:25.)

As a consequence, Walmart could and did circumvent its written policies by enforcing a strict liability standard devoid of any consideration of a customer's intent to steal—regardless of mistake or misunderstanding. So long as a Walmart customer passes the point of sale with an item not paid for—whether by mistake or cashier error—in Walmart's view that is shoplifting. Richardson, Harris, and Williams-Tobias blindly followed McManus's decision to arrest McCree without considering his intent, which was plainly obvious at the time.  As McManus testified, "if

25

you have a shoplifter in your store and you have an off duty officer working there, they're not going to refuse not [sic] to help you when you're paying them $30 an hour." (Ex. 63, McManus Tr. 58:22 – 59:22.)  In not refusing McManus's decision to arrest McCree, Walmart and its well-paid security guards unlawfully arrested him.  Indeed, after cuffing and detaining Mr. McCree in the store security room, Richardson left to find Ms. McManus to "find out what she wanted to do." (Ex. 27, Richardson Tr. 107:3-10.)   The South Carolina statute for shoplifting, codified in S.C. Code Ann. § 16-13-110, includes the required element that a person act with *intent* to deprive the merchant of the property without paying for it, which was ignored by McManus.

McManus's hard-line approach to having innocent customers arrested may be linked to Walmart's "[t]ying shoplifting apprehensions to Asset Protection personnel's annual performance review," which "promotes a quota/bounty/mentality" that drives "competition among Asset Protection associates" to "make more apprehensions in order to achieve a more favorable annual performance review." (Ex. 73 at 16.)

## PROCEDURAL HISTORY

### A. Civil Litigation

Plaintiff filed her original complaint in the Chester County Circuit Court on February 3, 2020.  Defendants subsequently removed the case to this court. (ECF No. 1.)  Plaintiff thereafter filed an amended complaint on November 4, 2020, alleging negligence, gross negligence, false arrest, wrongful death, and a survival action against all Defendants; negligent hiring, supervision, and/or retention against Defendant City of Chester; Fourth Amendment violations for unlawful seizure, use of excessive force, and bystander liability under 42 U.S.C. § 1983 against Defendants Harris and Baker; and Fourth Amendment violations under 42 U.S.C. § 1983 against Walmart.

### B. Criminal Investigation

Following SLED's investigation and report, on March 20, 2020, the South Carolina Attorney General's office issued a statement stating it was declining to prosecute Defendants Harris and Baker for the shooting of Ariane McCree. Three months later, on June 13, 2020, the Attorney General's office referred the investigation to the U.S. Attorney's Office and requested that federal prosecutors "review the findings in the shooting death of Ariane McCree" due to "continued questions from his family and the community and in the interest of full transparency."[6]

## **LEGAL STANDARD**

On summary judgment, the role of the court is not "to weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Thus, summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see also News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). The burden is on the moving party in the first instance to inform "the district court of the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] [s]he is ruling on a motion for summary judgment." *Id.* "Hearsay statements or

---

[6]    *See* https://www.scag.gov/about-the-office/news/s-c-attorney-general-s-office-requests-federal-review-of-mccree-case/

conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment." *Vardon v. W. Virginia*, No. 2:11-CV-00399, 2012 WL 685863, at *2 (S.D.W. Va. Mar. 2, 2012).  "[A]lthough the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe."  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000).  "If a movant asserts that a fact cannot be disputed, it must support that assertion either by 'citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;' or 'showing ... that an adverse party cannot produce admissible evidence to support the fact.'"  McFadden v. Gainey, No. 4:12-CV-01470-MGL, 2013 WL 425127, at *1 (D.S.C. Jan. 15, 2013) (quoting Fed. R. Civ. P. 56), report and recommendation adopted, No. CIV.A. 4:12-1470-MGL, 2013 WL 427328 (D.S.C. Feb. 4, 2013), aff'd, 520 F. App'x 176 (4th Cir. 2013)

"[E]ven though there may be no dispute about the basic facts, still summary judgment will be inappropriate if the parties disagree on the inferences which may reasonably be drawn from those undisputed facts.  *Morrison v. Nissan Co.*, 601 F.2d 139, 141 (4th Cir. 1979).  "[W]hen the disposition of a case turns on a determination of intent, courts must be especially cautious in granting summary judgment, since the resolution of that issue depends so much on the credibility of the witnesses, which can best be determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross-examination."  *Id.*; *see also Magill v. Gulf & W. Indus., Inc.*, 736 F.2d 976, 979 (4th Cir. 1984) ("Summary judgment also is inappropriate if an issue depends upon the credibility of witnesses, because such credibility can best be determined after the trier of fact observes the witnesses' demeanor.").

28

## ARGUMENT

I. **THERE IS A GENUINE DISPUTE OF FACT WHETHER IT WAS OBJECTIVELY REASONABLE FOR HARRIS AND BAKER TO SHOOT HANDCUFFED MCCREE IN THE WALMART PARKING LOT**

There is a fundamental dispute of fact whether McCree had a gun on his person and, if he did, whether he presented it in a threatening manner sufficient to justify the use of deadly force against him. It is undisputed that when McCree was being pursued by Harris and Baker in the Walmart parking lot, his hands were cuffed behind his back. It is further undisputed that when he was searched inside the Walmart loss prevention room, he was not in possession of any firearm. There is no video depicting McCree with a gun in his hands or entering any car to retrieve one before Harris shot at him, let alone of him pointing one at Harris or Baker. Rather, Defendants offer the testimony of Harris and Baker and affidavits from two witnesses who did not see McCree threatening anyone with a gun.

Courts have long recognized that the "reasonableness" of the use of deadly force "must be judged from the perspective of a reasonable officer *on the scene*, rather than with the 20/20 vision of hindsight." *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989). This approach not only protects officers from Monday morning quarterbacking of their split-second decisions, but also protects *citizens* by constraining an officer's ability to craft a *post hoc* favorable narrative to justify an unreasonable use of deadly force by pointing to events or circumstances that did not exist or did not inform their decision to employ deadly force. Thus, for purposes of summary judgment, the issue of whether Harris or Baker's use of deadly force on McCree was objectively reasonable is inherently tied to disputed facts over whether McCree engaged in any actions that justified such force. *See Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013) ("[A]n officer does not possess the unfettered authority

29

to shoot a member of the public simply because that person is carrying a weapon. Instead, deadly force may only be used by a police officer when, based on a reasonable assessment, the officer or another person is threatened with the weapon.").

Among the disputed fact issues for a jury to resolve is how and when the Taurus 9mm weapon found on McCree's body got there, whether it ever came into McCree's possession at all and, if so, whether McCree presented it in a threatening manner sufficient to justify the use of deadly force by Harris and Baker.  As set forth below, Defendants offer no evidence supporting McCree's presenting a firearm at them in the parking lot other than the self-serving testimony of Harris and Baker, which is inherently unreliable, contradictory, and uncredible on this issue, and two affidavits submitted by the City of Chester that are equally unreliable as they materially contradict those witnesses' prior statements to SLED.

### A. Harris's Self-Serving Testimony and Selective Memory Impairments Raise Serious Credibility Issues for the Jury to Resolve at Trial

That McCree had no firearm inside the Walmart store or when he ran out to the parking lot is not in dispute.  Harris and Richardson both admitted that prior to McCree being handcuffed inside the Walmart store he was not in possession of any firearm.  Their testimony on this fact is independently verifiable because they searched him for weapons inside the loss prevention room while he was handcuffed—an event recorded on video.  (*See e.g.*, Ex. 53.)  Harris also testified that McCree was "still unarmed" at the point in time in the parking lot *after* the claimed headbutting occurred until Harris lost sight of McCree.  (Ex. 28, Harris Tr. 256:13-20 ("See, at this time – he's still unarmed as far as I'm concerned at this time because I had searched him, he never left my sight until right here and this is the only time he left my sight.  So he didn't have a weapon on him until that point in my mind.  Now, I can tell you – I'm telling you what I believed to be true.  I don't think he was armed until that point.")  Harris then spoke of losing sight of

30

McCree for a period he estimated to be "under a minute." (*Id.* 256:23 – 257:07.) Harris never testified in his deposition, during his SLED interview, or in his written statement that he saw McCree enter a car or otherwise retrieve a weapon from anywhere.

While Harris alleges that McCree headbutted him twice, Harris is unable to provide specifics on where in the parking lot that occurred or where on his head the claimed blows landed. (*Id.* 250:18 – 252:05.) Whether this alleged assault occurred at all is also disputed, as video of Harris minutes after shooting as well as photographs of Harris taken by SLED in the hours after the shooting do not show any injuries to his head. (Ex. 33, Baker bodycam; Ex. 75, Ex. ).[7] Regardless, Harris was very certain in his testimony about a critical issue: he was not in fear for his life from the claimed headbutting and did not worry about dying. (Ex. 28, Harris Tr. 248:02 – 249:25 ("No, I was not in fear at that moment for my life.") Thus, Harris's claim that McCree physically assaulted him cannot justify the subsequent use of deadly force. Further, Harris confirmed that after the alleged headbutting encounter in the parking lot, it was McCree who disengaged and moved away from Harris. (*Id.* 252:06 – 253:02.)

Harris claims that when he regained sight of McCree after they separated in the parking lot, McCree somehow had acquired a gun. Neither Harris, Baker, nor Richardson, who were all in the parking lot, could explain how this occurred. At his deposition, Harris drew on a map the area of the parking lot where he claimed to see McCree holding a gun, which was at least four parking lot rows away from where McCree's car was later found parked and covered a large distance. (Ex. 77, Harris Dep Ex. 3, point #2.) Harris was then questioned on the details of the

---

[7]    Harris did not seek medical treatment for his claimed injuries until at least four days after he said it occurred. Further, the only photos of Harris depicting any injury to his head were taken days later at his criminal defense lawyer's office and show only a black eye. (Ex. 76.) SLED's investigative report concluded that the "cause and origin" of the injury on Harris's face depicted in the photograph "could not be verified." (Ex. 2, SLED Report at 17.)

31

moment he claims he saw McCree with a gun.  Harris initially testified that McCree was raising it "over the side of the car" (Ex 28, Harris. Tr. 83:02-10), then later that he was raising the gun "over the trunk of the car that he was standing at" (*Id.* 260:07-15.)  When asked to describe the car he saw McCree standing beside, Harris could not provide even the most basic details, such as whether it was a sedan or SUV.  (*Id.* 262:04 – 22.)  When Harris was asked whether he was standing at the front end or rear end of the vehicle, Harris replied, "I don't know."  (262:23 – 262:02.)  Harris then claimed that McCree raised the gun higher than vehicle's trunk height, raised it to chest-height, and then tried "to get over the top of the car" all with his hands still cuffed behind his back.  (*Id.* 263:12 – 18.)  Though Harris apparently was able to testify regarding the movements of the gun he claims to have seen, he could not recall the orientation of it when he says it was pointed at him.  (*Id.* 263:21 – 264:07.)

At that moment, according to Harris, "that's whenever I drew my weapon and shot, [and McCree] fell between the cars."  (*Id.* 183:03-12.)  Harris then claimed his gun malfunctioned but as soon as he cleared it he went around the car to "check on him," but then McCree "rolled over with the gun and tried to point it at me again so I shot some more rounds."  (*Id.* 183:02 – 184:03.)  According to Harris, "[t]hen [McCree] stood up like nothing even touched him."  (*Id.*)  Harris then says he cannot recall if he shot McCree again.  Harris's narrative is remarkable in that he claims that although McCree fell to the ground immediately after Harris first began firing, and that he "shot some more rounds" at McCree effectively at point blank range when McCree was on the ground and rolling over, McCree apparently stood right up—despite his hands still handcuffed behind his back and, according to Harris, still grasping onto a gun.  (*Id.*).  This would be a physically difficult movement for most people to accomplish even under the best of circumstances.

32

The sheer improbability of Harris's story—and his description of McCree's physical movements while cuffed and already shot—is best explained by Harris's concession that his memory of events and the order in which he perceives them is utterly unreliable that, by his own calculus, he cannot be trusted to testify accurately in a courtroom about events he witnessed or participated in. On March 10, 2021, Harris provided deposition testimony in the worker's compensation lawsuit he brought as a result of injuries he claimed occurred from the alleged headbutting in the parking lot. (Ex. 38.) In that case, Harris testified that he could no longer perform the functions of a police officer because he experiences severe memory deficits on a regular basis. Harris was not shy about providing detailed testimony to establish his claim that the alleged assault caused permanent memory deficits that renders him unable to reliably testify in court:

> Q:   Do you have any trouble doing your job responsibilities at the City of Chester?
>
> A:   …It's just that *I have memory problems*, so I can't be held – *I can't go into a law enforcement capacity and forget why I arrested you*, I you understand what I'm saying there.
> …
> Q:   So is it your opinion that you could not be a detective at this point?
>
> A:   Oh, no way in the world.
>
> Q:   Do you think you're ever going to be able to be a detective again?
>
> A:   That's what my hope is. . . . That was one of my goals in life was to become a detective, and *I can't be a detective if I can't remember where I picked up that bloody knife from, what I had a conversation with this person about.* I can't – I can't do my job correctly with the amount of issues and blunders that I make, whether it's through my coordination, my memory. *My recall is really, really bad sometimes. I put things in different orders that it happened, and you can't have that when you're in court trying to do things.*

(Ex. 38, Harris WC Tr. 65:11 – 66:1, 66:21 – 67:13 (emphasis added).)

The bloody knife in Harris's example is the alleged gun pointing at him in this case. Harris admitted under oath that his recall is "really, really bad" and his memory is so fallible that he cannot be trusted to testify accurately in a courtroom about evidence or even his reasons for arresting someone. Later in that deposition, Harris was asked how often he experiences forgetfulness. Harris replied, "A lot." (Ex. 38, Harris WC Tr. 73:7 – 74:8.) He then offered examples from his daily life, including an occasion when he was speaking with his police captain:

> I talked to him and he was like, 'man, I talked to you on the phone about that. We talked through it for 30 minutes.' I said, 'dude, I haven't seen you or talked to you in three weeks.' And he said, 'I was just talking to you. Look at your phone.' And then I looked at my phone and we had talked for 25, 30 minutes on the phone. And I was like, 'oh, well, what did we talk about?' and then he told me.

(*Id.*) Harris continued:

> I forget where I put stuff. I will forget what people say to me. Whenever I do remember it, sometimes it's out of order. Whenever I'm trying to recall certain situation, the best way to describe it is like the old-time movies where you've got like a thousand slides to a movie. Like you're flipping through the slides and there's nothing but blank slides, and I just get stuck."

(*Id.*) In short, Harris's memory is utterly unreliable and untrustworthy.

Harris's description of his physical and mental state after the alleged headbutting further undermines his claim that McCree was holding a gun and threatening him. Harris repeatedly claimed that in the moments after the alleged headbutting that he "was dazed pretty good," that his mind was "foggy," and that he "was going to lose consciousness." (*See, e.g.*, Ex. 28, Harris Tr. 182:03-04 ("I remember that I was dazed pretty good and he took off running through the parking lot."); 256:23 – 257:05 ("I was foggy headed because I got head butted quite a few times."); 256:22-16 ("I was having bad problems with my head to the point where I was going in and out to where I felt like I was losing consciousness"); Ex. 38, Harris WC Tr. 48:1-5 ("So whenever he ran away, I walked down the outside. And at that time, I was really – I was foggy and kind of having

34

problems with – I just had to keep pushing forward or I was afraid I was going to lose consciousness after that."), 49:1-5 ("I remember when I was shooting, I couldn't understand why I couldn't focus on my gun and aiming correctly. And it was just because of the mental state I was in. I was so foggy, like my coordination was off.").) He claimed that when he drew his weapon to fire at McCree, he "couldn't focus [his] gun and aim correctly," and despite being just feet away from McCree when he fired his gun, he claimed, "I don't know if I was the one who shot him or not." (Ex. 38, Harris WC Tr. 51:15-20.)[8]

Yet, in the seconds after McCree fell to the pavement, Harris experienced a remarkable recovery. Bodycam video shows him not dazed or struggling to remain conscious but walking casually up the parking lot aisle with an AR-15 rifle in his hand. (Ex 33, Baker bodycam at 11:35:39.) Seven minutes later, while EMS was tending to McCree, Harris handed out water bottles to other officers at the scene. (*Id.* at 11:42:25.) And despite testifying in his worker's compensation case that he did not know whether or not he shot McCree, he told Baker at the scene, "Me and you both got him." (*Id.* at 11:42:48.) Minutes after that he called out to Baker to "come over here and chill out," then asked him, "You got the PBA?" (*Id.* at 11:45:38.) PBA stands for the Police Benevolence Agency and when Harris immediately called the PBA from the scene of the shooting, it was "for lawyer representation." (Ex. 28, Harris Tr. 94:23 – 95:17.)

Harris repeatedly placed his memory deficits at issue in his testimony: "[M]y own memory it's – the best thing I can describe it to you is like in – when they made movies a long time ago, you know how they had, like, a thousand pictures and you flip through them? I have black spots

---

[8]     Harris's March 10, 2021 testimony that he does not know whether his gunfire injured Ariane directly contradicts his claim in his motion for summary judgment that apparently it is undisputed that "McCree was struck twice by Harris, once in the right arm and also in the left hip. . . . Those wounds were not fatal." (ECF No. 144-1 at 3.)

and it's weird. Sometimes I remember it, sometimes they're in order, sometimes they're not." (*Id.* 223:6-19.)[9] When pressed on details of what transpired in the parking lot, Harris invoked his lack of memory numerous times. (*See, e.g. Id.* 81:23-25 ("But, for the record, I do have memory issues and other problems that I – I guess at this time I don't remember."); 92:8-9 ("So another problem with my memory is the order of things is sometimes garbled."); 94:16-20 ("Like I said, extensive issues going on with memory…"); 177:16-19 ("[L]ike I said, I have problems remembering things. Sometimes I – I see blanks while I'm going through it, sometimes I get sequence of events mashed up."); 197:17-18 ("I do not have a memory of me doing it. That does not mean that I didn't do it. It just means that I cannot remember that time and events that you are requesting.").) When asked to describe the basic direction of his chase of McCree through the parking lot, Harris could not provide an answer: "I don't know. I don't know." (*Id.* 223:06-19.) Nor could he remember how many times he and McCree connected in the parking lot. (*Id.* 252:12-20 ("I can't remember exactly how many times we engaged out in the parking lot.").) Indeed, when Harris testified remembering McCree's "head beating up against mine pretty good," he also stated, "I remember seeing it on video." (*Id.* 223:20 – 224:02.) But there is no video of the alleged parking lot headbutting—the only video of McCree connecting with Harris is from Walmart's loss prevention room—and there was no headbutting involved. Either Harris is confused about what happened or no assault occurred in the parking lot. Or he cannot keep his story straight. Most critically, when pressed for details from the time period when Harris claimed McCree returned to him after getting a gun,

---

[9]     Harris provided almost verbatim testimony in his worker's compensation case: "Whenever I'm trying to recall certain situation, the best way to describe it is like the old-time movies where you've got like a thousand slides to a movie. Like you're flipping through the slides and there's nothing but blank slides, and I just get stuck." (Ex. 38, Harris WC Tr. 74:4-8.)

Harris admitted, "[T]hat part of my brain, I can't just sit there and – and run that part. It's all choppy through there." (*Id.* 257:12 – 258:03.)

Indeed, Harris's words establish his lack of credibility as a witness. *See Gell v. Town of Aulander*, 252 F.R.D. 297, 305 (E.D.N.C. 2008) (noting that memory issues "go[] to credibility and weight, which are matters for the jury"). Yet, regardless of whether his memory deficits are real or feigned, his testimony that he is unable to accurately testify about facts he witnessed and the sequence in which they arose—let alone that he is unable to be relied upon to testify accurately in a courtroom—undermines the weight and credibility of his testimony regarding the events in the parking lot and, more particularly, his justification for shooting McCree. A jury can readily conclude that Harris's selective memory is not a product of an injury but intentional—that he chooses to recall "details" that may help excuse his shooting of a handcuffed man who ran away from him but then fall back on his inability to recall basic facts when his responses may undermine his defense. But even if a jury concludes Harris is being genuine about his memory loss, that determination is ultimately one for them to make at trial. *See Ecology Servs., Inc. v. GranTurk Equip., Inc.*, 443 F. Supp. 2d 756, 771 (D. Md. 2006) ("[D]eterminations concerning witnesses' memories of events, and the judging of the credibility of witnesses are impermissible functions for the Court on summary judgment." (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000)); *Kelly v. Stassi*, No. CV 18-263-SDD-RLB, 2022 WL 586751, at *5 (M.D. La. Feb. 25, 2022) ("[T]he Court is bound on summary judgment to construe fact issues in favor of the non-movant, not to account for the vagaries of human memory.").

Further, that SLED could not eliminate Harris as the third source of DNA found on the pistol raises the question of why not? Harris's DNA was excluded as a source on the gun's trigger *but not on the gun's slide*. Baker's bodycam footage, which continued for 45 minutes after the

shooting, does not show Harris touching the gun before the crime scene was secured or anytime after. If Harris never handled the gun recovered from the scene, why couldn't SLED exclude him as a source of the DNA found on the slide as they did with the DNA on the trigger? This question must be resolved by a jury.[10]

Harris's statement to Baker immediately after the shooting that McCree "had that gun in his ass" is more evidence that McCree was never holding it in hands when he was shot. Along with the DNA analysis further raises the question of how handcuffed McCree could have retrieved and tucked a gun in his waistband in those moments Harris claimed he lost sight of him.

A jury can reasonably infer that McCree never handled a weapon at any time in the parking lot, let alone that he presented it in a threatening manner to Harris, in light of evidence of (1) Harris's history of criminal violence, insubordination, and misconduct while in uniform; (2) his highly selective "inconsistent memory" of events in the parking lot; (3) SLED's inability to eliminate him as a source of DNA on the gun's slide; (4) the request to SLED from Chester's police chief that was placed in Harris's personnel file calling for an investigation of a former law enforcement officer regarding a stolen gun immediately after Harris was fired; (5) the highly-speculative and demonstrably impossible suggestion from witnesses that McCree opened his car door while his hands were cuffed behind his back, entered the car, retrieved a weapon from somewhere inside, and then exited the car (not to mention that his car was found at the scene running with the key in the ignition) in less than 60 seconds, and (6) Harris's comment to Baker that McCree "had that gun in his ass."

### B. Evidence from the Gun Shot Wounds and Shell Casings Suggest McCree was Shot Before Harris Claims He Had a Weapon

---

[10]    A related question is why, if the firearm belonged to Ariane, his DNA was not found on the magazine or any of the bullets.

The testimony of Harris and Baker that McCree was facing them with a gun is further contradicted by the gunshot wounds on McCree's body. The autopsy report identified three wounds: one to Ariane's right upper chest, one to the anterolateral triceps in the backside of his right arm, and one to his lateral left hip. (Ex. 3.) The wounds to McCree's right arm and left hip strongly suggest that he was not facing Harris and Baker when those gunshots hit him. This is consistent with an absence of any confrontation or threat from McCree and suggests that McCree had sustained gunshot wounds as he was *running away* from Harris.

As for which bullet was fired from which gun at which time, that is an issue for the jury to consider. SLED's diagram of shell casings recovered from the parking lot establish that Harris fired his gun from separate points in time and places in the parking lot, including areas that McCree likely would have been prior to the 60 second period when Harris claimed he lost sight of him, which includes the time period Harris confirmed McCree was unarmed. (Ex. 25, SLED shell casing diagram.) A reasonable inference drawn from this evidence is that Harris began firing before Harris claims McCree possessed a gun.

## C. Baker's Changing Narrative of His Shooting McCree Raise Serious Credibility Issues for the Jury to Resolve at Trial

To hold that Baker was justified in using deadly force against McCree necessarily relies on finding disputed facts and resolving doubtful inferences in his favor and fully crediting his self-serving testimony as truthful at every step despite its many inconsistencies and contradictions. In this regard, Baker's arguments that his actions were objectively reasonable fall far short of meeting his burden under Rule 56(c), FRCP. *See Celotex Corp.*, 477 U.S. at 323. Because the material facts Baker relies upon to justify his use of deadly force are in dispute, a determination of the objective reasonableness of his actions cannot be made on summary judgment. These myriad disputes of fact are outlined below, and center on the material inconsistencies in Baker's evolving

narrative of what transpired in the parking lot, the lack of independent evidence to support his story, and his credibility as a witness.

In arguing that his shooting of McCree was justified, Baker's motion identifies nine "undisputed facts" apparently known to him prior to shooting. None are probative of the objective reasonableness of Baker's use of deadly force in the moment that he opened fire on McCree other than his assertion that McCree "had possession of a weapon and was pointing it" at him and others, which is a highly disputed fact.[11]  First, Baker was clear in his deposition testimony that his decision to shoot McCree was based "solely upon my threat assessment at the time when he presented himself to me with the weapon."  (Ex. 51, Baker Tr. 64:17-20.)  Yet, the only evidence supporting the claim that McCree presented a weapon to Baker comes from Baker.  Neither Baker's bodycam video nor Walmart surveillance video of the parking lot show McCree holding or pointing a gun at Baker or anyone when Baker opened fire at him, further casting doubt on the veracity of Baker's claimed justification.  Baker claims that "as he was advancing toward Sgt. Harris's location, [he] saw the suspect walking toward him, and that the suspect was armed with a gun."  (Baker MSJ, 139-1 at 3.)  However, Baker's body worn camera video shows McCree (visible in the background by his bright, white shoes) walking perpendicular to Baker—from left to right across the screen at the far end of the aisle—not walking towards Baker at the time he opened fire as he claims.  (Ex. 33, Baker Bodycam; Ex. 54).  SLED confirmed as much in its

---

[11]  For example, as one of the facts Baker claims was known to him immediately prior to firing his weapon and justified the shooting is that "the subject had assaulted another officer during his escape and continued efforts to evade capture."  Yet, these facts do not justify the use of deadly force, and Baker admitted he was "not taking that into consideration as to what needed to be done." (Ex. 51, Baker Tr. 62:08-23.)  Another fact Baker offers in his motion to justify his use of force is that he knew "shots had been fired."  But in his deposition, Baker conceded that the phrase "shots fired" can mean many things, including that an officer, not a suspect, is firing a gun.  (*Id.* Baker Tr. 69:01-11 (defining the term as "[a]lerting you to the fact that there are rounds in the air in the area").

review of the bodycam video evidence.  (Ex. 2, SLED Report at 20 ("McCree was seen on the left side of the aisle walking across to the right side where his vehicle was later seen in the video.").)  From this perspective, Baker—who estimated he was 45 yards away from McCree at the time—could not have seen McCree walking toward him with a pointed gun because McCree was walking away from him.

Moreover, SLED's investigation report concluded that Baker began shooting no later than 11:34:49 a.m. (per the timeclock embedded on the bodycam video image) based on video of the recoil movement of his weapon—a time when McCree was not walking toward Baker *but moving to the side away from him*.  (*Id.*).  As McCree reached the cars on the right side of the parking lot aisle, the body worn camera video shows Baker continuing to shoot at him.  McCree then moves back towards the center of the aisle in a diagonal direction, clearly injured, with the right side of his body facing away from Baker.  From this perspective, Baker would not be able to view McCree's right hand, which is where Baker alleged McCree was holding and presenting a gun.  (Ex. 51, Baker Tr. 176:22 – 177:10.)

While Baker argues that his body worn camera footage "corroborates" his testimony, not even Baker could identify any weapon in McCree's hand when presented with the video.  During his deposition, Baker was shown his body worn camera video on a 65-inch television and was asked to approach the screen and point out the gun in McCree's hand.  (Ex. 51, Baker Tr. 165:13 – 174:10.)  Baker repeatedly insisted that the video quality—even when viewed on a large screen—was too poor to show any weapon in McCree's hand.[12]  (*Id.*)  Thus, Baker's testimony is the only evidence in this case supporting this claim and, by definition, it is self-serving.  *United States v.*

---

[12]    For the same reason, Baker was unable to identify the gun on still images printed from the body worn camera footage.  (Ex. 51, Baker Tr. 187:05 – 188:20 and Ex. 81 (consists of Exs. 6, 7, 9, and 10 from Baker Depo.)

41

*Wertz*, 625 F.2d 1128, 1136 (4th Cir. 1980) ("Any subsequent account by an accused of his prior subjective mental impressions and reactions which is always influenced by self-interest, is to be carefully scrutinized.").

It is undisputed that McCree's hands were cuffed behind his back from the time he was stopped inside the Walmart store until the time EMS asked that his handcuffs be taken off so they could render aid, and that the handcuffs were standard-issue silver. (Ex. 79; Ex. 80 ("Patient's hands were handcuffed.").) It is also undisputed that the Nike sweatshirt McCree was wearing that day had large reflective patches on the sleeves near the wrists, and the pair of jeans he wore had a large white faded area on the right pant leg. (*See* Ex. 82, Ex. 83; Ex. 16, Ex. 94, Ex. 95.) McCree's clothing is critical--the white faded area on his jeans and large reflective patches visible in the store vestibule and later in the bodycam footage are what Baker apparently contends was a gun. (*See* ECF No. 139-1 at 6-7 and Ex. D.) Yet, by Baker's own estimation, he was 45 yards away from McCree at the time he claims he saw him pointing a gun. (Ex. 51, Baker Tr. 148:13-17.) And at that distance—nearly half a football field away—Baker remarkably claims to have discerned "the black hole" of a barrel contrasting with the silver slide of a gun pointing at him. (*Id.* 199:25 – 200:23.) Yet, when asked about the shirt McCree was wearing at the time, Baker conceded that it too was black. (*Id.* 191:17-24.) When asked about the color of the handcuffs, Baker conceded they were nickel-plated or "roughly" silver. (*Id.* 191:01-16.) Baker's characterizing McCree's clothing for a gun at such a far distance and shooting him in response is hardly objectively reasonable under the circumstances.

Second, although Baker claims he called out an order to McCree to "drop your gun" before shooting him, the audio from Baker's dashboard camera disputes this claim. Rather, in the dashcam recording Baker is heard yelling, "Put your hands up!" (Ex. 44, at 00:38., Att 63 # 3.)

42

In his deposition, Baker said that he could not recall the exact words that he called out to McCree, only that his "sentiment" was that McCree "drop the weapon." (Ex. 51, Baker Tr. 64:21 – 66:12; 162:25 – 164:03; 192:16 – 195:21.) But Baker's "sentiment" is far different than the facts. Indeed, Baker acknowledged that an "officer can – people can think they said something and they said something else." (*Id.* 65:03-09.) And ordering a suspect to "Put your hands up!" is far different than "Drop your weapon!" Baker's command tends to demonstrate that at that moment he called out the order, McCree was not holding any weapon in his hand. For if Baker had seen McCree holding a gun in his hands and aiming it at him, it strains credulity to believe that his reaction would be to order McCree to raise the gun up in the air. But that's what Baker did. A jury can readily infer from the audio evidence of Baker's command to McCree that there was no gun pointing at him or others as he claimed.

SLED's investigation similarly concluded that "Sgt. Baker's statement that he gave verbal commands to McCree to drop the firearm could not be verified." (Ex. 2, SLED Report at 29.) McCree's failure to put his hands up in the air before Baker began shooting him can be excused as it was physically impossible to comply with both hands cuffed behind his back. Whether Baker knew McCree's hands were cuffed or not is material, as "non-cooperation with law enforcement has never given officers carte blanche to use deadly force against a suspect." *Est. of Jones by Jones v. City of Martinsburg, W. Virginia*, 961 F.3d 661, 670–71 (4th Cir. 2020).

Third, the time interval between Baker's order to McCree to put his hands up and the time Baker began firing was less than one second as reflected on the dash cam audio recording. Giving a suspect less than one second to comply with a command before shooting renders the command meaningless. Walmart surveillance video shows that Baker had up to 30 seconds in the parking lot viewing McCree. (Ex. 54, att 65 Ext Front 05 – no 5). The Walmart video and Baker's body

43

worn camera show McCree clearly injured and struggling in those moments—he was not running, but walking slowly, he was leaning over forward, and his arms were behind him.  And it is undisputed that he had already been shot at least once by Harris at that time.  (Ex. 28, Harris Tr. 183:11-2, 265:03-09.)  Under these circumstances—with McCree already shot and his hands cuffed—giving him less than one second to comply with a command to "put your hands up" before shooting him thirteen times is not an objectively reasonable use of deadly force.  *See Casey v. City of Fed. Heights*, 509 F.3d 1278, 1285 (10th Cir. 2007) (explaining that a reasonable jury could find that the officer committed a constitutional violation when the officer deployed her taser immediately upon arrival and without warning).

Fourth, Baker has offered conflicting accounts of what occurred in the parking lot prior to his shooting McCree, which raises serious questions regarding his credibility and truthfulness as a witness that render summary judgment inappropriate.  *See Ecology Servs., Inc.*, 443 F. Supp. 2d at 771 ("[D]eterminations concerning witnesses' memories of events, and the judging of the credibility of witnesses are impermissible functions for the Court on summary judgment." (citing *Reeves*, 530 U.S. at 150–51)).

For example, immediately after the shooting, Baker offered a narrative that would legally justify his actions—claiming he saw McCree firing a gun in the parking lot before he approached him.  (Ex. 33, Baker Bodycam at 11:49:10 ("He pulled a gun and started shooting at people.").)  Days later, when it was clear to law enforcement that McCree never fired a gun, Baker's story changed.  He abandoned his claim of seeing McCree fire a gun.  (Ex. 51, Baker Tr. 192:11-15 ("I did not see him holding a weapon until I gave him the instructions to drop the gun.").  And in his deposition he denied that Harris told him that McCree had been firing rounds in the parking lot.

44

(Ex. 51, Baker Tr. 57:22 – 58:09.)  He also backed off his earlier claim of seeing Harris and McCree engaged in the parking lot.  (*Compare* Ex. 33, Baker Bodycam at 11:49:10, *with* Ex. 50 at 2.)

Similarly, in his November 27, 2019 affidavit provided to SLED, he stated, "I turned into Walmart on the side near Taco Bell but I did not see the subject.  I turned off my siren but left my blue lights on.  I drove through the bottom portion of the parking lot but did not see anyone."  (Ex. 50.)  During his interview with SLED, which occurred after Baker signed his affidavit, Baker changed his story and claimed he "initially saw a subject wearing a black hoodie running in the parking lot of Walmart."  (*Id.* at 6 ¶ 1-2.)  In his subsequent deposition on October 20, 2021, Baker expanded this claim—not only did he see McCree running through the parking lot, but that McCree was *running away* from Harris.  (Ex. 51, Baker Tr. 191:25—192:10, c*ompare* 255:12 – 256:03.)  Yet, despite claiming to have seen McCree running away from Harris, Baker later testified that he did not see Harris until after the shooting.  (Ex. 51, Baker Tr. 258:17-23 ("I don't remember seeing Sergeant Harris period until he shows up on the body camera footage where he knelt down beside me holding his department-issued rifle.").)  This latter statement raises the question of how Baker knew McCree was running away from Harris if he never saw Harris in the parking lot.  The inconsistencies in his recollection of who and what he saw in the minutes before shooting McCree raise serious question regarding the reliability of his testimony.  *Alston v. DIRECTV, Inc.*, 254 F. Supp. 3d 765, 789–90 (D.S.C. 2017) (observing that evidence of inconsistencies or contradictions in statements raises credibility determinations inappropriate to resolve on summary judgment).

Baker also claimed in his deposition that he did not know McCree's hands were cuffed, (Ex. 51, Baker Tr. 148:10-13), but this claim contradicts his statements at the scene discussed above that he saw McCree interacting with Harris while he was circling the parking lot, including his statement that McCree "pulled a gun and started shooting people."  If Baker's statements in

45

the parking lot minutes were correct, then it was not McCree who he saw. These contradictions are material because they go to the heart of his claimed justification of his use of deadly force. Indeed, had McCree been firing a gun at Harris, as Baker claimed in the minutes after he shot him, Baker would have been legally justified in shooting McCree.[13]

The inconsistencies in Baker's story exemplifies why his testimony is not credible and must be submitted to a jury to determine. That Baker failed to address them in his motion for summary judgment demonstrates his failure to meet his burden under Rule 56 to establish no genuine dispute as to any material fact and his entitlement to judgment as a matter of law. Fed. R. Civ. P. 56 (a); *see also Lincoln v. Reksten Mgmt.*, 354 F.3d 262, 268 (4th Cir. 2003) (recognizing that a party opposing summary judgment "has no burden . . . to reconcile inconsistent statements in the record.) And the self-serving nature of whichever version of his testimony he will present at trial demonstrates that his credibility is at issue. *United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) ("Subsequent testimony by an accused about his prior subjective mental impressions and reactions must be carefully scrutinized, as such testimony is 'always influenced by [his] self-interest.'" (quoting *Wertz*, 625 F.2d at 1136)).

Fifth, even if there was a gun on McCree's body, which is disputed, the mere presence of a gun is insufficient to justify the use of deadly force. Rather, the gun must be presented in a threatening manner. *Cooper v. Sheehan*, 735 F.3d 153, 157 (4th Cir. 2013) ("Absent any additional

---

[13]     Baker's arguments that Plaintiff's law enforcement expert, Dr. Roy Taylor, agreed that Baker's use of force would have been objectively reasonable if Ariane was threatening him or others with a gun or if Ariane had fired at Harris earlier in the parking lot is irrelevant for purposes of summary judgment. There is no dispute over the law governing objective reasonableness; rather, the dispute is over the facts of what transpired in the parking lot, resolution of which will determine the objective reasonableness of Baker's actions. Indeed, the entirety of Baker's arguments on excessive force are premised on "a reasonable officer having the same factual backdrop" that Baker presents in his motion—a factual backdrop that is clearly in dispute. (Baker MSJ, ECF No. 139-1 at 8-10.)

46

factors which would give the [officers] probable cause to fear for their safety or the safety of others, the mere presence of a weapon is not sufficient to justify the use of deadly force." (citing *Pena v. Porter*, 316 Fed. App'x 303, 312 (4th Cir. 2009). Whether there was a gun and whether it was presented in a threatening manner is a fact issue for a jury to determine.

In making that determination, a jury can also question the credibility of Baker's story by considering the video recording of his interview with SLED agents on November 27, 2019. Baker's interview took place in his criminal defense attorney's office and was recorded on video. In multiple instances during that interview, a SLED agent interrupted Baker's initial answers to, told him what he believed he was trying to saying, followed by Baker adopting the agent's recharacterization of events in a more favorable light. During the course of the interview, Baker was asked to write out written answers to questions about the shooting, including whether McCree had fired a gun and how Baker secured the gun found next to McCree. The SLED agent who was conducting the interview went so far as to *instruct* Baker on the specific language to write down in his written statement. For example, in response to the question, "Do you know if Mr. McCree fired any rounds?" Baker initially responded orally, "I'm not aware of [if] he fired anything at me. I don't know if he fired anything prior to that." (Ex. 68 at 13:54:29.) The SLED agent immediately interjected, "you just know a gun was pointed at you." (*Id.* at 13:54:35.) The discussion continued with the SLED agent repeatedly interrupting Baker to telling him that someone was pointing a gun at him and how to answer the written question in front of him:

> Baker: I don't, I don't remember any gunshots being fired, I just, I remember--
>
> Agent: Somebody pointing a gun at you.

(*Id.* at 13:43:52.) The agent then instructed Baker how to answer the written question on his statement, even proposing first-person language for Baker to use: "I don't know, I just saw him

47

advancing toward me when pointing—when he was pointing a gun at me." (*Id.* at 13:55:04.) Baker had no problem adopting the agent's answer virtually verbatim in his written answer, in which Baker wrote: "I don't know I just recall him pointing a gun at me and advancing toward me." (Ex. 50 at 4.)

In another instance, in response to the agent's question, "How did you secure McCree's weapon?" Baker responded that he had to "rip" it from McCree's hands. (Ex. 68 at 13:56:02.) The SLED agent interrupted, saying "So there was resistance when you tried to pull it out of his hands" Baker took the cue, agreed, and then the agent told Baker, "Spell that out for me." The agent explained, "Knowing that was—he had been shot at that point, he was wounded yet he was still holding onto that gun providing resistance." Baker's attorney nodded in agreement. (*Id.*) The SLED agent then instructed Baker how to answer the question just posed to him, including proposing first-person language for Baker to adopt: "I had to…he was still gripping the gun holding the gun tightly and I had to pry it out of his hands to secure it." (*Id.* at 13:56:50.) Baker listened, then wrote the following in his written statement: "He provided resistance even as I was attempting to remove the weapon from his hand. I had to pry the weapon from his hand." (Ex. 84, Baker written statement at 4-5.) After watching this interaction, a jury can reasonably conclude that Baker was coached by fellow law enforcement officers on how to craft a favorable narrative of what occurred in the parking lot.

Sixth, while Baker's body worn camera video shows a 9mm handgun underneath McCree's body after the shooting, the circumstances of how that weapon came into McCree's possession— if at all—are highly disputed. As discussed above, neither the Wallace nor Smith affidavits establish that McCree retrieved a weapon from his car. Further, SLED's inability to exclude Harris's DNA as the third, unknown source of DNA on the firearm also raises the strong inference

48

that Harris placed the weapon on McCree at some point in the parking lot—such as immediately after he shot McCree and the reality of his shooting a handcuffed black man set in. There is simply no other rational explanation for Harris's DNA to be found on a gun that Defendants claim belonged to McCree but was indisputably not on McCree until after the alleged headbutting occurred in the parking lot and one that Harris never claimed to have touched at any point, including after the shooting, as reflected on the video footage. The inference that the gun was placed on McCree is even stronger when coupled with the fact that it was never fired—either offensively or in self-defense in response to the dozens of gunshots fired at McCree by Harris and Baker.

Seventh, in determining the veracity of Baker's story, a jury will consider the events that took place prior to his originally notice deposition in this case. Both Harris and Baker avoided appearing for deposition testimony in this case for over a year after they were first subpoenaed, *see* ECF. No. 36, prompting this Court to order that they provide testimony no later than January 15, 2021. (*See* ECF No. 65 ¶ 8.) Yet, Baker's deposition was canceled at the last minute for unspecified medical reasons and delayed for months afterward. When it finally convened on November 20, 2021, Baker explained why he failed to testify earlier in the case: "I was planning to come down, do my deposition and return home and kill myself. I wanted to tell my story and kill myself. That was it." (Ex. 51, Baker Tr. 115:1-24.) This remarkable admission is highly relevant to Baker's state of mind and is highly probative of his consciousness of guilt. Here, Baker's suicide-related statements were made in the context of testifying in this case, his ideation arose on the eve of his noticed deposition, and his stated plan was to kill himself immediately after testifying. The Fourth Circuit has recognized that "[u]nder generally accepted rules of evidence flight after the commission of a criminal act constitutes circumstantial evidence of consciousness

49

of guilt and suicide is a form of flight." *Tug Raven v. Trexler*, 419 F.2d 536, 543 (4th Cir. 1969) (citing 2 Wigmore, Evidence § 276 (3d ed.1940), and McCormick, Law of Evidence § 248 (1954)). In *Trexler*, the person in charge of a gasoline-discharging operation on a barge that caught fire, killing the crew member on a tugboat moored next to it, testified in a Coast Guard investigation and then killed himself eight days later. *Id.* at 541-43. The court discussed the relevance of the suicide, noting that "[w]hile no criminal charges had been lodged, [the person in charge] must have known that his part in the disaster was one of the subjects of official investigation, if indeed the finger of suspicion was not pointed to him." The Fourth Circuit concluded that evidence of his post-testimony suicide was admissible to show his consciousness of guilt, despite the lack of criminal charges. *Id.* at 543. So too, here. Like *Trexler*, the present case is a civil case, and the shooting of an unarmed, handcuffed man is a criminal act. Evidence of a suicide plan to take place immediately after testifying about that shooting is circumstantial proof of a guilty conscience. *See United States v. Cody*, 498 F.3d 582, 591-92 (6th Cir. 2007) (holding that suicide ideations or attempts may be admissible as consciousness of guilt). A jury should weigh that evidence in determining the veracity of Baker's claim of seeing a gun pointed at him prior to shooting McCree.

### D. Witness Affidavits Do Not Justify Harris and Baker's Use of Deadly Force

To support the claim that McCree retrieved a gun from his car, Defendants offer the affidavits of Jeffery Wallace (ECF No. 143-9) and Diane Smith (ECF No. 143-10) submitted with the City of Chester's motion for summary judgment. Yet, a close review of those statements, does not support this claim. In Jeffery Wallace's affidavit, he states that he was present at the Walmart store, "saw a person running away from Wal-Mart toward Taco Bell," that an "officer was chasing him," and that "[t]he person running was a black male with blue jeans and a hoodie." Wallace then states that he "saw the suspect run past me toward his black car," that "[h]e got in the car and

50

then got back out of it with a gun in his hand," and "[a]fter that, one officer started shooting at the suspect." (ECF No. 143-9 at 2.). Notably, Wallace does not state that McCree was pointing, presenting, or firing a gun at anyone. Nor does he clarify that the black male referred to in paragraph two of his affidavit was the "suspect" he referred to in paragraph three.

Wallace's affidavit is also insufficient to establish that McCree went to "his" car to retrieve a weapon. For example, there is no mention of the black male he witnessed retrieving a gun from a car being handcuffed. If Wallace had witnessed McCree running away from Walmart towards the Taco Bell, or witnessed McCree enter "his" car, surely he would have had an opportunity to observe that his hands were cuffed behind his back. But this critical identifying feature is not mentioned anywhere in Wallace's affidavit. If the person Wallace saw enter a car was McCree, Wallace would have witnessed what undoubtedly would have been a slow and awkward attempt to open a car door with cuffed hands while facing away from it, sitting down backwards into the car, and moving awkwardly around to retrieve a gun before awkwardly getting up to exit the car. Yet none of this is mentioned by Wallace. Nor is Wallace able to describe the more prominent features of McCree's clothing that would have been apparent had he see him, such as the yellow Nike swoosh on the front of his shirt, the large yellow reflective patches on both sleeves, or his bright white sneakers. (See, e.g., Ex. 84.). Thus, even accepting Wallace's affidavit as true, it is entirely possible that he witnessed someone else enter a car, such as one of the many black men dressed in dark tops and light pants entering and exiting the Chester Walmart that morning— including Lavar Richardson who exited his vehicle with a gun (see, e.g., Ex. 66) or even Williams-Tobias (Ex. 86.) Assuming Wallace testifies at trial consistent with his affidavit, a jury can readily infer that the person he witnessed simply was not McCree.

51

More critically, Wallace's affidavit omits a key "fact" regarding the gun that he made in the written statement he provided SLED agents immediately after the shooting; namely that the black man he witnessed was "holding [the gun] up toward his shoulder"—an impossible physical feat for a handcuffed person that not even Harris claims to have witnessed. (Ex. 87 at 2.) Wallace's affidavit also contains significantly more information than he shared with SLED's lead investigator during a January 30, 2020 telephone interview. According to a memorandum of that interview, there was no mention of Wallace seeing a "suspect," no mention of that person running toward "his car," no mention of seeing that person get in the car and emerge "with a gun in his hand." (Ex. 48.) The absence of this material information in SLED's memorandum of Wallace's interview undermines the veracity of his affidavit—why did he not share this information with SLED and why did his telephone interview terminate after only one minute? While Wallace is free to challenge the veracity of SLED's memorandum when he testifies, it is the jury's role to determine whether any of the iterations of his story are credible.

The affidavit of Diane Smith, (ECF No. 143-10), states that she looked out of the storefront window and "saw a black male handcuffed behind his back with a gun," then heard gunfire and "believed that he was shooting at the officers." (*Id*.). In her affidavit, she writes, "I did not see anything else." (*Id*.). Notably, she does not state that she saw McCree holding a gun or presenting it in any threatening manner. Yet, Smith's affidavit stands in stark contrast to two prior handwritten statements she gave to SLED, including one provided hours after the November 23 shooting and another week later on December 12, 2019. In her November 23 statement, Smith writes, "I seen a guy in handcuffs behind his back shooting at the officers," "then we got out of the frontend [of the store] toward the back," and that she "seen the guy shoot behind his back about 3 times and probably 15 shoots total." (Ex. 88, D. Smith Nov. 23, 2019 Stmt.). In her December

52

12 follow-up statement to SLED, he stated that she saw the black man in handcuffs "shoot first," that he fired "approximately five or six times," that she had "seen the gun move when he shot." (Ex. 89.). In contrast, SLED's crime scene examination concluded there was "no forensic evidence to corroborate" Smith's claim—calling her out by name. (Ex. 2 at 42.) Her testimony is thus highly dubious and her evolving story of what she claims to have witnessed undermines her credibility as a witness. Yet, even accepting her sworn statements as undisputed facts—which they are not—they still fall short of establishing that McCree was threatening anyone with a gun.

The material inconsistencies between these witnesses' affidavits and their unsworn statements to SLED undermines their credibility as witnesses, diminishes the weight of their proffered testimony, and provides a substantial basis for impeachment at trial, where they will both be subject to heavy cross-examination. Far from demonstrating an absence of a dispute of material fact on the issue of whether McCree was threatening anyone with a gun, these affidavits alone demonstrate the material dispute of fact on this issue and, standing alone, demonstrate why summary judgment in Harris's favor is inappropriate in this case. *See, e.g., Lincoln v. Reksten Mgmt.*, 354 F.3d 262, 268 (4th Cir. 2003) (observing that a plaintiff "has no burden in opposing summary judgment to reconcile inconsistent statements in the record" rather, "[t]he burden is on the moving party"); *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) ("Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility as to which part of the testimony should be given the greatest weight if credited at all.").

### E. Williams-Tobias's Testimony Does Not Justify Harris and Baker's Use of Force

Williams-Tobias claimed she saw the silver barrel of a gun sticking out an inch or two past McCree's belly button while she was in the parking lot. (Ex. 21, Williams-Tobias Tr. 129:24 –

53

131:24.)    Her testimony, however, is not credible and, even if it were, it does not provide an objectively reasonably basis for Harris or Baker to shoot.  First, her claim of seeing a gun is entirely inconsistent with how she responded to it.  She did not say anything to McCree when she claimed she saw the silver barrel of a gun.  (*Id.* 131:08-24.)  She did not call out any commands or instructions to him to drop the alleged gun.  (*Id.*)  She did not ask him if he had been shot despite hearing numerous gunshots.  (*Id.*)  She did not ask him who was shooting.  (*Id.*).  She did not draw her own gun out to use offensively or defensively. (*Id.* Tr. 155:01-15.)  And, critically, she did not pick up her police radio and inform dispatch or any Chester police officers responding to Walmart that McCree was holding a gun at the time she claimed to have seen it *or at anytime afterwards* despite having her police radio with her.  (*Id.*)  Second, even if her claim of seeing a gun is fully credited, the mere presence of a gun alone is not evidence that justifies the use of deadly force under Fourth Circuit precedent.  Further, Williams-Tobias does not claim to have seen a weapon at the time Harris or Baker were confronting McCree.  Thus, even if true, her testimony does not justify *their* use of deadly force in the moments they fired at McCree.

Third, as with Harris, Baker, and Richardson, Williams-Tobias's testimony is highly biased in favor of law enforcement to the degree that her credibility is an issue.  For example, during her deposition, she was unwilling to admit that McCree would still be alive had he not been detained at Walmart because, in her view, "he can go to another Walmart and could have got shot and killed" or "[h]e could have choked on a piece of candy."  (*Id.* 74:20 – 75:08.)  In her view, "it's not possible" that McCree would still be alive.  (*Id.* 77:11-25.)  Further, when asked whether in her view of justice it would be wrong to be killed over a $50 lock.  She disagreed and, in her words, "I do not agree that it is wrong for someone to be killed for a lock."  (*Id.* 202:17 – 203:03.)

### F.  McCree Had the Lawful Right to Resist His Unlawful Arrest

54

While Plaintiff agrees that *Graham v. Connor*, 490 U.S. 386, 395 (1989), evaluates a claim of excessive force using an objective reasonableness standard, the use of any force to effectuate an illegal arrest is unreasonable. For this reason, resisting an unlawful arrest is not illegal but privileged. *See, e.g., State v. Bethune*, 112 S.C. 100 (1919); *State v. Robertson*, 191 S.C. 509 (1939); *State v. Poinsett*, 250 S.C. 293 (1967); *State v. DeBerry*, 250 S.C. 314 (1967); *State v. McGowan*, 347 S.C. 618, 624 (2001). "A citizen is not, of course, required to submit to an illegal arrest and may use as much force as is reasonably necessary to prevent an unlawful arrest." *DeBerry*, 250 S.C. at 320. Here, even crediting Harris and Baker's speculative and unproven claim that McCree was holding and presenting a firearm at them while handcuffed, McCree's conduct is only a punishable offense if his arrest was warranted in the first instance. Since it is not, Harris and Baker's use of force was excessive and McCree was privileged to resist it. Even assuming he had a gun in his hand, the fact that McCree did not fire a gun at anyone in the face of dozens of bullets fired at him demonstrates that his resistance was proportional to the fatal threat he faced. Even applying the *Graham* factors, Harris and Baker's use of deadly force was not justified.

First, McCree was arrested for shoplifting at $45 door lock set, which is a misdemeanor offense as is petit larceny. Harris's argument that McCree's subsequent escape from the loss prevention room transformed the severity of the crime into a felony necessarily relies on a jury finding that his arrest inside of Walmart was lawful—if not, McCree's escape is legal privileged. It further requires a jury to conclude that Harris was acting in a law enforcement capacity rather than as a private Walmart security guard. Second, even a jury finds McCree's arrest was lawful, his running from the loss prevention room with his hands cuffed behind his back into a parking lot with no ability to escape other than on foot presents very little risk to anyone. At that point, the police knew who he was, knew that he lived just up the street, and easily could have caught up to

55

him quickly and without incident.  Third, as discussed at length above, whether McCree presented an immediate threat to anyone in the parking lot is a highly disputed question that cannot be resolved on summary judgment.  But as it is undisputed that McCree was handcuffed at all times, his presence in the parking lot posed a minimal threat to anyone.  To the extent it did, the Chester police had many non-lethal use of force options to detain him, particularly given that he was partially physically restrained when he first entered the parking lot and was subsequently shot several times, further limiting his ability to move or engage in any threatening conduct.  "A reasonable officer would have asked him to surrender, called for backup or an ambulance, or retreated." *Brockington v. Boykins*, 637 F.3d 503, 507 (4th Cir. 2011).  The objective facts, when viewed in the light most favorable to McCree, show that he was neither a dangerous felon, a flight risk, nor an immediate threat to Harris, Baker, or anyone else.  Thus, applying the *Graham* factors, Harris and Baker's shooting of McCree constituted excessive force under the Fourth Amendment.

### G.  Harris and Baker Each Face Bystander Liability

The Fourth Circuit recognizes a cause of action for bystander liability "premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them."  *Randall v. Prince George's Cnty.*, 302 F.3d 188, 203 (4th Cir 2002). To succeed on a theory of bystander liability, a plaintiff must demonstrate that a law-enforcement officer "(1) [knew] that a fellow officer [was] violating an individual's constitutional rights; (2) ha[d] a reasonable opportunity to prevent the harm; and (3) cho[se] not to act." *Id.* at 204.

The disputed facts outlined above provide sufficient evidence for a jury to conclude that Harris and Baker each had knowledge of and an opportunity to prevent the constitutional violations engaged in by the other but chose not to.  While Baker was not present inside the Walmart store and could not have prevented the unlawful arrest inside, it is undisputed that he drove through the

parking lot and claimed to see Harris and McCree together. As the evidence shows that Harris and Baker's credibility as witnesses are at issue due to their Baker's changing narrative and Harris's admitted memory issues, a jury can reasonably conclude based on the evidence that Baker indeed saw Harris and McCree in the parking lot when he was driving around (as he originally claimed after the shooting) but also conclude that McCree never had a gun in his hand. Harris's initial shooting of McCree was the first instance of excessive force in the parking lot, and Baker could have intervened before, during, or after any of those shots to prevent Harris from continuing to fire at McCree. Similarly, contrary to Harris's claim that "Harris was not in Baker's vicinity" and thus was not a bystander, the video evidence proves otherwise. When Baker approached McCree with his gun drawn, Harris was just feet away on the other side of a car watching him. (Ex. 90 at 11:35:06.) A jury can reasonably conclude that because Harris knew McCree was unarmed, that he had already been shot, and that Harris was nearby Baker who had his gun drawn and pointing and yelling at McCree, that Harris had a reasonable opportunity to prevent Baker's shooting. "The rationale underlying the bystander liability theory is that a bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer." *Randall*, 302 F.3d at 204 n.24.

### H. Plaintiff's Fourth Amendment False Arrest Claims Made Pursuant to 42 U.S.C. § 1983 Survive Summary Judgment Because Defendants Lacked Probable Cause to Arrest

Plaintiff's false arrest claim made pursuant to § 1983 tracks closely with the state law false arrest claim but is made pursuant to the guarantees of the Fourth Amendment instead of the common law of the State of South Carolina. "An arrest is a seizure of the person." *Wilson v. Kittoe*, 337 F.3d 392, 398 (4th Cir. 2003). "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of

his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891). And "Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Id*.; *see also, Park v. Shiflett*, 250 F.3d 843 (4th Cir. 2001) (holding probable cause is the standard to determine lawfulness of arrest). An officer has probable cause for arrest when the "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id*. To determine the existence of probable cause, a court "examine[s] the totality of the circumstances known to the officer at the time of the arrest." *Taylor v. Waters,* 81 F.3d 429, 434 (4th Cir. 1996) (citations omitted). The "general right to be free from an unlawful arrest is of course clearly established-under the Fourth Amendment, [and] police officers must have probable cause before they arrest a suspect." *Ferguson v. Taylor*, 933 F.2d 1001 (4th Cir. 1991); *see also, Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).

The lack of probable cause in this case is set forth below in Plaintiff's response regarding the state law false arrest claims. At bottom, there is sufficient evidence for a jury to find there was no probable cause to establish an intent to deprive Walmart of the retail value of the item at the time he was arrested, because McCree returned to the store on his own volition and tendered payment for the item. As such, the arrest of McCree was unlawful, violative of the Fourth Amendment, and actionable under §1983.

The status of the defendant as a state actor is the essential element that separates the federal cause of action under §1983 from the state law cause of action for false arrest. Walmart contends Richardson and Harris were state actors and acting in their capacity as employees of the Chester Police Department instead of as private security agents of the store when they seized McCree.

58

(Dk. 140-1 at 18). If Walmart's arguments are credited by the jury, then Defendant Harris would be considered acting under the color of state law, and therefore liable as a state actor for the false arrest pursuant to 42 U.S.C. § 1983. Additional factual support for the state actor element are set forth herein throughout. However, there exists a genuine dispute of material fact regarding the capacity under which Harris acted – as an agent of Walmart, as an independent law enforcement officer, or both.

II. **THERE ARE GENUINE AND MATERIAL FACTUAL DISPUTES AS TO WALMART'S LIABILITY AS A STATE ACTOR AND FOR IT'S CONDUCT GIVING RISE TO PLAINTIFF'S STATE LAW CLAIMS**

A. **Walmart Is Subject to § 1983 Liability**

In a section 1983 action against a private party, a plaintiff can establish liability if the private party was "a willful participant in joint activity with the State or its agents" which activity deprived the plaintiff of a constitutional right. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). A private actor acts under color of state law when its conduct is "fairly attributable to the state." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 947 (1982). The Fourth Circuit has said that "there is 'no specific formula' for determining whether state action is present," rather, "a variety of factors may bear upon the inquiry" [such that] "none is individually dispositive" but "serve to inform an evaluation of the 'totality of the circumstances.'" *Holly v. Scott*, 434 F.3d 287, 292 (4th Cir. 2006) (*quoting Goldstein v. Chestnut Ridge Volunteer Fire Co.*, 218 F.3d 337, 343 (4th Cir. 2000).

Courts have long held that retail stores and their employees may be considered acting jointly with police when the police detain accused shoplifters without making an independent investigation. *See Smith v. Brookshire Bros., Inc.*, 519 F.2d 93, 94 (5th Cir.1975) (per curiam). As one of the country's largest discount retailers, Walmart has not been immune to § 1983 liability

59

either.[14] *See, e.g.*, *Murray v. Wal-Mart, Inc.*, 874 F.2d 555, 559 (5th Cir. 1989) (finding Walmart to be a state actor under §1983 in a case where private security guards and police acted in concert to deprive plaintiff of her civil rights when detaining her for shoplifting).

In *Chapman v. Higbee Co.*, the Sixth Circuit denied summary judgment in a § 1983 case brought against Dillard's department store after considering whether the plaintiff could present evidence that a strip search conducted by a store's security guard, who was an off-duty sheriff's deputy "wearing his official sheriff's department uniform, badge, and sidearm," constituted an act that may be attributable to the state. 319 F.3d 825 (6th Cir. 2003). The *Chapman* court expressly recognized that if the plaintiff "did not feel free to leave, as a result of the security officer's sheriff's uniform, his badge, or his sidearm, a reasonable jury could find the detention was a tacit arrest and fairly attributable to the state." *Id.* at 835.

In *Murray v. Wal-Mart, Inc.*, the Fifth Circuit found state action on the part of Walmart on facts substantially similar to this case. 874 F.2d at 559. The Walmart store manager testified that "it is the practice of Wal–Mart to work with the police department in prosecuting shoplifters." *Id.* The store security guard was also a police department employee, and police officers relied on his "incomplete version of the facts" to justify detaining, searching, and prosecuting the plaintiff. *Id.*

So too here. Numerous facts point to the conclusion that Wal–Mart was acting in concert with the Chester police such that its private security guards acted under color of state law. As Walmart concedes in its briefing, "the expectation was that officers would wear Chester Police Department apparel" and among other things, "carry police department issued weapons." (ECF No. 140-1 at 14.) And there is no dispute that Harris, Richardson, and Williams-Tobias did so on

---

[14]   While Walmart argues that it is not a state actor under § 1983, it has not discussed the number of occasions where it has been found to be a state actor in cases involving alleged unlawful detention or arrest of customers.

60

November 23, 2019.  The Supreme Court has recognized that when individuals performing security work wearing the badge and uniform of a law enforcement agency, and they purport to act under that authority, their conduct becomes state action. *Griffin v. Maryland*, 378 U.S. 130, 135 (1964) (noting that the guard "purported to exercise the authority of a deputy sheriff.  He wore a sheriff's badge and consistently identified himself as a deputy sheriff rather than as an employee of the park.").  Walmart's argument that "the officers were paid a flat hourly rate that was negotiated by the Chester Police Department" further supports that the Chester Police Department had a role in setting Walmart's pay scale for store workers—a fact that demonstrates a close nexus between Walmart and the police.  (Walmart MSJ, ECF No. 140-1 at 14.)

The circumstances of the arrest of McCree further provide evidence of state action. Walmart claims that Harris, Baker, and Richardson exercised their authority as Chester police officers to arrest McCree.  But Walmart's McManus admitted that she made the decision that McCree was a shoplifter and that he would be arrested. (Ex. 63, McManus. Tr. 14:17 – 17:8.) While Walmart contends that "Richardson had probable cause to detain and arrest Decedent for shoplifting," it cannot deny that Richardson was one of its paid security guards that day.[15]  And while probable cause is disputed fact issue in this case, no one disputes that the security guards used the authority of their uniform, badge, and gun to place McCree in police handcuffs and to detain him inside of the loss prevention room.  Further, McManus was clear in her view that shoplifting occurs when an item is taken outside of the store regardless of intent, and she was clear in her authority to direct the off-duty officers to do what was asked of them regarding individuals

---

[15]   As a Class 3 law enforcement officer with no lawful authority to conduct arrests under South Carolina law, Walmart cannot credibly argue that Richardson was acting in any lawful capacity when he handcuffed McCree and placed him in Walmart's loss prevention room.  In hiring Richardson, Walmart got exactly what it requested from the Chester Police Department: "armed security," not a licensed police officer.

61

she deemed to be shoplifters. (*Id.* 58:22 – 59:22 ("If you have a shoplifter in your store and you have an off duty officer working there, they're not going to refuse not [sic] to help you when you're paying them $30 an hour."). Thus, there is ample evidence upon which a jury can find that Walmart acted under color of state law in misusing the city's badge and gun for its private ends.

Acting under color of state law, and under the custom established at the Chester store of hiring private security guards untrained in Walmart's written policies to effect arrests as directed by McManus, Walmart deprived McCree of his right to be free from unlawful seizure. And Harris, as one of Walmart's paid security guards that day, chased McCree when he ran into the parking lot and repeatedly shot him, thus depriving him of his right to be free from excessive force (and his due process right to life).

### B. Walmart Is Liable for the Acts of Its Private Security Guards

Walmart's fundamental argument to escape liability on all claims is grounded in the flawed and misleading characterization of Richardson, Williams-Tobias, and Defendant Harris as "law enforcement officers" and not paid private security guards working for Walmart. Yet the record is clear that on November 23, 2019, these individuals were paid private security guards working for Walmart, and, under the law, Walmart is liable for their acts. *Bradley v. Hullander*, 272 S.C. 6 (1978). Agency is a question of fact. *Gathers v. Harris Teeter Supermarket, Inc.*, 282 S.C. 220, 226 (Ct. App. 1984). "The relationship of agency need not depend upon express appointment and acceptance, but may be, and frequently is, implied from the words and conduct of the parties and the circumstances of the particular case. If there are any facts tending to prove the relationship of agency, it then becomes a question for the jury." *Id.* (citing *Reid v. Kelly*, 274 S.C. 171 (1980); *Hunter v. Hyder*, 236 S.C. 378 (1960); *City of Greenville v. Washington American L.B. Club*, 205 S.C. 495 (1945)). As discussed above, there is no evidence disputing that Harris, Richardson, and

62

Williams-Tobias were working as private security guards for Walmart on November 23, 2019. (*See also* Ex. 73, Birks Report at 34.)  To the extent Walmart disputes this, it merely establishes a dispute of fact on the agency relationship.

Under South Carolina law, a master is liable for and is charged with knowledge of the acts and conducts of its agents operating within the scope of their employment. *Bradley v. Hullander*, 272 S.C. 6, 249 S.E.2d 486 (1978). An act is within the scope of an agent's employment where it is reasonably necessary to accomplish the purpose of his employment and is in furtherance of the master's business. *Lane v. Modern Music*, 244 S.C. 299, 136 S.E.2d 713 (1964). A master or employer will not be responsible for the acts of its agents where the employee is not engaged in the execution of the employer's business, but rather is engaged in the servant's own private business. *Lane v. Modern Music*, supra; *Tucker v. United States*, 385 F. Supp. 717 (D.S.C. 1974).

Walmart's argument that its guards were not "agents" of Walmart by reference to IAPSC Best Practices No. 3 is misplaced.  (Walmart Mot. at 18-19, ECF No 140-1.) Plaintiff's retail security expert, William Birks, who is board-certified and tested by IAPSC, explained during his testimony that the IAPSC is just one of several groups that publish best practices, but this definition is not an "industry standard" as that term is understood to be a binding. (Ex. 85, Birks Tr. 121:9 – 122:11.)  Nevertheless, during his deposition, Walmart's counsel insisted on focusing on the narrow, common sense exception to the IAPSC's definition of "agent," which excludes on a limited basis certain off-duty law enforcement officers as being "agents" of a retailer.  As Mr. Birks' explained, the safe harbor from the definition of "agent" does not apply to off-duty law enforcement "working in security." (*Id.* at 124:9 – 126:8).  Mr. Birks testified, "you can't have it both ways," *id.*, which is what Walmart is trying to argue in summary judgment: that it is free to hire and pay off-duty law enforcement officers to provide private security services on its private

63

store property solely for the benefit of Walmart without bearing the consequence of their malfeasance when something goes wrong. As Mr. Birks testified, industry standards do not create such a large, gaping loophole for retailers like Walmart to exploit. Indeed, the commonsense reasoning for excepting a subset of off-duty law enforcement officers from the definition of "agent" in the IAPSC definition is to protect officers who are off-duty and not working for or paid by the retailer, such as for example, those who are patronizing a retailer on their personal time yet need to exercise their law enforcement powers in response to an emergency incident.

Birks also testified at length regarding the distinction in the security world between an off-duty law enforcement detail, such as a traffic detail after a Sunday church service or sporting event and paid private security work performed by off-duty law enforcement officers. He made clear that this distinction is embedded in the IAPSC policy. (Ex. 85, Birks Tr. 349:7 – 351:23.). He further testified that the evidence shows Walmart did not request "law enforcement officers" as security for its Chester store, but rather requested "armed security" without regard to their qualifications. (*Id.* 341:21 – 344:18.) Because there is sufficient evidence demonstrating that Harris, Richardson, and Williams-Tobias were paid to perform private security services for Walmart on November 23, 2019, and the claims raised against Walmart arise in part from their performance of the security services, Walmart is legally liable for their conduct on November 23, 2019, along with the conduct of its other employees, Joshua Stephenson, Ann Curtsinger, and Evelyn McManus.

### C. Walmart Is Liable for Negligence

Walmart argues that it owed no duty of care to McCree and, if it did, it did not breach such duties. Here, there is evidence and precedent establishing Walmart's duty and its breach. The standard of care can be established by looking to the common law, industry standards, or a

64

defendant's own policies and procedures. "Evidence of a company's deviation from its own internal policies is relevant to show the company deviated from the standard of care, and is properly admitted to show the element of breach." *Roddey v. Wal-Mart Stores E., LP*, 415 S.C. 580, 589 (2016); *see also Caldwell v. K–Mart Corp.*, 306 S.C. 27, 31 (S.C. Ct. App. 1991) (holding K–Mart's loss prevention manual was relevant on the material issue of the reasonableness of K–Mart's actions).

There is ample evidence of the standard of care in Walmart's AP-09 policy and industry standards. As discussed above, the AP-09 policy prohibits Walmart from restraining or searching a customer or pursing one who flees the store, restraining a customer, searching a customer, or pursing a "fleeing Suspect." (Ex. 72, Ex. 74; *see also* Ex. 73 at 17-22.) Walmart's policy also requires the shoplifting be confirmed by the customer "demonstrat[ing] intent to steal the merchandise." (Ex. 72 at 2.) In other words, when a customer does not demonstrate intent to steal merchandise, Walmart does not recognize that customer as shoplifting. In this regard, the AP-09 policy reflects generally accepted security practices and policies used by retail security and loss prevention personnel. (*Id.* at 26.)

Walmart repeatedly violated its own policy and industry standards when interacting with McCree, as discussed at length in the report and testimony of Plaintiff's retail security expert, William Birks. (Ex. 73 at 17-30.) These breaches of the duty of care include violating the Approaching a Suspect section of AP-09, (*id.* at 20), by not providing McCree an opportunity to explain if there was a mistake or misunderstanding, (*id.* at 22), by not training Harris, Richardson, or Williams-Tobias on its policies, (*id.* at 21), by using aggressive methods to detain McCree, (*id.*), by handcuffing him, (*id.* at 27), by leaving McCree alone in the loss prevention room with Harris, (*id.* at 21), and by failing to withdraw from McCree, (*id.* at 21-22). Walmart further breach its

65

policies by ordering that McCree be arrested for shoplifting in violation of its Prosecution of Suspects provision of the AP-09 policy. (*Id.* at 22.)

Chasing McCree through the parking lot and attempting to apprehend him through force further breached Walmart's policy and industry standards. (*Id.* at 27-29.) In *Roddey v. Wal-Mart Stores E., LP*, the South Carolina Supreme Court found that evidence of Walmart's security personnel failing to adhere to its shoplifting policies when attempting to apprehend a fleeing shoplifter in a parking lot established the elements of duty and breach. *Roddey*, 415 S.C. at 589 (finding evidence that "Wal–Mart employees either instructed Jones to act in violation of Wal–Mart's policies or acquiesced in Jones's improper pursuit of Hancock and Beckham" established breach of the duty of care it owed to its customer.).

Walmart's argument that the store was merely a crime victim and had no involvement with McCree is baseless. (ECF No. 140-1 at 17.) Walmart's store management and private security guards engaged in the detention and arrest of McCree and the subsequent pursuit of him in the parking lot. Walmart's argument that Harris, Baker, and Williams-Tobias were not "Walmart Associates" is also unavailing. As *Roddey* recognized, evidence that Walmart "instructed" or "acquiesced" its security guards to engage in improper conduct is evidence of the breach of its duty to adhere to its policies and industry standards. *See Roddey*, 415 S.C. at 589.

Walmart's defense that it offends public policy to subject it to liability for "cooperating with law enforcement in good faith" also fails. There is ample evidence in the record that Walmart was not acting in good faith. This includes McManus's testimony regarding her disregard of the "intent" requirement in AP-09 and under the law when deciding to arrest McCree. (Ex. 63, McManus Tr. 14:17—17:8, 21:22-22:25.) This also includes: McManus's disregard of her knowledge that McCree was going to the bank to get money, (Ex. 13 at 1), that he returned to the

66

store and offered to pay, and that ███████████████████████████████████████, (Ex. 18, WM 608 ); as well as the "bounty" culture that incentivized the quantity of apprehensions in annual performance reviews for loss prevention personnel establish that the decision to arrest McCree was done bad faith.  (Ex. 73, Birks Report at 16.)

### D.  Walmart Is Liable for False Arrest

The record is replete with evidence establishing Walmart's liability for false arrest/false imprisonment of McCree.  The essence of the tort of false imprisonment consists of depriving a person of his or her liberty without lawful justification. *Law v. S.C. Dep't of Corr.*, 368 S.C. 424, 440 (2006). To establish false imprisonment under South Carolina law, the plaintiff must show that the defendant restrained the plaintiff, the restraint was intentional, and the restraint was unlawful. *Id.*; *see also Gist v. Berkeley County Sheriff's Dep't*, 336 S.C. 611, 618 (Ct. App. 1999).

There is no dispute that McCree was handcuffed inside the store by Richardson.  McManus testified that made the decision that he was shoplifting and she made the decision that he would be arrested.  The evidence also shows that McManus's determination was devoid of any consideration of whether McCree *intended* to deprive Walmart of the door lock, despite having overwhelming knowledge that he did not, *e.g.,* including McCree's interaction with Stephenson, her knowledge that McCree was going to a bank, and his voluntary return to the store and offer to pay.

Walmart argues that the decision to arrest McCree was a law enforcement decision, but Williams-Tobias testified that she asked McManus if he could pay, and that offering to pay was a reasonable thing for McCree to do.  (Ex. 21, Williams-Tobias Tr. 59:17 – 60:03.)  Yet, according to McManus, Walmart's security guards are "not going to refuse not [sic] to help you when you're paying them $30 an hour."  (Ex. 21, McManus Tr. 58:22 – 59:22.)   Further, it is "well settled that where a private person induces an officer by request, direction or command to unlawfully arrest

67

another, he is liable for false imprisonment." *Huffman v. Sunshine Recycling, LLC*, 426 S.C. 262, 272–73, 826 S.E.2d 609, 615 (2019); *see also Wingate v. Postal Tel. & Cable Co.*, 204 S.C. 520, 528 (1944) ("The charge of false imprisonment is not confined to the party who unlawfully seizes or restrains another, but it likewise extends to any person who may cause, instigate or procure an unlawful arrest.").

Walmart raises the Merchant's Defense under S.C. Code Ann. § 16-13-140, which protects merchants and their employees who restrain or delay customers suspected of shoplifting if the customer was delayed in a reasonable manner and for a reasonable time to permit such investigation, and reasonable cause existed to believe that the customer delayed had committed the crime of shoplifting.[16]    "Reasonable cause" under the statute is synonymous with "probable cause." *Faulkenberry v. Springs Mills, Inc.*, 271 S.C. 377, 380 (1978) (holding that the Merchant's Defense under § 16-13-140 "must be supported by probable cause; and the delay must be reasonable in time and manner and can only be justified during the commission of the suspected wrongdoing."); *Gathers*, 282 S.C. at 228. Probable cause is defined as "a good faith belief that a person is guilty of a crime when this belief rests on such grounds as would induce an ordinarily prudent and cautious person, under the circumstances, to believe likewise." *Jones v. City of Columbia*, 301 S.C. 62, 65 (1990).  The determination of whether probable cause "is a question of fact and ordinarily one for the jury." *Id.*  Here, as previously discussed, there is ample evidence

---

[16]   Walmart argues in its motion that the statute "provides a complete defense to *any action* related to a shoplifting investigation," but notably fails to cite any legal authority for this broad and misleading characterization of the law.  Indeed, the plain language of the Merchant's Defense statute clearly limits the defense to only those circumstances where the detention was done in a "*reasonable* manner", for a "*reasonable* time," and the merchant had "*reasonable* cause" to believe the person detained was engaged in shoplifting.  S.C. Code Ann. § 16-13-140 (2003) (emphasis added).

for a jury to conclude that the detention of McCree inside the store by Walmart was unreasonable and not based on probable cause.

### E.  Plaintiff Is Entitled to Recover Punitive Damages From Walmart

Walmart's sole basis for contending that Plaintiff is not entitled to seek punitive damages from a jury is its claim that Walmart reported the alleged shoplifting "in good faith."  Yet, whether Walmart acted in "good faith" is an issue for a jury to resolve.  In South Carolina, the issue of whether to award punitive damages should be submitted to the jury where "there is evidence that a tortfeasor's conduct was willful, wanton, or in reckless disregard of the rights of another." *Cartee v. Lesley*, 350 S.E.2d 388, 390 (S.C. 1986) (citing *Fox v. Munnerlyn*, 323 S.E.2d 68 (S.C. Ct. App. 1984)). "Ordinarily, the test is whether the tort has been committed in such a manner or under circumstances that a person of ordinary reason or prudence would have been conscious of it as an invasion of the plaintiff's rights." *Id.* (citing *Hinson v. A.T. Sistare Construction Company, Inc.*, 113 S.E.2d 341 (S.C. 1960)). "It is always for the jury to determine whether a party has been reckless, willful, and wanton." *Wise v. Broadway*, 433 S.E.2d 857, 859 (S.C. 1993) (citing *Ralls v. Saleeby*, 182 S.E. 750 (S.C. 1935)).

Here, there is clear and convincing evidence in the record to establish that Walmart's employees (McManus, Stephenson, and Curtsinger) and Walmart's paid security guards (Lavar Richardson, Makeesharia Williams-Tobias, and Defendant Harris) engaged in willful and wanton misconduct and in conscious and reckless disregard of McCree's rights under the law.  A jury could reasonably conclude that cashier Joshua Stephenson, ███████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

69

███████████████████████████████████████████.  A jury could also fully credit Stephenson's testimony that McCree discussed putting the lock set on a "tab" and that, whether by agreement or not, Stephenson clearly understood that McCree would return to the store to pay for the item and never intend to deprive Walmart of its value.

A jury can readily conclude that the store's managers responsible for store profits and losses, Curtsinger and McManus, were aware of ████████████████████████████ ████████████████████████████████████, but purposefully withheld that information from others, including later withholding it from SLED investigators, to create the false impression that McCree was shoplifting from the store and Defendants' actions were justified. McManus knew that McCree was returning to the store after going to the bank. (Ex. 13). And it is undisputed that McCree in fact returned to the store that morning with money in hand to pay for the lockset. Yet, McManus admitted that she made the decision that McCree shoplifted and that he should be arrested. (Ex. 63, McManus Tr. 30:14-19.) And McManus also knew that McCree would not be detained or arrested absent her directive.

Walmart's employees also knew McCree very well. Video from the store shows McCree hugging and waiving to Walmart employees when he arrived. Like McManus and Curtsinger, McCree's grandmother was a decades-long employee of Walmart in Chester and as a boy McCree routinely visited her for lunch at the store. A jury can readily conclude that Curtsinger and/or McManus harbored personal animus toward McCree that was the driving force behind Walmart's determination that he shoplifted and decision to have him arrested, directions that Richardson, Harris, and Williams-Tobias blindly followed. (*Id*.)

A jury can also conclude from Richardson's testimony and the statements he made in the minutes after the shooting that Walmart had no lawful purpose in detaining McCree inside the loss

70

prevention room and that the sole reason he was handcuffed and detained was to allow McManus to "come take his picture and put him in the system." (Ex. 33 at 11:48:10; Ex. 27, Richardson Tr. 71:13-19; *see also* Ex. 38, Harris WC Tr. 43:8-11 (testifying that Richardson left "to go get a paper signed.").) A jury can easily conclude that Walmart engaged in this conduct because it wanted to send a clear message to the Chester community in advance of Black Friday shopping that it would not hesitate to have customers like McCree arrested and prosecuted for the slightest of mistakes—including mistakes caused by Walmart's employees. A jury can readily reach this conclusion from Walmart's ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████. Thus, a jury can reasonably find clear and convincing evidence that Walmart's misconduct was willful, wanton, or in reckless disregard of McCree's legal rights.

## IV.    PLAINTIFF'S STATE LAW CLAIMS SURVIVE SUMMARY JUDGMENT

### A. The immunities provided within the SCTCA are inapplicable and do not afford protection to Defendants Harris, Baker, or the City of Chester.

Based on the constitutionally violative conduct outlined above, a jury could reasonably find such conduct constitutes gross negligence and satisfies the elements of wrongful death and false arrest, precluding summary judgment as to Plaintiff's state law claims against Harris, Baker and the City of Chester. *See e.g., Henry v. Purnell*, 652 F.3d 524, 536–37 (4th Cir. 2011) (holding that because qualified immunity was denied as to Purnell's conduct, the parallel state law claims for gross negligence and assault and battery could likewise proceed to trial). Moreover, Plaintiff's state law claims also fall outside the protections provided under the South Carolina Tort Claims Act, or, at a minimum, give rise to a jury issue as to the SCTCA's applicability.

71

As an initial matter, Harris, as a security guard for Walmart cannot invoke the SCTCA exceptions to the waiver of immunity. As noted herein, whether Harris was acting as an agent of Walmart or as a police officer is a question of fact that must be decided by the jury. The SCTCA applies only if Harris was not acting on behalf of Walmart but in an independent capacity as a law enforcement officer.[17] The SCTCA "is the exclusive and sole remedy for any tort committed by an employee of a governmental entity while acting within the scope of the employee's official duty." S.C. Code Ann. § 15-78-200. "For a government employee to be acting within the scope of his official duty or employment, the employee must be (1) 'acting in and about the official business of the government entity,' and (2) 'performing official duties.'" *Wade v. Berkeley County*, 498 S.E.2d 684, 688 (S.C. 1998) (*quoting* S.C. Code § 15–78–30(i)). But even assuming Harris was not acting on behalf of Walmart, immunity under the SCTCA is specifically waived for gross negligence involving the custody of an arrestee or detainee like McCree.[18] *See Tarashuk v. Orangeburg Cty.*, No. 5:19-CV-02495-JMC, 2022 WL 969752, at *15 (D.S.C. Mar. 30, 2022) (denying summary judgment as to gross negligence claim against police under exception waiving immunity for grossly negligent conduct involving custody of arrestee or detainee). The SCTCA

---

[17] Similarly, any constitutional tort claim made pursuant to section 1983 against Harris can stand only if Harris was acting in a law enforcement capacity independent from his agency with Walmart. *See generally, Town of Mount Pleasant v. Jones*, 335 S.C. 295, 516 S.E.2d 468 (Ct. App. 1999) ("The Fourth Amendment is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the government . . .").

[18] Defendants do not assert SCTCA immunity for Plaintiff's false arrest/false imprisonment claim. Nonetheless, the SCTCA does not provide immunity for challenges to the lawfulness of an arrest or detention without a warrant, as in McCree's case. *See Gist v. Berkeley Cnty. Sheriff's Dep't*, 521 S.E.2d 163, 166–67 (Ct. App. 1999) (finding Sheriff's Department not shielded from liability by arrest warrant under exception for "execution, enforcement, or lawful implementation of any process" where cause of action arises from securing warrant without probable cause); *Wortman v. Spartanburg*, 310 S.C. 1, 425 S.E.2d 18 (1992) (declining to find city immune from suit alleging plaintiff's arrest was unlawful where plaintiff was arrested before city police obtained a warrant, and thus actions of police did not occur during execution or enforcement of order of any court or during lawful implementation of any process, as contemplated by the SCTCA).

provides immunity to state entities for failures in the "supervision, protection, control, confinement, or custody of any student, patient, prisoner, inmate, or client of any governmental entity, *except when the responsibility or duty is exercised in a grossly negligent manner.*" S.C. Code Ann. § 15-78-60(25) (emphasis added).

Here, Plaintiff alleges that Harris and Baker were "grossly negligent [or] reckless" in shooting McCree in the parking lot resulting in his death. (ECF No. 41 at 9 ¶ 40). Plaintiff also asserts, and Defendants do not dispute, that McCree was in custody when Harris and Baker shot him. (ECF 41 at 4-5 ¶¶ 15, 20, 29-30 (alleging McCree was detained, arrested and handcuffed)). Thus, § 15-78-60(25) applies and the City of Chester is not shielded from liability for gross negligence while McCree was in police custody.

Defendants' assertion of immunity under the exception for negligence claims involving the method of providing police protection is misplaced. (*See* ECF 144-1 at 29-30, citing § 15-78-60(6) as providing immunity for Plaintiff's claims but neglecting to mention § 15-78-60(25)). The fact of custody distinguishes this case from a "failure to protect" claim, which applies instead to members of the public who are not detained, arrested, or otherwise confined by the state. *See Tarashuk*, 2022 WL 969752 at *15; (citing *Shelley v. South Carolina Highway Patrol,* 852 S.E.2d 220, 221 (S.C. Ct. App. 2020). As recently held in *Tarashuk*, a cause of action challenging police conduct involving the custody of an arrestee or detainee is not a challenge to the method of providing police protection, but rather, it is more properly analyzed under the custodial immunity exception of 15-78-60(25). *Id. Tarashuk* involved a gross negligence claim arising from the death of a man after police left him at a gas station in the middle of the night. *Id.* Aware the man was mentally unstable and out of concern for his safety, the police were preparing to take him to the police station or to the hospital but instead left him at a gas station off I-95,

where he wandered into the highway and was struck and killed by on-coming traffic. *Id.* The court analyzed the immunity provisions of § 15-78-60 and specifically concluded that where a suspect is arrested or detained, the custodial immunity provision of 15-78-60(25), which includes a gross negligence exception, applies. *Id.*

Plaintiff's claim falls squarely within the gross negligence exception for custodial immunity provided in § 15-78-60(25).[19]   Pursuant to the same reasoning regarding Plaintiff's § 1983 claims, the evidence in this case supports an inference that Harris and Baker acted with gross negligence or recklessness with regard to McCree–this includes Harris and Baker's grossly negligent conduct in firing recklessly at a handcuffed McCree; and Harris' recklessness in ambiguously announcing "shots fired" and "he's already hit me twice" over the police radio so as to improperly suggest that McCree was a threat when it was Harris who had fired shots.  Because gross negligence is a mixed question of law and fact, it should be presented to the jury where, as here, there are competing inferences to be drawn from the evidence.  *See Tarashuk*, 2022 WL 1672780 at \*15 ("Gross negligence is a mixed question of law and fact and should be presented to the jury unless the evidence supports only one reasonable inference") (quoting *Taylor v. S.C. Dep't*

---

[19] The City and Harris' argument that Plaintiff cannot pursue a negligence/gross negligence claim is also misplaced.  (*See* ECF No. 141-1 at 27-29; ECF No. 143-1 at 8-9.)  It is well-settled that a plaintiff may assert alternate and competing theories of recovery, especially where, as here, the SCTCA authorizes recovery for grossly negligent conduct under the facts of this case.  *See* S.C. Code Ann. § 15-78-60(25) (exempting immunity for "custody" of "prisoner", *i.e.,* arrestee or detainee, when the "responsibility or duty is exercised in a grossly negligent manner.").  For this same reason, the public duty rule is inapplicable because Plaintiff's negligence claim is premised on the custodial duty owed by Defendants to McCree and does not implicate any statutory duty of care that would otherwise trigger the public duty rule. *See Newkirk v. Enzor*, 240 F. Supp. 3d 426, 437 (D.S.C. 2017) (holding that because Mrs. Newkirk does not assert negligence based on breach of a statutory duty, SCDPS's argument based on the public duty rule is inapposite to her negligence claim).

*of Corr.*, No. 0:19-cv-02105-JFA, 2020 WL 1672780, at *10 (D.S.C. Apr. 6, 2020) (citing *Bass v. S.C. Dep't of Soc. Servs.*, 780 S.E.2d 252, 259 (S.C. 2015))).

Moreover, even assuming § 15-78-60(6) was applicable, this exception to the waiver of immunity for a loss resulting from the method of providing police protection does not provide the police with blanket immunity. *See Shelley v. South Carolina Highway Patrol*, 432 S.C. 335, 852 S.E.2d 220 (S.C. Ct. App. 2020). Police officers whose conduct is outside the scope of their official duties or constitutes actual fraud, actual malice, intent to harm, or a crime involving moral turpitude are liable for their torts in the same manner and to the same extent as a private individual under like circumstances without any immunity from the Act. *Id.* A jury could reasonably conclude that Harris and Baker, in shooting over twenty-four rounds of ammunition into a crowded parking lot full of customers, were so reckless as to evince an intent to harm not just McCree but other innocent civilians in the parking lot. In circumstances such as this, Harris and Baker will remain individually liable for their acts. *See, e.g.*, *Bellamy v. Horry Cty. Police Dep't*, No. 4:19-cv-03462-RBH-KDW, 2020 WL 2559544, at *5 (D.S.C. Apr. 30, 2020), report and recommendation adopted, No. 4:19-cv-03462-RBH-KDW, 2020 WL 2556953 (D.S.C. May 20, 2020); *Betton v. Knowles*, No. 4:15-cv-04638-AMQ-KDW, 2018 WL 4404073, at *15 (D.S.C. May 21, 2018), report and recommendation adopted, No. 4:15-CV-04638-AMQ, 2018 WL 3744957 (D.S.C. Aug. 7, 2018), aff'd sub nom. *Betton v. Belue*, 942 F.3d 184 (4th Cir. 2019) ("Because the undersigned has determined that questions of fact remain concerning Belue's alleged unlawful entry and his alleged use of excessive force, whether Defendant is entitled to statutory immunity also remains a genuine issue of material fact on the trespass and assault and battery allegations.").

75

In so far as there is a genuine and material dispute as to whether Harris was acting on behalf of Walmart or for the City of Chester and whether Harris and Baker's conduct falls outside the scope of the SCTCA, these Defendants must remain named defendants on all state law claims. A jury must first determine whether Harris was working on behalf of Walmart or the City of Chester. *See, e.g.*, *Gathers v. Harris Teeter*, 282 S.C. 220, 226-27, 317 S.E.2d 748, 752-53 (Ct. App. 1984) (holding the jury could have reasonably concluded the off-duty police officer that worked security for the grocery store was acting as an agent for the store at the time he made an arrest for shoplifting). For example, if a jury finds Harris was an agent for the City of Chester, the jury will then have to determine whether he acted within the scope of his employment with the City of Chester or whether he acted with malice or intent to harm. The same analysis will apply for Baker. Only then can the Court properly determine whether these defendants are subject to SCTCA immunity as governmental employees. If the jury concludes Harris was not acting on behalf of Walmart, Plaintiff's gross negligence claim will still proceed against the City of Chester as the governmental entity liable for Harris and Baker's grossly negligent conduct while McCree was in custody. But at this stage of the proceedings, summary judgment cannot be granted on this issue.

### B. Plaintiff's state law false arrest claims survive summary judgment because, at a minimum, there is a genuine and material dispute as to probable cause.

Viewing the facts and inferences in Plaintiff's favor, a jury could reasonably conclude that McCree intended to pay for the door lock and, thus, did not intentionally seek to deprive Walmart of the value of the door lock as is required by the statutory definition of shoplifting. *See* S.C. Code Ann. § 16-13-110 (requiring possession or carrying away of property "with the intention of depriving the merchant of the possession, use, or benefit of the merchandise without paying the full retail value").

76

False arrest and false imprisonment are interchangeable, both being dependent on the existence of probable cause. *See Thomas v. Colonial Stores, Inc.,* 113 S.E.2d 337 (1960) (stating the essence of the tort of false imprisonment consists of depriving a person of his liberty without lawful justification). "Probable cause" is defined as a good faith belief that a person is guilty of a crime when this belief rests on such grounds as would induce an ordinarily prudent and cautious man, under the circumstances, to believe likewise. *Gathers v. Harris Teeter Supermarket,* 317 S.E.2d 748, 753-54 (Ct. App. 1984)). "The issue of probable cause is essentially a question of fact and ordinarily for the determination of the jury." *Id.* The fundamental question, therefore, is whether there was probable cause to arrest McCree on the misdemeanor offense of shoplifting. Given the evidence in this case, the answer is, unequivocally, no.

Under the relevant language of S.C. Code Ann. § 16-13-110, an individual is guilty of shoplifting if he:

> takes possession of, carries away . . . or causes to be carried away or transferred any merchandise displayed, held, stored, or offered for sale by any store or other retail mercantile establishment *with the intention of depriving the merchant of the possession, use, or benefit of the merchandise without paying the full retail value.*

*Id.* The South Carolina General Assembly specifically included the phrase "*with the intention of depriving the merchant of the possession, use, or benefit of the merchandise without paying the full retail value.*" *Id.* Probable cause cannot be found unless there is a reasonable belief that all elements of the offense are met, including the essential, statutory element of "intent." Such intent to deprive is utterly absent in McCree's case.

To the degree defendants argue the offense of larceny as an alternative basis to establish probable cause to arrest, the outcome is the same. "Larceny is also implicit within the crime of shoplifting." *State v. Moore*, 374 S.C. 468, 478, 649 S.E.2d 84, 86 (Ct. App. 2007). "To make out the offense of larceny, there must be a felonious purpose. The taking must be done *animo*

77

*furandi*—with a view of depriving the true owner of his property and converting it to the use of the offender." *State v. Williams*, 237 S.C. 252, 260, 116 S.E.2d 858, 862 (1960). In *Williams*, the court reviewed whether directed verdict should have been granted in favor of a larceny suspect that took a patrol officer's gun while resisting arrest. *Id.* In doing so, the *Williams* court found intent was the critical factor and should be decided by the jury noting "a jury would be fully justified in concluding that there was no intent to steal the pistol but that the dominant and primary purpose . . . was to disarm the patrolman, and that shortly after doing so, he discarded the pistol." *Id.* at 261; *see also*, *State v. Watson*, 7 S.C. 63, 66 (1876) ("The motives with which the goods are taken is an essential inquiry for the jury.").

As shown on video, McCree's interaction with the cashier suggested no intent to deprive Walmart of the value of the lock. (Ex. 10, Att POS 5 ). He simply waits in line, waits for the cashier to scan and bag his item, and accepts the bag from the cashier. (*Id.*) He then walks out casually like any other customer. One inference, supported by the evidence, is that the cashier, Stephenson, simply made a mistake. While another equally supported inference is that he made an error when checking out McCree—an error that he did want to claim as his own.

Another inference is that McCree believed it was acceptable for him to return with payment based upon the interaction with the Stephenson, which is what he did two hours later. The complete lack of intent to deprive Walmart of the full retail value of the door lockset is supported by the Stephenson's allegation that McCree stated, "put it on my tab" and McManus's report that McCree was going to the bank. (Ex. 13, McManus Statement to SLED). On this evidence, a jury can readily conclude that it would be objectively unreasonable to conclude McCree had the requisite criminal intent for either shoplifting or larceny, but rather he intended to return to the store to pay for the item in question. While it will be for the jury to determine the credibility,

weight, and significance of these statements, it is undisputed that McCree did, in fact, return to Walmart less than two hours later with money in hand and asked to pay for the lock.

Under either inference, each aptly supported by the evidence, the requisite element of intent is undeniably absent. There is simply no way to square the statutory requirement of intent to deprive the merchant of the full retail value with McCree's conduct and the known facts. Critically, McCree's offer to pay is not an admission to shoplifting, as Defendants disingenuously suggest. It is precisely the opposite. The return to the store and offer to pay unequivocally negates the element of intent and, thus, probable cause. It strains all credulity to accept Defendants' position that (1) McCree openly carried the door lock through the checkout process with the intent to shoplift it and (2) then returned to Walmart to admit to shoplifting. This position is further placed into doubt by the fact that McCree had $45 cash in hand with him when he returned to Walmart.[20] At the very least, this evidence establishes a genuine and material dispute as to probable cause.

Next, defendants advance the theory that McCree was being arrested for possession of marijuana or could have been arrested for possession of marijuana as the probable cause to arrest for shoplifting or larceny must fail. In support of this defense, they look to *U.S. v. Humphries*, 372 F.3d 653 (4th Cir. 2004). The *Humphries* opinion was a concurrence with Judge Gregory joining in the result but not in the analysis. *See United States v. Humphries*, 372 F.3d 653 (4th Cir. 2004). Judge Gregory opined that the smell of marijuana would have established reasonable suspicion, which would authorize a pat down, which would inevitably lead to the discovery of the contraband.

---

[20] The coroner recovered $45.27 during the inventory of McCree's body and the full retail value of the lock including sales tax alleged by Walmart was $45.87. This evidence further negates any alleged criminal intent by McCree as it is not mere coincidence that these numbers match so closely. The amount evidences an intent to pay the retail value of the lock. It may be another matter if McCree merely had $2.00 on hand offering to pay, but that is not the case.

*Id*. at 660-61.  As such, whether the officer "arrested" the suspect was harmless error.  *Id*. at 661-62.

It is uncontested here that Richardson and Harris handcuffed McCree and transported him from retail area of the store to the loss prevention office.  Once inside, Harris conducted a pat down of McCree and emptied his pockets.  (Ex. 31.)  No marijuana was found in the search of McCree's person.  Thus, whether the smell of marijuana initially justified an investigatory detention or an arrest as Defendants' now claim, it is of no real matter.  Once the search of McCree was performed and any suspicion that he possessed marijuana was extinguished, then any and all probable cause to arrest or reasonable suspicion to seize was extinguished, too.  In other words, if McCree was being held for possession of marijuana, then he would have been released as soon as the search was completed.

Finally, defendants advance a backstop argument that regardless of whether the initial arrest of McCree was lawful, the subsequent killing of McCree was a lawful exercise of force in the furtherance of making an arrest for assault on a police officer.  However, this too is a question to be decided by the jury.  Addressing this same question regarding an alleged assault on a law enforcement officer during the furtherance of an unlawful arrest, the South Carolina Supreme Court determined the trial court erred when it did not charge the jury regarding the "in the presence" limitation on arrest power in South Carolina.  *State v. Williams*, 237 S.C. 252, 259-60, 116 S.E.2d 858, 862 (1960).  The Supreme Court found the request to charge "embodied sound legal principle" constituting "prejudicial error" in refusing to charge that that offense "is not committed in the presence of an officer within the meaning of the statute, if the officer does not know it.  And where the officer could not observe nor become cognizant of the act constituting the offense by the use of his senses it could not be committed in his presence so as to authorize an

80

arrest without a warrant." *Id*. The failure to give this charge is only prejudicial if a citizen has a legal right to resist an arrest violative of the "in the presence" statute. *See e.g.*, *State v. Robertson*, 191 S.C. 509, 5. S.E.2d 285 (1939) (finding reversable error in the absence of a right to resist unlawful arrest, the court said, "The defendant was entitled to such a charge as the issue of the lawfulness of the arrest was raised by the evidence . . .").

In addition, the allegation of assault is essentially an allegation of resisting arrest, however the law is clear that a person "has the right to resist an arrest to the point of deadly force if necessary" if that arrest is unlawful. *State v. McGowan*, 347 S.C. 618, 623-24, 557 S.E.2d 657, 660-61 (2001) ("Accordingly, a person may not be convicted of resisting arrest with a deadly weapon where the underlying arrest is unlawful."); *see also*, *State v. Davis*, 53 S.C. 150, 31 S.E.62 (1898) ("An unlawful arrest vests no authority in the one arresting; hence one arrested may lawfully escape, if possible, and he has the right to use as much force as may be necessary to regain his liberty . . ."). The *McGowan* court found these matters to be appropriately decided by a jury as questions of fact. The same holds true in the present case. Whether the arrest was lawful is a question of fact for the jury. Whether McCree's actions in response to the unlawful arrest were privileged or disproportionate to the injury threatened is also a question of fact for the jury. *Id*.

### C. Plaintiff's state law false arrest claim survives summary judgment because, the alleged misdemeanor arrest was in violation of South Carolina statutory limits on the power to arrest.

Not only was the arrest unlawful because it lacked probable cause, but also the arrest was statutorily unlawful because the alleged misdemeanor offense was not committed in the officers' presence nor was the arrest made "immediately thereafter." For a misdemeanor arrest in South Carolina, it must be made "at the time of such violation of law or immediately thereafter." S.C. Code Ann. § 23-13-60; *see also State v. McAteer*, 340 S.C. 644, 532 S.E.2d 865 (2000) (reviewing

81

common law authority to arrest and holding "there is no common law right to make a warrantless citizen's arrests of any kind and that such rights as exist are created by statute in South Carolina"). In essence, a misdemeanor arrest is only authorized without a warrant when the police officer observes the crime or when the crime has been freshly committed. This statute is derived from the traditional common law authority to arrest and is almost universally adopted by state statutes. *See United States v. Watson*, 423 U.S. 411, 418-22 (1976). While the "in the presence" element of misdemeanor arrest law has not been incorporated into constitutional tort analysis under Section 1983 precedent, it remains relevant and applicable to state-law or common law causes of action. "It is the law of this State that an officer cannot arrest one charged with a misdemeanor, not committed in his presence, without a proper warrant for such arrest being in the possession of the officer at the time of the arrest." *State v. Mims*, 263 S.C. 45, 48, 208 S.E.2d 288, 289 (1974). Because no warrant was obtained from a neutral magistrate upon a showing of probable cause and the alleged offense was neither witnessed nor freshly committed, the arrest of McCree was unlawful under state law.

None of the security guards were present when Ariane went through the checkout line to purchase the door lock and thus could not have witnessed McCree commit any alleged crime. In fact, all three arrived at the Walmart to start their security jobs with Walmart only after McCree had already left the store. They were not called to the store to investigate this instance as a crime. They were present at the store to work there as paid security guards for Walmart and could not leave the premises until their shifts were over.

In support for the assertion that they met the "freshly committed" requirement, Defendants cannot point to a single viable fact that the offense was freshly committed. The surveillance video referenced shows no evidence of a crime being committed. (*See* ECF 144-1 at 25.) It merely

82

depicts McCree in the checkout line waiting for the transaction to be complete and accepting his bagged item from the cashier. Nothing about this video suggests a crime had been committed. When McCree voluntarily returned, he attempted several times to tender payment to Walmart, but Walmart refused. His returning to the store with money in hand to pay for the door lock is the opposite of intending to deprive Walmart of the full retail value of it. Under these facts, no reasonable law enforcement officer would have understood McCree's actions to be criminal—and none of those present arrested McCree when he first returned to the store. It was only after McManus gave the order that he was placed under arrest. (Ex. 21, Williams-Tobias 59:03-12; 44:21 – 45:02.)

Again, no law enforcement officer witnessed McCree's actions during his initial visit to Walmart. McCree did not come back to the store until approximately two hours later. By then the Walmart security officers were present, but in their capacity as private security instead of Chester police officers. That two-hour window is grossly insufficient to fall within the statutory meaning of "immediately thereafter" or "freshly committed." *See* S.C. Code Ann. § 23-13-60. Instead of investigating and presenting the facts and allegations to a neutral and detached magistrate, these security officers chose to follow the directive of Walmart management and subordinate themselves to corporate actors as opposed to the proper judicial process. (Ex. 63, McManus Tr. 14:17 – 15:5; McManus Tr. 15:6 – 17:8.) As Walmart's management put it, "they're not going to refuse not [sic] to help you when you're paying them $30 an hour." (*Id.*, 58:22 – 59:22.)

Under these facts, viewed in the light most favorable to Plaintiff, there are serious questions surrounding the lawfulness of McCree's arrest such that summary judgment cannot be granted. Accordingly, Plaintiff's false arrest/false imprisonment claim must proceed to trial.

0:20-cv-00867-JFA     Date Filed 06/09/22     Entry Number 170     Page 89 of 105

**D. Plaintiff's claims for negligent hiring, negligent supervision, and negligent training survive summary judgment because there exists a genuine dispute of material fact.**

Plaintiff brought negligent hiring, supervision, and training causes of action against the City of Chester and against Walmart. The City of Chester was negligent in hiring and retaining Defendant Harris because of his history of law enforcement problems. Walmart was negligent in hiring, supervising, and training the off-duty security guards hired to provide security at the Walmart store in this case. Because the facts establish that both the City of Chester and Walmart were negligent in their separate ways, summary judgement should be denied on these claims.

An employer can be independently liable in tort for its own negligent acts. *James v. Kelly Trucking Co.,* 377 S.C. 628, 632, 661 S.E.2d 329, 330 (2008). In circumstances where an employer knew or should have known that its employment of a specific person created an undue risk of harm to the public, a plaintiff may claim that the employer was itself negligent in hiring, supervising, or training the employee, or that the employer acted negligently in entrusting its employee with a tool that created an unreasonable risk of harm to the public." *Id.* In addition, an employer can be held liable when under a duty to exercise reasonable case to control an employee acting outside the scope of his employment. *Degenhart v. Knights of Columbus*, 309 S.C. 114, 116-17, 420 S.E.2d 495, 496-97 (1992). An employer may be liable for negligent supervision even when an employee intentionally harms another when he: (i) "is upon the premises in possession of the employer or upon which the employee is privileged to enter only as his employee, or (ii) is using a chattel of the employer and the employer knows or has reason to know that he has the ability to control his employee and know or should know of necessity and opportunity for exercising such control." *Id*. The *Degenhart* court also recognized that "[a]n employer may have a legal duty arising out of a contract . . . when an employer, by entering into a contract with an employee, places himself in

84

such a relation with the plaintiff that the law imposes upon the employer an obligation, sounding in tort . . . to act in such a way that the plaintiff will not be injured." *Id.*

The negligent hiring of Defendant Harris by the City of Chester is evident from the multiple adverse employment actions taken against Harris, including his prior termination for cause by the City of Chester. The Chief of Police wrote, "I believe it is in the best interest of the Chester Police Department and the City of Chester to sever all ties with Sgt. Harris and to terminate him." (Ex. 56.) Harris attributed his termination to reverse racism even though he had multiple policy violations, behavioral problems, a problem with authority, and a record of disrespect for the citizens he was sworn to protect. (Ex. 28, Harris Tr. 43:11—50:16.) After that termination, Harris received multiple written warnings and documented policy violations at the Clover Police Department. (Ex. 55.) In the face of the knowledge that Harris previously posed an unreasonable risk of harm to the public for which he was terminated, the City of Chester rehired him and entrusted him again with a gun and a badge. The jury could reasonably find that the City of Chester was negligent in hiring Harris based upon the facts in this case.

Next, the negligent hiring, supervision, and training by Walmart of Harris and Richardson is evident from the known facts, including the abject failure to conduct any pre-hiring screening, the failure to perform any training, the failure to enforce Walmart policies and procedures, and the failure to supervise and intervene when policy violations were witnessed. (Ex. 73 at 30-31.) Walmart did not use any screening process for hiring "armed security" to work as security guards in its store, but rather simply had a signup sheet at the police department where officers could claim shifts at the Walmart. (Ex. 28, Harris. Tr. 165:15 – 166:1). Harris, Richardson, and Williams-Tobias each said that they were never trained by Walmart on any of its policies, including AP-09 or any other relevant loss prevention policy or safety policy. (Ex. 28, Harris Tr. 17:02-20;

85

Ex. 27, Richardson Tr. 80:23—81:20, Ex. 21 Williams-Tobias Tr. 72:08-24.)   The testimony is uncontested that Harris, Richardson, and Williams-Tobias were restricted to Walmart's property during their shifts.  (Ex. 27, Richardson Tr. 94:13 – 95:21, Ex. 71 (Ex. 3 of Richardson Depo); Ex. 28, Harris Tr. 173:22 –174:05.)  These security guards reported directly to Walmart's loss prevention manager, Evelyn McManus.  (Ex. 63, McManus Tr. 58:22 – 59:22).  And McManus was clear that the security guards would do what Walmart directed them to do.  (*Id.*)  But that supervision – the right to control the security guards – was not reasonably exercised.  Instead of following the written policy, McManus directed the security guards to seize McCree, refuse his tender, and have him arrested.  (Ex. 72; Richardson Tr. 107:3-10.)  Based on these facts a jury could reasonably find that Walmart is liable for its own negligent acts as set forth herein.

**E.  Plaintiff's derivative wrongful death claim survives summary judgment based on the factual disputes precluding summary judgment as to Plaintiff's other state law claims**

Because the evidence--and lack of evidence, *i.e.,* absence of McCree's own account-- supports multiple inferences in Plaintiff's favor, Plaintiff's wrongful death claim survives summary judgment as to all Defendants.  The South Carolina Wrongful Death Act provides recovery to the family of a victim killed by "wrongful act, neglect or default of another and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages."  S.C. Code Ann § 15-51-10.

Defendants challenge Plaintiff's claim for wrongful death, arguing the officers were justified in shooting and recklessly killing McCree. *See* ECF 143-1 at 17-18.  Gross negligence is a jury issue unless and only if the evidence supports but one reasonable conclusion.  This is not such a case.  As detailed above, there is ample evidence to the contrary which, at a minimum, creates a genuine and material dispute as to whether the officers' conduct in fatally shooting

86

McCree was grossly negligent and reckless, whether it evinced malice or intent to harm, or whether it was something less than gross negligence so as to potentially fall within SCTCA immunity.

To somehow escape liability for his part in McCree's wrongful death, Harris attempts to distinguish the bullets he shot at McCree from those fired by Baker. This argument is as unavailing and is not supported by any evidence. As for which bullet was fired from which gun at which time, that is an issue for the jury to consider. SLED's diagram of shell casings recovered from the parking lot establish that Harris fired his gun from separate points in time and places in the parking lot, including areas that McCree likely would have been prior to the 60 second period when Harris claimed he lost sight of him, which includes the time period Harris confirmed McCree was unarmed. (Ex. 92, SLED shell casing diagram.) A reasonable inference drawn from this evidence is that Harris began firing before any claim that McCree possessed a gun. The testimony of Harris and Baker that McCree was facing them with a gun is further contradicted by the gunshot wounds on McCree's body. The autopsy report identified three wounds: one to Ariane's right upper chest, one to the anterolateral triceps in the backside of his right arm, and one to his lateral left hip. The report stated the cause of death was the gunshot wound to the chest, with the other two wounds contributing to his death. (Ex. 3, Autopsy report at 2.) The wounds to McCree's right arm and left hip strongly suggest that he was not facing Harris and Baker when those gunshots hit him. This is consistent with an absence of any confrontation or threat from McCree, and is consistent with McCree sustaining gunshot wounds as he was *running away* from Harris.

Whether it was the bullet to the chest or all three bullets that resulted in McCree's death, it is undisputed that Harris fired multiple shots at McCree intending to cause deadly harm. In fact, Harris fired so many bullets at McCree, he emptied his magazine, reloaded, and emptied it again. *See Elliott v. Leavitt*, 99 F.3d 640, 643 (4th Cir. 1996) (observing a distinction between multiple

87

shots fired and mindlessly shooting or emptying a gun, where multiple shots from two officers at the same time is reasonable to eliminate a deadly threat but emptying a gun may not be reasonable). While there is testimony and evidence suggesting that the shot to McCree's chest was fatal and incapacitating, it is not clear to a reasonable degree of certainty which bullets came from Harris as both Harris and Baker's bullets were identical and indistinguishable. It is also suggested that the gunshot wound to the chest "is not immediately fatal." (*See* Collins Tr. at 25:20-26:9). What is clear is that Harris fired multiple shots at McCree in the parking lot, Harris knew he struck McCree at least twice, yet Harris continued firing at McCree until he emptied his gun.

Harris points to no controlling Fourth Circuit authority for his position. Instead, Harris references two unpublished cases from California, neither of which involve a dispute over whose gun delivered the fatal shot. *See* ECF 144-1 at 31, citing *Lopez v. City of Los Angeles*, 126 Cal. Rptr. 3d 706, 716 (2011) ("It was undisputed Gallegos, Perez, or Sanchez fired the fatal shot. Therefore, appellant cannot establish liability for negligence or wrongful death based on O'Sullivan's shot"); *Shannon v. Cnty. of Sacramento*, No. 2:15-CV-00967 KJM DB, 2018 WL 3861604, at *9 (E.D. Cal. Aug. 14, 2018) ("the only shots relevant to this claim are the second set of fatal shots. Jones's initial shot, although potentially unreasonable, did not cause Mr. Shannon's death and so cannot be the basis for his wrongful death claim"). These unreported California cases are factually distinguishable on the most critical issue, *i.e.,* they do not address the precise situation where, as here, the evidence concerning the fatal shot is disputed and inconclusive.

Moreover, Harris' reckless conduct leading to McCree's death is indisputably a proximate cause of McCree's death and is, thus, sufficient, standing alone, to support wrongful death. It is undisputed that Harris escalated the situation by shooting at McCree and by ambiguously radioing "shots fired" without clarifying that it was he who was firing the gun. Had Harris not set in motion

88

this chain of events through his excessive force, there is no doubt the situation would have resolved without the unnecessary loss of McCree's life. But this, of course, is a question appropriately reserved for the jury.

Finally, Walmart's sole argument for dismissal of Plaintiff's survival and wrongful death claims is that Plaintiff cannot establish liability under any of her state law claims. (ECF No. 140-1 at 24.) Yet, because summary judgment is not warranted on those claims raised against Walmart, there is no basis to dismiss her survival and wrongful death causes of action.

## III.   QUALIFIED IMMUNITY DOES NOT SHIELD DEFENDANTS HARRIS AND BAKER FROM LIABILITY

Resolving a qualified immunity claim requires discerning (1) whether the facts (construed in the light most favorable to the nonmoving party) show the violation of a constitutional right, and (2) whether the right in question was clearly established at the time of the misconduct. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "The burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense." *Meyers v. Baltimore Cty.*, 713 F.3d 723, 735 (4th Cir. 2013). As the Supreme Court recognized, qualified immunity does not protect the "plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 335 (1986).

Qualified immunity is an objective test. The appropriate way to assess the objective reasonableness of force is to "view it in full context, with an eye toward the proportionality of the force in light of all the circumstances." *Rowland v. Perry,* 41 F.3d 167, 173 (4th Cir. 1994). "Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985) (the question is "whether the totality of the circumstances justified a particular sort of ... seizure"). Thus, an appropriate totality of the circumstances review considers not one event in isolation but an evaluation of

89

several factors, including: "the severity of the [suspected] crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. 386, 396 (1986).

### A.    Harris and Baker's use of deadly force was objectively unreasonable

Harris and Baker's qualified immunity arguments should be denied because, as discussed above, there are triable issues of fact regarding the existence of probable cause to arrest McCree inside the Walmart store and triable issues of fact regarding whether he presented a weapon in the parking lot to Harris or Baker prior to being shot. Under the requisite totality review, the conduct of Harris and Baker in using deadly force fails the objective reasonableness test. "A police officer who shoots a fleeing suspect without 'probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others' violates that suspect's Fourth Amendment rights." *Henry v. Purnell*, 652 F.3d 524, 531–32 (4th Cir. 2011) (quoting *Tennessee v. Garner,* 471 U.S. 1, 3 (1985)). "Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so." *Garner,* 471 U.S. at 11.

Under this standard, neither Harris nor Baker's subjective beliefs of what they intended or what they mistook are relevant. Rather, "an officer's subjective intent or beliefs play no role." *Purnell*, 652 F.3d at 535. "'An officer's good intentions' do not make objectively unreasonable acts constitutional." *Id.* (quoting *Melgar v. Greene,* 593 F.3d 348, 361 (4th Cir. 2010) (citations omitted)). The qualified immunity determination is "'dependent not on the subjective beliefs of the particular officer at the scene, but instead on what a hypothetical, reasonable officer would have thought in those circumstances.'" *Id.* (quoting *Owens v. Lott,* 372 F.3d 267, 279 (4th Cir. 2004) (quoting *Wilson v. Kittoe,* 337 F.3d 392, 402 (4th Cir. 2003))).

90

Use of deadly force against a suspect fleeing a misdemeanor offense has been deemed objectively unreasonable since *Tennessee v. Garner*, 471 U.S. 1 (1985).  The Fourth Circuit has consistently found such uses of deadly force objectively unreasonable and in violation of the Fourth Amendment.  In *Henry v. Purnell*, the Fourth Circuit analyzed an officer's claim of qualified immunity for shooting a fleeing suspect evading an eleven-day old warrant for the misdemeanor offense of failure to pay child support.  Having shot the suspect in the leg as he ran from his car, Purnell claimed the use of force was justified because the suspect had previously evaded issuance of the warrant by hiding his identity.  Purnell further maintained he was entitled to qualified immunity because he fired his gun by mistake and instead intended to use his taser, which he claims was an "honest mistake." *Id.* at 535.  The Fourth Circuit disagreed, reasoning that, "it would have been clear to a reasonable officer that shooting a fleeing, nonthreatening misdemeanant with a firearm was unlawful."  *Id.* at 534.

*Rowland v. Perry* is also instructive.  There, the Fourth Circuit analyzed a claim of excessive force that resulted in permanent partial disability to Rowland's leg arising out of his alleged theft of a five-dollar bill.  In assessing the reasonableness of the force used, the Court declined to adopt the police officer's segmented view of the facts and instead undertook a totality review that considered the proportionality of the force in light of the circumstances.  The Court held that "[w]hen all the factors are considered *in toto,* it is impossible to escape the conclusion that a man suffered a serious leg injury over a lost five-dollar bill." *Id.* at 174.  The Court reasoned, "[t]here is no dispute here that the offense was a minor one . . . At worst, Rowland picked up a five dollar bill that he knew had been lost by someone else." *Id.*  The Court further observed that Rowland claimed he offered to return the money, which, the Court noted, "if true, would further mitigate the seriousness of the act." *Id.*  The Court further observed that Rowland posed no threat

to the officer or anyone else and there was no suggestion that Rowland was armed or that Perry suspected he might be. And while there was some evidence that Rowland offered resistance, the facts on this issue were disputed with Rowland maintaining he resisted only to the extent he was trying to protect himself. On these facts, the Fourth Circuit found the use of force was unreasonable and denied qualified immunity.

Here, as in *Purnell* and *Rowland*, there is no dispute that the alleged offense of shoplifting a $45 door lock was a minor one. Though Plaintiff disputes that McCree intended to shoplift, even assuming he did, the uncontested facts establish that McCree voluntarily returned to the store and repeatedly offered to pay for the item. Thus, these factors mitigate against the use of any force, much less the use of deadly force. Moreover, as the Fourth Circuit observed, the sequence of events in this case cannot be viewed in isolation. While Defendants seek to separate the underlying misdemeanor arrest from their use of deadly force in the parking lot, these events are inseparable and must be viewed in totality. Under these facts, McCree posed no serious threat to the officers or the public. McCree was searched while detained in the loss prevention room. No firearm was in his possession. Thus, there was nothing reasonable about Harris's decision to fire multiple rounds at McCree while he fled through the parking lot. Harris' contention that McCree's effort to "head butt" him posed a great enough threat to warrant use of force, such minimal threat does not rise to the level of deadly force considering the totality of the circumstances as a whole.

It is also undisputed that McCree never fired a weapon. Rather, it was Harris that posed a threat to the public by irresponsibly and repeatedly discharging his weapon in a crowded parking lot. There being no shot ever fired by McCree, Harris' call over the radio, stating, "shots fired" was perhaps the most egregious violation outside of his unreasonable use of deadly force. This

92

misleading and ambiguous radio call was a gross mischaracterization of the facts known to Harris and cannot now serve to excuse his unreasonable conduct which cost McCree his life.

If Harris's testimony carries any weight, it establishes that no officer in his position would have reasonably perceived that the threat of deadly force was justified. First, Harris was aware that McCree was unarmed because he searched him for weapons minutes prior. Second, Harris knew that McCree's hands were properly cuffed behind his back. Third, Harris also knew the handcuffs placed on McCree were silver in color. Fourth, Harris did not perceive the alleged headbutting in the parking lot as life threatening to him or others. Fifth, Harris claimed to have had the presence of mind in those moments after the alleged headbutting to know that he was losing consciousness, that his mind was foggy, that he could not properly aim his weapon, or perceive any objects with any degree of clarity, such as a gun. Under these circumstances, no reasonable officer would conclude that a perception of McCree pointing a gun was anything more the handcuffs on his wrists or the reflective material on his sweatshirt. What is far more likely, and what a jury can reasonably infer, is that Harris was angry that McCree escaped his unlawful detention inside the loss prevention room and was going to employ whatever means necessary to ensure he did not get away from Walmart. *See Yates v. Terry*, 817 F.3d 877, 887 (4th Cir. 2016).

As to Baker, as discussed above, his claim that McCree was holding a weapon is belied by the lack of any evidence of this on the body worn camera video. All that can be seen is McCree walking slowly in a perpendicular direction to Baker, as if struggling, when Baker opens fire. No gun is visible and Baker was unable to identify one when watching the video at his deposition. Further, Baker's testimony that he claimed he ordered McCree to drop the weapon prior to shooting him is contradicted by audio evidence that demonstrates he did not give this order, but rather that he told McCree to put his hands up and then shot him less than a second later. Baker's self-serving

93

effort to justify his wrongful shooting by claiming McCree was firing a gun at Harris further undermines his credibility as to what transpired in the parking lot. Where, as here, an witness account conflicts with actual video evidence of what occurred, the issue of qualified immunity is one of credibility and weighing evidence and is thus not appropriately resolved at summary judgment. Consequently, as in *Purnell* and *Rowland*, qualified immunity is inappropriate here.

**B.     McCree's Fourth Amendment Rights to be Free from Unlawful Seizure and Unreasonable Force Were Clearly Established**

Turning to the second prong of the qualified immunity inquiry, the guarantees of the Fourth Amendment as they pertain to Mr. McCree were clearly established at the time of the unconstitutional seizure and use of deadly force by Defendants. A constitutional right is "clearly established" when "its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). "The mere possession of a firearm by a suspect is not enough to permit the use of deadly force." *Id.* at 159. *Tennessee v. Garner*'s prohibition against shooting suspects who pose no significant threat of death or serious physical injury to the officer or others has been clearly established law since 1985. Defendants' use of deadly force against McCree was not only objectively unreasonable, but it violated clearly established law as set forth in *Garner. See Sheehan*, 735 F.3d at 160 ("The right to be free from deadly force when posing no threat—were clearly established at the time the Officers shot Cooper."). It was clearly established in 2019 that officers may not use force against an incapacitated suspect, as a jury could find of McCree after Harris first shot him. *See Est. of Jones by Jones v. City of Martinsburg, W. Virginia*, 961 F.3d 661, 669 (4th Cir. 2020). And "[n]on-cooperation with law enforcement has never given officers carte blanche to use deadly force against a suspect." *Id.* at 670-71.

94

As to unlawful seizure, it is clearly established--and fundamental to the profession of policing--that an arrest lacking probable violates a plaintiff's Fourth Amendment rights such that an officer can expect to face liability for making an illegal arrest. A warrantless arrest by a police officer offends the constitution unless backed by probable cause to believe a person committed a crime in the officer's presence. *See, e.g.*, *Virginia v. Moore*, 553 U.S. 164, 178 (2008); *Karadi v. Jenkins*, 7 F. App'x 185, 195 (4th Cir. 2001). "Probable cause exists when the facts and circumstances known to the officer would warrant the belief of a prudent person that the arrestee had committed or was committing an offense." *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996)

An unlawful arrest is one made without probable cause. *United States v. Watson*, 423 U.S. 411 (1976); *Pritchard v. Perry*, 508 F.2d 423 (4th Cir. 1975); *Street v. Surdyka*, 492 F.2d 368 (4th Cir. 1974). Indeed, "an individual not in lawful custody has an 'uncontrovertible' right--a right always of constitutional dimensions to be free from unreasonable interference by police officers and to enjoy 'security from arbitrary intrusion by the police.'" *Pritchard v. Perry*, 508 F.2d 423, 426 (4th Cir. 1975); *Jenkins v. Averett*, 424 F.2d 1228, 1231 (4th Cir. 1970). And the use of "unreasonable" force in making an arrest is prohibited. *Jenkins*, 424 F.2d at 1232. In light of this longstanding precedent, the "general right to be free from an unlawful arrest is of course clearly established-under the Fourth Amendment, [and] police officers must have probable cause before they arrest a suspect." *Ferguson v. Taylor*, 933 F.2d 1001 (4th Cir. 1991). Since McCree's right to be free of illegal arrest is clearly established by precedent, qualified immunity and judgment as a matter of law should be denied if a jury finds that his arrest and parking lot seizure lacked probable cause and were thus objectively unreasonable.

C.     **Qualified Immunity Does Not Shield Harris's Actions as a Private Walmart Security Guard**

95

The purpose of the qualified immunity doctrine is to ensure that public officials are not constrained from performing government functions because of fear that they may become personally liable.  Indeed, the Supreme Court has long recognized that "the rationales mandating qualified immunity for public officials are not applicable to private parties." *Wyatt v. Cole*, 504 U.S. 158, 167 (1992).  Because qualified immunity "protect[s] *government's* ability to perform its traditional functions," *id.* (emphasis added), courts "have recognized qualified immunity for government officials where it was necessary to preserve their ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service."  *Id.*; *see also id.* at 168 ("qualified immunity . . . acts to safeguard government, and thereby to protect the public at large, not to benefit its agents.").

While the Fourth Circuit has not addressed the availability of qualified immunity to off-duty police officers acting as private security guards, the Ninth Circuit has recognized that qualified immunity is unavailable to an off-duty police officer acting as a private security guard. *Bracken v. Okura*, 869 F.3d 771, 777–78 (9th Cir. 2017).  The court examined that question in light of the Supreme Court's guidance to determine whether qualified immunity was "generally available" to certain classes of individuals—by looking to whether "[h]istory ... reveals a 'firmly rooted' tradition of immunity" and whether immunity would "serve the purposes underlying the immunity doctrine"—before evaluating its possible application in a given case. *Id.* at 776–77. The court concluded that there was no such "firmly rooted" tradition of immunity for off-duty police officers acting as private security guards and that the availability of immunity to those individuals would not further the purposes of qualified immunity. *Id.* at 777-78.  The principle espoused in *Bracken* is equally applicable here.  There is no firmly rooted tradition of immunity for off-duty police officers acting as private security guards for retailers such as Walmart that would extend

96

qualified immunity to the conduct Harris engaged in as a Walmart security guard. This includes his arrest of McCree inside the store, his detaining McCree inside of the store's loss prevention room for no lawful purpose, and his shooting of McCree in the parking lot.

Denying qualified immunity to an off duty police officer working as a private security guard is entirely consistent with finding that the officer engaged in state action. *Id.* at 776 ("[T]he availability of immunity does not necessarily overlap with state action under § 1983 when a government officer uses the 'badge of their authority,' . . . in service of a private, non-governmental goal." (quoting *Wyatt*, 504 U.S. at 161).) Here, although Harris used the badge, authority, and city-issued weapon in furtherance of Walmart's private security goals, the manner in which he did so was under color of state law: he was wearing his City of Chester black police polo shirt with an embroidered Chester police badge (Ex. 52), "a jacket with police on the side," was carrying "Chester city's police equipment," and told McCree he was being arrested. (Ex. 28, Harris Tr. 172:15-173:12; 192:23-193:9.) "[O]ff-duty police officers who flash a badge or otherwise purport to exercise official authority generally act under color of law." *Bonenberger v. Plymouth Tp.*, 132 F.3d 20, 24 (3d Cir. 1997). And "[t]he threat of arrest is one of the purest acts of state authority." *Pruitt v. Pernell*, 360 F.Supp.2d 738, 744 (E.D.N.C. 2005).

The fact that Harris was pursuing a private goal does not preclude a finding that he acted under color of state law. *See Georgia v. McCollum*, 505 U.S. 42, 54 (1992) (noting, in a case involving a question of "state action" for purposes of the Fourteenth Amendment, that "[w]henever a private actor's conduct is deemed 'fairly attributable' to the government, it is likely that private motives will have animated the actor's decision").

D.        **Qualified Immunity Is Inconsistent with the Text and History of Section 1983**

97

Finally, as many courts have recently acknowledged, the judicially-created doctrine of qualified immunity has become unworkable and is wholly-inconsistent with the plain text and history of the Civil Rights Act of 1871. Although some have observed that had Congress wished to eliminate certain common law immunities that "were so well established in 1871" when it passed the Civil Rights Act it would have done so specifically in the statute, such then-existing immunities were limited and benefited legislators and the judiciary, not executive branch officials. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1872, 198 L. Ed. 2d 290 (2017) (Thomas, J., concurring in part). State law enforcement officers did not fall within the limited scope of these common law immunities. *Id*; *see also Imbler v. Pachtman*, 424 U.S. 409, 417 (1976) (acknowledging that § 1983 "on its face admits of no immunities"); *Owen v. City of Independence*, 445 U.S. 622, 625 (1980) ("[Section 1983's] language is absolute and unqualified; no mention is made of any privileges, immunities, or defenses that may be asserted.").

It is clear that the doctrine's focus on whether the right in question was clearly established has no constitutional, statutory, or common law foundation. *Anderson v. Creighton*, 483 U.S. 635, 645 (1987). Rather, the doctrine developed out of judicial concern with the imposition of personal liability on public officials and the attendant consequences flowing from litigation. *See id.* at 638; *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Yet, however valid those policy concerns may have been when the doctrine first expanded several decades ago, today law enforcement indemnification is the norm and there is no evidence that qualified immunity plays a meaningful role in alleviating litigation burdens. *See* Joanna C. Schwartz, *How Qualified Immunity Fails*, 127 Yale L.J. 2, 48-51 (2017). In this case, Defendants Harris and Baker enjoy $1,000,000 in

98

indemnity protection from the South Carolina Municipal Insurance and Risk Financing Fund (which, itself, is not a governmental agency) per incident.[21] (*See, e.g.*, Ex. 62.)

Current application of the doctrine bears little resemblance to any common-law immunity defense or alleviates public policy concerns. Rather, the doctrine of qualified immunity has ballooned into a catch-all defense for law enforcement personnel who have, in fact, violated a citizen's constitutional rights and leaves significant violations without vindication. Because "[n]early all of the Supreme Court's qualified immunity cases come out the same way—by finding immunity for the officials," jurists have cautioned that the current "one-sided approach to qualified immunity transforms the doctrine into an absolute shield for law enforcement officers." *Kisela v. Hughes*, 138 S.Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting); *see also Ziglar*, 137 S. Ct. at 1872 (Thomas, J., concurring in part) ("Our qualified immunity precedents instead represent precisely the sort of 'free wheeling policy choice[s]' that we have previously disclaimed the power to make."). In practice, bare recitation of the talismanic phrase "qualified immunity," as Defendants Harris and Baker have done here, shifts the burden to the injured party to overcome what has developed into an almost absolute shield for law enforcement misconduct. The concern that application of the doctrine has no legally justifiable underpinning has garnered criticism from courts across the country, including from the Fourth Circuit. *See Est. of Jones by Jones v. City of Martinsburg, W. Virginia*, 961 F.3d 661, 673 (4th Cir. 2020), as amended (June 10, 2020) ("This has to stop. To award qualified immunity at the summary judgment stage in this case would signal absolute immunity for fear-based use of deadly force, which we cannot accept."); *see also Morrow v. Meachum*, 917 F.3d 870, 874 n.4 (5th Cir. 2019) ("Some—including Justice Thomas—have

---

[21]    *See Reeves v. S.C. Muni. Ins. and Risk Financing Fund*, 4343 S.C. 18, 36 (2021) (vacating lower court's holding that SCMIRF is a political subdivision of the state under the South Carolina Tort Claims Act).

queried whether the Supreme Court's post-*Pierson* qualified-immunity cases are 'consistent with the common-law rules prevailing [when [Section] 1983 was enacted] in 1871.'"); *Rodriguez v. Swartz*, 899 F.3d 719, 732 n.40 (9th Cir. 2018) ("Some argue that the 'clearly established' prong of the analysis lacks a solid legal foundation."); *Thompson v. Cope*, 900 F.3d 414, 421 n.1 (7th Cir. 2018) ("Scholars have criticized [the qualified immunity] standard."); *Ventura v. Rutledge*, 389 F. Supp. 3d 682, 697 n.6 (E.D. Cal. 2019) ("[T]his judge joins with those who have endorsed a complete re-examination of the doctrine which, as it is currently applied, mandates illogical, unjust, and puzzling results in many cases."); *Thompson v. Clark*, Case No. 14-CV-7349, 2018 WL 3128975, at *10 (E.D.N.Y. 2018) ("The legal precedent for qualified immunity, or its lack, is the subject of intense scrutiny."). Accordingly, the doctrine's application in this case, and more broadly, has no lawful basis and is inconsistent with the conventional principles of statutory interpretation.  For this additional reason, the Court should reject Defendants Harris and Baker's defense of qualified immunity.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions for summary judgment in their entirety.

Respectfully submitted,                    **McLEOD LAW GROUP, LLC**

Post Office Box 21624
Charleston, South Carolina 29413
(843) 277-6655

*s/ Colin V. Ram*
Colin V. Ram, No. 12958
W. Mullins McLeod, Jr., No. 7142
Michael T. Cooper, No. 12198
colin@mcleod-lawgroup.com
*Attorneys for Plaintiff*

June 9, 2022
Charleston, South Carolina