IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| Vickie J. McCree, *As Personal Representative of the Estate of Ariane L. McCree*, | ) ) ) | C/A No. 0:20-867-JFA-PJG |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| City of Chester; Walmart Inc.; Wal-Mart Stores East, L.P.; Justin M. Baker, *in his individual capacity*; Nicholas Harris, *in his individual capacity*, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | **REPORT AND RECOMMENDATION** |
| Nicholas Harris, *in his individual capacity*, | ) ) ) | |
| Counter Claimant, | ) ) ) | |
| v. | ) ) | |
| Vickie J. McCree, *As Personal Representative of the Estate of Ariane L. McCree*, | ) ) ) ) | |
| Counter Defendant. | ) ) | |

This action arises out of the November 2019 killing of Ariane L. McCree by City of Chester police officers in a Walmart store parking lot. Plaintiff Vickie J. McCree, as the personal representative of the Estate of Ariane L. McCree, filed this civil rights and personal injury action in the Chester County Court of Common Pleas against Defendants City of Chester; the City of Chester Police Department;[1] Walmart Inc.; and Wal-Mart Stores East, L.P. The defendants removed the action in February 2020. Plaintiff filed an Amended Complaint in November 2020

---

[1] The court dismissed the Chester Police Department by order dated August 20, 2021. (ECF No. 103.)

that added City of Chester police officers Nicholas Harris and Justin M. Baker as defendants. Harris filed a state law counterclaim of assault and battery against McCree's estate.

This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) (D.S.C.) for a Report and Recommendation on the motions for summary judgment filed by Justin Baker (ECF No. 139); Wal-Mart Stores East, L.P. and Walmart, Inc. ("Walmart") (ECF No. 140); City of Chester (ECF No. 143); and Nicholas Harris (ECF No. 144). Plaintiff filed a consolidated response in opposition to the motions (ECF No. 170), and the defendants filed replies (ECF Nos. 194-197). Having reviewed the record presented and the applicable law, the court concludes that the defendants' motions for summary judgment should be granted as to Plaintiff's federal civil rights claims, and that the court should decline to exercise supplemental jurisdiction over Plaintiff's remaining state law tort claims and Harris's counterclaim.

## BACKGROUND

The following facts are either undisputed or are taken in the light most favorable to the plaintiff, to the extent they find support in the record. Where it is especially relevant, the court has noted the source of the facts.

### A.     McCree Visits Walmart

Ariane McCree visited a Walmart store in Chester, South Carolina around 8:45 a.m. on November 23, 2019, to purchase a combination doorknob and door lock set. After browsing several aisles and talking to a Walmart employee, McCree took a door lock set to a cash register in the front of the store. Walmart surveillance video, which does not include audio, shows that McCree stood in line at lane number five and placed the lock on the conveyor belt when he approached the register. The Walmart cashier, Joshua Stevenson, scanned the door lock set and hit a button on his register. Stevenson then placed the door lock set into a plastic bag and handed

it to McCree.  McCree took the bag and immediately walked away from the register toward the exit.  The video shows Stevenson turning to McCree, raising his hand or pointing in McCree's direction, and then walking toward the exit and outside of the view of the camera.  McCree never paid for the door lock set.  According to Stevenson, McCree told him to "put it on my tab." (Stevenson Dep. at 33, Ex. 12, Pl.'s Resp., ECF No. 174-12 at 2.)  Stevenson testified that as McCree walked away, Stevenson told McCree that he forgot to pay but McCree did not respond. (Id.)

Stevenson reported the incident to a manager, who in turn told Lavar Richardson, an off-duty City of Chester police officer working as a security guard for Walmart.  Richardson reviewed surveillance video of McCree taking the door lock set and informed the Walmart loss prevention manager Evelyn McManus about the incident when she arrived at the store later that morning. Another off-duty Chester police officer working as security for Walmart, Makeesharia Williams-Tobias, arrived at the store after the incident and reviewed the surveillance video.  Williams-Tobias knew McCree personally and identified McCree as the suspect.   McManus requested that Richardson or Williams-Tobias seek a warrant for McCree's arrest.  Around 11:00 a.m., Defendant Nicholas Harris arrived.  Harris was yet another off-duty City of Chester police officer who was working as security at the store.  Richardson asked Harris to assist him with the prosecution of McCree.

## B.     Return Visit and Arrest

McCree returned to the Walmart store around 11:15 a.m. and smoked a cigarette outside of the entrance.  McCree then entered the store and encountered Williams-Tobias around the self-checkout registers.   Williams-Tobias testified that McCree asked her several times, "Where is the guy," though Williams-Tobias did not know to whom McCree referred.  (Williams-Tobias Dep. at

47, Ex. G, Walmart's Mot. Summ. J., ECF No. 140-8 at 4.)  Williams-Tobias walked to the asset protection office to retrieve a printout of a still shot from the surveillance video of McCree's earlier visit to the store.  At the same time, McCree walked back outside to the parking lot, turned around, and immediately entered the store again.  McCree then walked outside a second time but returned to the vestibule of the store—the entrance of the store that housed the shopping carts.

During that time, Williams-Tobias called Richardson to tell him that McCree had returned to the store.  Williams-Tobias then walked into the vestibule with the still shot from the surveillance video.  It is unclear if Williams-Tobias showed McCree the still shot or discussed his earlier visit to the store, but Williams-Tobias testified that McCree offered to pay for the door lock set and had cash on hand.  Richardson and Harris also arrived in the vestibule at some point.  Harris testified that McCree claimed that he left with the door lock set and the cashier, who McCree claimed was his cousin, was supposed to put the set on McCree's "tab."  (Harris Dep. at 179, Ex. N, Walmart's Mot. Summ. J., ECF No. 140-15 at 6.)  Williams-Tobias radioed McManus to inform her that McCree was present and offered to pay for the door lock set, but McManus responded that Walmart would not accept payment.  Richardson and Harris then handcuffed McCree and took him to the asset protection office.

Richardson testified that he was not aware that McCree offered to pay for the door lock set when he returned to the store.  Richardson also testified that at the time they handcuffed McCree, they told McCree he was being detained until they determined if Walmart wanted to press charges.  Harris, however, testified that McManus wanted a trespass notice against McCree and to have him prosecuted for shoplifting and that Williams-Tobias told McCree he was under arrest.  Harris further testified:

> As we were talking to him he had, like, this thousand yard stare.  He smelled like marijuana.  He was flinching his muscles, tightening up, looking around for all the

exits[.]  He was sizing people up, looking up and down them.  I told Richardson to go ahead and put handcuffs on him.  We put handcuffs on him.  He kept just acting fidgety.  He was looking at you but he wasn't looking at you.  He was looking, like, right through your soul, he just—he had that stare.  He indicated every bit of fight or flight.  So I said, let's take him into the loss prevention office.  That way he can't hurt any of the public or us out here and it's a more controlled environment.

(Harris Dep. at 179-80, Ex. N, Walmart's Mot. Summ. J., ECF No. 140-15 at 6-7.)  Richardson also testified that he detected an odor of marijuana on McCree but that did not play a factor in his decision to detain McCree.

## C.    McCree Flees

Harris and Richardson placed McCree in the loss prevention office near the entrance to the store.  They requested that an on-patrol City of Chester police officer pick up McCree and transport him to jail.  Harris searched McCree and found a pocketknife, which Harris placed on a bench.  Harris did not find a gun on McCree.  McCree remained handcuffed.  Harris testified that McCree continued to appear "really antsy" and "agitated."  (Harris Dep. at 180-81, Ex. N, Walmart's Mot. Summ. J., ECF No. 140-15 at 7-8.)  Harris testified that McCree "kept smiling at me and he kept sizing me up"[2] and that McCree "gave me every signal that . . . he wasn't in the right state of mind."  (Id.)  Harris tried to signal to Richardson not to leave the room, but Richardson left anyway to retrieve something.  Harris testified that he continued to see indicators that McCree was "not right" and that "something was going on in his life at that moment to where he was violent."  (Id.)

---

[2] A report on this incident from the South Carolina Law Enforcement Division ("SLED") indicates that McCree was a former college football linebacker for Jackson State University. (SLED Report, Pl.'s Resp., ECF No. 174-2 at 31.)  And Harris testified that McCree was "a lot bigger than me."  (Harris Dep. at 181, Ex. N, Walmart's Mot. Summ. J., ECF No. 140-15 at 8.)

Harris testified that McCree smiled at him, charged him, and pushed him against the wall.[3] McCree then ran out of the room.

McCree ran out of the store with his hands cuffed behind his back. Harris and Richardson chased McCree to the parking lot. Multiple bystanders observed the chase in the parking lot. Harris caught up to McCree near a Taco Bell restaurant at the edge of the Walmart parking lot. Harris testified that McCree again headbutted him several times and they scuffled. (Harris Dep. at 181, Harris Mot. Summ. J., ECF No. 144-2 at 6.) Harris testified that McCree got loose, smiled back at him, and ran away. (Id.) Harris also testified that McCree reached into his pocket while he was running through the parking lot. (Id. at 182, ECF No. 144-2 at 7.) Over the radio, Harris instructed other officers to form a perimeter and warned them that McCree had already assaulted him multiple times.

**D.    Harris Shoots McCree**

Jeffrey Wallace, a Walmart customer who witnessed parts of the incident while he was loading groceries into his car, saw McCree get in a car and then exit the car with a gun in his hand. (Wallace Aff. ¶¶ 2-3, Ex. 8, Chester Mot. Summ. J., ECF No. 143-9 at 2.) According to Harris, the following sequence of events then occurred. At this point, Harris still believed that McCree was unarmed because Harris previously searched him in the loss prevention office and found only a pocketknife, which Harris had removed. Harris regained sight of McCree, who was walking between cars and toward Harris. Harris heard a woman scream "he's got a gun." (Harris Dep. at 183, Harris Mot. Summ. J., ECF No. 144-2 at 8.) Harris was holding a radio in his hand and his gun was in his holster at that time. (Id. at 260-61, ECF No. 144-2 at 47-48.) Harris then saw the

---

[3] Walmart indicates that McCree's charging Harris was captured on surveillance video, but no such video is in the record.

gun in McCree's handcuffed hands—behind his back—being raised over the side of a car pointed toward Harris, less than ten feet away. Harris believed that McCree was going to shoot him because McCree had already assaulted him, was staring him down, and was "coming after" him with a gun. (Id. at 259, ECF No. 144-2 at 46.) Harris drew his gun and fired at McCree, who fell between two cars. Harris's gun jammed and he had to clear it before he could shoot again. Harris told a bystander near him to get away, but the bystander responded that he could not leave because his child was in the car. The bystander then warned Harris that McCree was getting up. (Id. at 265, ECF No. 144-2 at 52.)

Harris approached McCree to clear the car he was near and check on McCree. As Harris approached, McCree rolled over with the gun and tried to point it at Harris again. Harris fired more shots but his gun jammed again and Harris took cover. (Id. at 265-66, ECF No. 144-2 at 52-53.) Harris was not sure if he hit McCree and McCree stood up like he had not been shot. (Id. at 266-67, ECF No. 144-2 at 53-54.) Harris testified that McCree never fired back, but at some point during the incident, Harris radioed to the other officers that shots had been fired without specifying who was shooting. Harris took cover behind a car and radioed that he needed help because he was out of ammunition and McCree still had a gun. McCree again began approaching Harris, still holding the gun. Harris testified that he attempted to flee between cars and McCree pursued him. (Id. at 281-82; ECF No. 144-2 at 63-64.)

### E.    Baker Shoots McCree

By that time, City of Chester police officer Justin M. Baker, who was already en route to pick up McCree to transport him to jail, had arrived on scene. Baker testified as follows. Baker had heard Harris's radio transmissions that shots had been fired and that he needed help, though he did not know who had fired the shots or if the suspect was armed. Baker pulled into the parking

lot in his police car, exited the vehicle, and began walking down a parking aisle.[4]    McCree walked

into the aisle that Baker was walking down.  Baker testified that McCree turned to face him and

McCree was holding a gun at his side.  Baker testified that he did not initially know that McCree's

hands were cuffed, and he did not know McCree was armed until he saw McCree holding the gun

at his side.  (Baker Dep. at 148, Baker Mot. Summ. J., ECF No. 139-3 at 13.)  Baker testified

McCree's gun was pointed in his direction and he could see the barrel of the gun.  Baker testified

that he ordered McCree to drop the gun once, but McCree did not comply with that order.  (Id. at

163-64, ECF No. 139-3 at 16-17.)  Baker testified that he feared for his life.  Baker's body camera

video shows that as McCree approached him, Baker fired several shots over approximately thirteen

seconds, during which time McCree did not stop walking toward Baker until McCree fell, still

holding the gun.  (Baker Body Camera at 00:10-00:23, Pl.'s Resp., ECF No. 174-33.)

Baker approached McCree with his gun still aimed at McCree, who lay on the ground, on

his right side, bleeding.  Baker positioned himself over McCree and put his gun to McCree's head

with his right hand while he used his left hand to pull McCree's gun away from McCree, which

took approximately ten seconds.[5]  McCree's gun was ultimately found to be loaded.

---

[4] Baker's body camera began recording video, though it did not begin recording audio until
Baker began rendering first aid to McCree.  (Baker Body Camera, Pl.'s Resp., ECF No. 174-33.)

[5] It is unclear from Baker's body camera video whether Baker pulled the gun from
McCree's hands or whether it was lodged or wedged between some other part of McCree's body
or the ground.

The following still photos taken from Baker's bodycam video depict these events:



(Baker Mot. Summ. J., Ex. D, ECF No. 139-5 at 4, 5, 6, & 11.)

Baker testified that he then turned McCree over on his stomach to place him in handcuffs but realized for the first time that McCree was already handcuffed. Baker then turned McCree back over and rendered first aid. Harris, who at that point had returned to his police vehicle and retrieved a rifle, knelt near them with his rifle pointed near or at McCree. Baker placed pressure on a gunshot wound on McCree's chest and began searching McCree's pockets. Harris remarked, "Check him real good, he had that gun in his ass." (Baker Body Camera at 2:12, Pl.'s Resp., ECF

No. 174-33.)  EMS eventually arrived, tended to McCree, and took him to a hospital where he was pronounced dead.

While EMS was tending to McCree, Baker stated on a phone call with his captain that McCree pulled a gun and started shooting people.  Minutes later, Richardson, also on a call with the captain, stated that McCree was shooting at the officers.

## F.     Investigation

An investigation by SLED showed that McCree was shot three times and died because of the gunshot wound to his chest.  The investigation found that the gun that was recovered by Baker at the scene, a black and silver semi-automatic pistol, was purchased by McCree on May 13, 2016 in Rock Hill, South Carolina.  Interviews with McCree's family revealed that they knew that McCree owned a gun.  The investigation also concluded that McCree's gun was not fired during the incident, which contradicted statements by Richardson and other witnesses on the day of the incident that they saw McCree shoot or that they believed he was shooting at Harris.  SLED's DNA analysis of McCree's gun showed that DNA from McCree, Baker, and a third, unknown individual was found on the gun.  Harris, Richardson, and Williams-Tobias submitted DNA samples too and were eliminated as contributors to the DNA profile from McCree's gun.  (SLED Report, Ex. 2, ECF No. 174-2 at 41.)

## G.     Lawsuit

Plaintiff raises claims pursuant to 42 U.S.C. § 1983 of excessive force and unlawful seizure in violation of the Fourth Amendment and bystander liability against Harris and Baker.  Plaintiff also raises a § 1983 claim against Walmart for violations of the Fourth Amendment.   Plaintiff further raises state law claims of false arrest or false imprisonment, negligence, gross negligence, and wrongful death and survival against all of the defendants, and Plaintiff asserts claims of

negligent hiring, supervision, and retention against the City of Chester.  Harris filed a state law counterclaim of assault and battery against McCree's estate.

## DISCUSSION

### A.     Summary Judgment

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  Rule 56 mandates entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In deciding whether there is a genuine issue of material fact, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248.

The moving party has the burden of proving that summary judgment is appropriate.  Once the moving party makes this showing, however, the opposing party may not rest upon mere allegations or denials, but rather must, by affidavits or other means permitted by the Rule, set forth

specific facts showing that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(c), (e); Celotex Corp., 477 U.S. at 322.

**B.     Plaintiff's Claims Pursuant to 42 U.S.C. § 1983**

Plaintiff's federal claims are brought pursuant to 42 U.S.C. § 1983, which " 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.' "  Albright v. Oliver, 510 U.S. 266, 271 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)).  To establish a claim under § 1983, a plaintiff must show:  (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).  Here, Plaintiff claims that Harris and Baker falsely arrested McCree and used excessive force against him in violation of the Fourth Amendment.

**1.     False Arrest**

Harris argues that he is entitled to summary judgment as to Plaintiff's false arrest claim because he had probable cause to arrest McCree for shoplifting or petit larceny.  The court agrees.

The Fourth Amendment protects individuals from unreasonable searches and seizures by the government and requires warrants be issued only upon a finding of probable cause.  U.S. Const. amend. IV.  To establish a § 1983 claim for false arrest in violation of the Fourth Amendment, the plaintiff must show the seizure of his person was unreasonable, *i.e.*, he must show that he was arrested without probable cause.  See Rogers v. Pendleton, 249 F.3d 279, 294 (4th Cir. 2001) (stating that claims for false arrest and false imprisonment "are essentially claims alleging a seizure of the person in violation of the Fourth Amendment"); see also Brown v. Gilmore, 278 F.3d 362, 367 (4th Cir. 2002) (stating that to establish an unreasonable seizure under the Fourth Amendment, the plaintiff must show he was arrested without probable cause).  Thus, there is no § 1983 claim

for false arrest unless the officer lacked probable cause.  See Street v. Surdyka, 492 F.2d 368, 372-73 (4th Cir. 1974).

A law enforcement officer has probable cause to effect a warrantless arrest where the totality of the facts and circumstances known to the officer at the time of the arrest would cause a reasonable officer to believe that a criminal offense has been committed.  Devenpeck v. Alford, 543 U.S. 146, 152-53 (2004); Smith v. Munday, 848 F.3d 248, 253 (4th Cir. 2017).  Probable cause inquiries turn on two factors:  the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct.  Pritchett v. Alford, 973 F.2d 307, 314 (4th Cir. 1992).  Probable cause requires more than bare suspicion, but it requires less than evidence necessary to convict.  Munday, 848 F.3d at 253.

Under South Carolina law, a person is guilty of shoplifting if he:

> [T]akes possession of, carries away, transfers from one person to another or from one area of a store or other retail mercantile establishment to another area, or causes to be carried away or transferred any merchandise displayed, held, stored, or offered for sale by any store or other retail mercantile establishment with the intention of depriving the merchant of the possession, use, or benefit of the merchandise without paying the full retail value.

S.C. Code Ann. § 16-13-110(A)(1).  Shoplifting is a misdemeanor if the value of the merchandise taken is $2,000 or less.  S.C. Code Ann. § 16-13-110(B)(1).  Similarly, larceny is defined under South Carolina law as the felonious taking of the goods of another without the consent of the other. Kerrigan v. State, 406 S.E.2d 160, 161 (S.C. 1991) (citing State v. Brown, 260 S.E.2d 719, 720 (S.C. 1979)).  Petit larceny is a type of larceny where the value of goods taken is $2,000 or less. S.C. Code Ann. § 16-13-30.

At the time of the arrest, the information available to the Chester police officers, including Harris,[6] was that McCree took a door lock set to a cash register; the cashier rang up the item, bagged it, and handed the bag to McCree; and McCree took the bag from the cashier and left the store without paying for the item. The cashier told Richardson that McCree took the item even though the cashier told McCree that he had not paid for the item. Richardson also reviewed security camera footage showing that McCree took the bag from the cashier without paying, and Williams-Tobias identified McCree as the person in the video. When McCree returned to the store, he admitted that he took the door lock set without paying for it, explained that he told the cashier to put it on his tab, and offered to pay for it then. This information is more than sufficient to lead a reasonable officer to believe that McCree intended to take the door lock set without paying for it, a misdemeanor under South Carolina law.

Plaintiff argues that probable cause was negated by the fact that McCree offered to pay for the door lock set when he returned to the store. McCree may have innocently believed that he could later return to pay for the door lock set. And there is evidence in the record that could support such a determination. McCree returned to the store just a couple of hours after he took the door lock set. He returned with $45.27 in his pocket—the door lock set cost $45.87 with tax— and offered to pay for it. However, before McCree returned, the officers already reasonably believed that McCree shoplifted the door lock set and Walmart had already decided to press charges. At that time, the officers were aware that McCree took the door lock set without paying, despite the cashier's informing McCree that he had not paid while McCree walked away from the cashier and out of the store. And a reasonable officer could interpret McCree's offer to pay for

---

[6] The record appears to show that Richardson and Williams-Tobias also had a role in arresting McCree, but they are not named as defendants in this action.

the item upon return as a sign of guilt or contrition because he did not offer to pay for the item until he was confronted by the officers, and his explanation that he asked the cashier to put the door lock set on his "tab" defies common understanding of how modern retail stores operate.  See, e.g., Farrell v. Macy's Retail Holdings, Inc., 645 F. App'x 246, 248 (4th Cir. 2016) (finding the district court did not err in finding probable cause existed to detain the plaintiffs for theft even though the plaintiffs testified that they *intended* to pay for the items before leaving the store). McCree could have offered such a defense to contest his guilt in a trial.  But for the officers to establish probable cause, they needed only to have a reasonable belief in his guilt, not proof beyond a reasonable doubt.  See United States v. Gray, 137 F.3d 765, 769 (4th Cir. 1998) ("While probable cause requires more than 'bare suspicion,' it requires less than that evidence necessary to convict."); see also Wadkins v. Arnold, 214 F.3d 535, 541 (4th Cir. 2000) ("Reasonable law enforcement officers are not required to 'exhaust every potentially exculpatory lead or resolve every doubt about a suspect's guilt before probable cause is established.' ") (quoting Torchinsky v. Siwinski, 942 F.2d 257, 264 (4th Cir. 1991)).

In other words, a suspect's insistence that he is innocent does not negate an officer's otherwise reasonable belief based on conflicting evidence that a crime has been committed.  And as explained above, a reasonable officer in Harris's situation could have concluded that McCree intended to take the door lock set without paying for it.  See Wilson v. Kittoe, 337 F.3d 392, 401 (4th Cir. 2003) ("While the benefit of hindsight might have allowed us to paint a different picture,

we focused our probable cause analysis on the scene as it appeared to the officers when they chose to detain [the suspect].").[7]

Plaintiff relatedly argues that whether McCree intended to pay for the door lock set creates a question of fact that must be resolved by a jury to determine whether the officers had probable cause. The court disagrees. As explained above, McCree's true intentions may be a question of fact relevant to his *ultimate* guilt or innocence at trial. But here, the court is concerned only with the facts material to the officers' determination that they had probable cause to arrest McCree, facts which are not in dispute. See, e.g., Gooden v. Howard Cnty., Md., 954 F.2d 960, 965 (4th Cir. 1992) (stating that conflicting evidence of guilt does not create an issue of triable fact as to probable cause because the court should consider only "whether the officers acted reasonably upon the reports available to them and whether they undertook an objectively reasonable investigation with respect to that information in light of the exigent circumstances they faced"). Because there is no dispute about the material facts—that is, what the officers knew at that time—whether the officers had probable cause is a question of law. See S.P. v. City of Takoma Park, Md., 134 F.3d 260, 272 (4th Cir. 1998) ("When, as in this case, there is no genuine issue of *material* fact, the existence of probable cause becomes a purely legal question subject to de novo review.") (emphasis added). The facts available to the officers at that time would allow a reasonable officer to conclude that McCree intended to take the door lock set without paying for it, and those facts are not in dispute. Consequently, Harris is entitled to summary judgment as to Plaintiff's Fourth Amendment false arrest claim.

---

[7] In so finding, the court also concludes that even if Harris *incorrectly* believed that McCree intended to take the door lock set without paying, he would be entitled to qualified immunity as to the Fourth Amendment false arrest claim. See Graham v. Gagnon, 831 F.3d 176, 184 (4th Cir. 2016) ("If the probable cause determination, though mistaken, was nevertheless objectively reasonable, the officer should enjoy immunity.").

### 2.    Excessive Force

Harris and Baker argue that their shooting of McCree did not constitute excessive force in violation of the Fourth Amendment because it was reasonable under the circumstances. Specifically, they argue that the undisputed evidence in the record shows that each time they fired their guns, McCree was holding a gun himself and pointing it at them.  The court agrees.

### a.    Substantive Law of Excessive Force

A claim that a law enforcement officer has used excessive force during an arrest, investigatory stop, or other seizure of a person is properly analyzed under the reasonableness standard of the Fourth Amendment to the United States Constitution.  Graham v. Connor, 490 U.S. 386, 394-95 (1989).  The Fourth Amendment test is an objective one; however, it is not capable of precise definition or mechanical application.  Id. at 396-97.  It requires the court to determine "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Id. at 397; see also Yates v. Terry, 817 F.3d 877, 884-85 (4th Cir. 2016); Yarborough v. Montgomery, 554 F. Supp. 2d 611, 617 (D.S.C. 2008).  The court must balance " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the importance of the governmental interest alleged to justify the intrusion."  Yarborough, 554 F. Supp. 2d at 617 (quoting Graham, 490 U.S. at 396); see also Yates, 817 F.3d at 884-85.

Courts must examine the totality of the circumstances in determining whether the force used was objectively reasonable.  Yates, 817 F.3d at 885.  Therefore, application of this standard "requires careful attention to the facts and circumstances of each particular case."  Graham, 490 U.S. at 396; see also Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003).  In Graham, the Supreme Court established several factors to consider, including "the severity of the crime at issue,

whether the suspect poses an immediate threat to the safety of officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Yates, 817 F.3d at 885 (quoting Graham, 490 U.S. at 396). Courts must view the evidence " 'in full context, with an eye toward the proportionality of the force' in light of all the circumstances." Yates, 817 F.3d at 883 (quoting Rowland v. Perry, 41 F.3d 167, 173 (4th Cir. 1994)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

"[T]he right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id.; see also Yarborough, 554 F. Supp. 2d at 617. "This right is obviously greater when the suspect is resisting arrest and refusing to comply with the officer's orders." Yarborough, 554 F. Supp. 2d at 617. However, notwithstanding probable cause to seize a suspect, an officer may use deadly force to effect the seizure only if he has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." Tennessee v. Garner, 471 U.S. 1, 11 (1985). As the United States Court of Appeals for the Fourth Circuit recently explained:

> When *deadly* force is used, we have a more specific test for objective reasonableness. In those cases, we consider whether the hypothetical reasonable officer in that situation would have had probable cause to believe that the suspect posed a threat of serious physical harm, either to the officer or to others. That determination must focus on the moment that deadly force was used, not the whole episode. And the justification for deadly force can fall away in seconds. In questioning the split-second decisions of police officers, we must avoid hindsight bias and try to place ourselves in the heat of the moment.

Stanton v. Elliott, 25 F.4th 227, 233 (4th Cir. 2022) (internal citations, alterations, and quotation marks omitted).

b.     **Application to the Facts**

Here, at the moments Harris and Baker shot McCree, the undisputed facts in the record show that a reasonable officer in their situations would have probable cause to believe that McCree posed a threat to their lives or the lives of bystanders.   Most crucially, at each of the moments Harris and Baker opened fire, the undisputed evidence in the record shows that McCree was pointing a gun at the officers in a public parking lot filled with bystanders.   As will be discussed at length herein, the law of this circuit allows officers to use deadly force when confronted with a suspect who is pointing a gun at them.  See, e.g., Stanton, 25 F.4th at 235; Elliott v. Leavitt, 99 F.3d 640, 643 (4th Cir. 1996).

Other facts and circumstances provided Harris and Baker with further reason to believe that McCree posed a threat to them or bystanders.  McCree, who was under arrest and in handcuffs, assaulted Harris in the loss prevention office and fled.  When Harris gave chase, McCree again assaulted Harris in the parking lot and continued to flee.   McCree then apparently retrieved a gun from his car and approached Harris with the gun in his hand, pointed at Harris.  Thus, by the time Harris drew his own gun and shot at McCree the first time, Harris reasonably believed that McCree intended to shoot him because, rather than fleeing the scene after assaulting Harris in the parking lot, McCree reengaged with a gun and pointed it at Harris.  See Williams v. Strickland, 917 F.3d 763, 769 (4th Cir. 2019) (stating an officer may reasonably apply deadly force to a fleeing suspect, regardless of the seriousness of the crime, only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others); cf. Henry v. Purnell, 652 F.3d 524, 532 (4th Cir. 2011) (stating the use of deadly force is not justified where an officer shoots a fleeing misdemeanant whom the officer has no reason to believe was a threat).   And the officers' justification for force never dissipated during the encounter because

McCree continued pointing his gun at the officers. When Harris approached McCree, who had fallen to the ground after Harris fired his first round of shots, McCree again pointed the gun at Harris, justifying Harris's second round of shots at McCree. As for Baker, he was aware that shots had been fired and that Harris was out of ammunition and in danger. By the time Baker fired at McCree, he saw that McCree was moving toward Harris with a gun in his hand, that McCree turned toward Baker and pointed the gun at him, and that McCree refused to drop the gun when ordered by Baker. In every instance that Harris and Baker shot at McCree, the undisputed evidence in the record shows that McCree was pointing a gun at the officers.

The law of this circuit simply does not require police officers to risk being shot when confronted with a violent, armed arrestee who is pointing a gun at them. The Fourth Circuit's decision in Elliott v. Leavitt, 99 F.3d 640, 643 (4th Cir. 1996), is illustrative. There, police officer Jason Leavitt initiated a traffic stop of Archie Elliott, who admitted to drinking excessively and failed sobriety tests. Leavitt handcuffed Elliott and called for backup. Leavitt searched Elliott but found no weapon. A second officer, Wayne Cheney, arrived and assisted Leavitt in placing Elliott in the front passenger seat of Leavitt's police car with the seatbelt fastened, the door closed, and the window rolled up. The officers began talking by the passenger's side of the car when they noticed movement in the car. The officers observed a gun in Elliott's hand. Elliott had also released the seatbelt, twisted his arms to the right side of his body to position the gun at the officers, and Leavitt saw Elliott's finger on the trigger. Leavitt yelled, "Gun!" and ordered Elliott to drop it. Elliott did not respond or drop the gun. The officers opened fire, killing Elliott. Elliott, 99 F.3d at 641-42.

Elliott's estate sued the officers claiming they used excessive force. The district court refused to grant the officers qualified immunity, but the Fourth Circuit reversed. In rejecting the

estate's argument that Elliott did not pose a real threat to the officers because his hands were cuffed behind his back while he was sitting in a police car with the door closed and the window up, the Fourth Circuit stated:

> Such a conclusion, however, is untenable in light of uncontroverted evidence that immediately before firing, Leavitt and Cheney confronted an intoxicated individual pointing a gun at them from only a few feet away with his finger on the trigger. The car window was no guarantee of safety when the pointed gun and the officers at whom it was aimed were in such close proximity. Moreover, expert testimony in the summary judgment record emphasized that even suspects with their hands handcuffed behind their backs have been able to position a concealed weapon so as to fire at an arresting officer.

Id. at 642. Also, in rejecting the district court's contention that Elliott's intention with the gun was unclear and that the officers could have retreated, the Fourth Circuit found that Elliott's intentions became immaterial once he pointed the gun at the officers. The Fourth Circuit stated:

> This suggestion that the officers might have responded differently is exactly the type of judicial second look that the case law prohibits. Furthermore, even if Elliott's specific intent were relevant, it is not clear what other evidence of intent the district court would require—Elliott was pointing his gun at the officers with his finger on the trigger and ignored the order to drop his weapon. Given the officers' proximity to the car, it is also unclear that they could have moved away from the car quickly enough to avoid being shot.
>
> The critical point, however, is precisely that Elliott was "threatening," threatening the lives of Leavitt and Cheney. The Fourth Amendment does not require police officers to wait until a suspect shoots to confirm that a serious threat of harm exists. The court's comment that the officers could have moved away from the car is, unfortunately, a suggestion more reflective of the "peace of a judge's chambers" than of a dangerous and threatening situation on the street.

Id. at 643 (quoting Graham, 490 U.S. at 396).

Here, the situation confronted by Harris and Baker provides even stronger justification for their use of deadly force than the situation facing the officers in Elliott. Both Elliott and McCree were under arrest and handcuffed behind their backs. But unlike Elliott, McCree was not restrained in a car with a seatbelt fastened. And whereas Elliott had not assaulted an officer prior to drawing a gun, McCree retrieved a firearm after twice physically assaulting Harris and fleeing. Further,

McCree approached the officers while he pointed the gun, having reengaged them after originally fleeing, whereas Elliott was sitting in a police car. Based on these facts, no reasonable jury could find that Harris's and Baker's belief that McCree posed a serious threat to their lives or safety was unreasonable.

Beyond Elliott, the Fourth Circuit has found that officers reasonably used deadly force in situations with far fewer indications of a threat to officer safety. See, e.g., Anderson v. Russell, 247 F.3d 125, 131 (4th Cir. 2001) (finding that an officer was justified in firing on a suspect that he reasonably—but incorrectly—believed to be armed with a concealed gun when the suspect lowered his hands in contravention of the officer's instructions in the direction of what the officer believed was a gun); McLenagan v. Karnes, 27 F.3d 1002, 1005 (4th Cir. 1994) (finding an officer's use of deadly force justified where the officer shot a fleeing man in handcuffs after hearing someone yell that an arrestee had a gun, though it turned out that the man in handcuffs was not the arrestee with a gun); Slattery v. Rizzo, 939 F.2d 213, 216 (4th Cir. 1991) (finding the officer was justified in using deadly force when a suspect in the back of a car disobeyed the officer's orders and then "came at" the officer with an object in his hand, though the object turned out to be a beer bottle); Ayala v. Wolfe, 546 F. App'x 197, 201 (4th Cir. 2013) (finding an officer's shooting of the plaintiff was justified where the plaintiff was instructed to put his hands on the hood of a patrol car and, instead, the plaintiff attempted to remove a gun from his waistband).

That McCree never fired his gun does not diminish the officers' concern for their safety; see Stanton, 25 F.4th at 234 ("A police officer need not wait for a suspect to shoot before using deadly force.") (quoting Elliott, 99 F.3d at 643); nor does Harris's failure to give a warning for McCree to drop the gun in light of his uncontradicted testimony that McCree was pointing the gun at him. See Hensley on behalf of N. Carolina v. Price, 876 F.3d 573, 584 (4th Cir. 2017) ("[A]n

officer should give a warning before using deadly force unless there is an immediate threatened danger."); McLenagan, 27 F.3d at 1005 ("We decline, therefore, to fashion an inflexible rule that, in order to avoid civil liability, an officer must always warn his suspect before firing—particularly where . . . such a warning might easily have cost the officer his life."). Finally, that McCree was originally detained for a misdemeanor carries no weight in the analysis because McCree turned violent, fled, retrieved a gun, and pointed it at the officers. See, e.g., Anderson v. Russell, 247 F.3d 125, 131-32 (4th Cir. 2001) ("At the precise moment that Russell used deadly force, he reasonably believed that Anderson posed a deadly threat to himself and others, making the nature of the suspected criminal activity at issue at the time Russell approached Anderson irrelevant."); see also Stanton, 25 F.4th at 233 (stating that the determination of whether deadly force was unreasonable focuses on the "moment that the deadly force was used, not the whole episode").

### c.    Plaintiff's Arguments

Plaintiff argues that genuine disputes of material fact exist about whether McCree posed any threat to the officers. Plaintiff's overarching argument is that a reasonable jury could determine that McCree was never armed or that he never pointed the gun at the officers. Plaintiff's argument is extensive and thorough, spanning twenty-seven pages of her consolidated response to the defendants' motions for summary judgment. Despite that, Plaintiff's argument suffers two fundamental flaws. First, she fails to point to any *affirmative evidence* in the record that supports her theories. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 256 ("The movant has the burden of showing that there is no genuine issue of fact, but the plaintiff is not thereby relieved of [her] own burden of producing in turn evidence that would support a jury verdict."); see also id. at 257 ("[T]he plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment."). Second, any inconsistencies in the record upon which she relies are

either not genuine, or they are immaterial to the question of whether the officers used excessive force—or both.  See id. at 247-48 ("By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.")

Instead, Plaintiff merely assumes in her briefing that the witnesses are lying, essentially asking the court to disregard all the undisputed evidence in the record showing that McCree assaulted Harris, retrieved a gun, and pointed it at the officers—not because there is contradictory evidence in the record that could reasonably yield different conclusions, but because Plaintiff supposes that a jury might not believe it.  See id. at 256-57 (stating that "discredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion" sufficient to create a genuine dispute of fact) (quoting Bose Corp. v. Consumers Union of U.S., Inc., 466 U.S. 485, 512 (1984)).  But Plaintiff cannot avoid summary judgment on her excessive force claim without pointing to any evidence undermining the defendants' proof that McCree posed an imminent threat to the officers, as is her burden.  See id. at 256 (rejecting the argument that summary judgment is appropriate where the plaintiff does not put forth any concrete evidence but asserts that a jury might disbelieve the evidence relied on by the defendant); Thomas v. Holly, 533 F. App'x 208, 221 (4th Cir. 2013) (stating a plaintiff in a § 1983 suit may not avoid summary judgment on the issue of qualified immunity by asserting that the jury might disbelieve an officer's testimony where the plaintiff presents no evidence to put the testimony in dispute).  This naked type of "liar, liar, pants on fire" argument is insufficient to defeat a well-supported motion for summary judgment.

Plaintiff argues that Harris's testimony is not credible because it is "self-serving" and Harris has "selective memory impairments."  (Pl.'s Resp., ECF No. 170 at 35.)   For instance, Plaintiff points to Harris's testimony, in this case as well as his workers' compensation claim, that

injuries to his head from being headbutted by McCree have caused Harris to have "severe memory deficits." (Id. at 38-39.)  Plaintiff also points to numerous instances in Harris's deposition where, Plaintiff claims, Harris either could not remember key facts or gave testimony that was inconsistent with other evidence in the case.

As explained above, a plaintiff cannot avoid summary judgment by merely offering unsupported supposition that a jury might discredit otherwise admissible evidence.  See Anderson, 477 U.S. at 256.  Moreover, Plaintiff fails to point to any evidence that Harris's memory issues have caused him to misremember the facts material to this case.  Plaintiff's insinuation that Harris is sometimes forgetful is not evidence that Harris misremembered the specific facts about this case. Plaintiff goes to great lengths to point out that Harris testified multiple times in his deposition that he could not remember certain facts when asked about them, but Harris's inability to recall every detail about the incident does not render the facts he can remember inadmissible or irrelevant.  For example, Plaintiff points to Harris's inability to remember details about the car that McCree raised his gun over (Pl.'s Resp., ECF No. 170 at 37), a factual detail irrelevant to whether Harris's use of force was reasonable in light of Harris's uncontradicted testimony that the gun was pointed at him at that moment.  Similarly immaterial is Plaintiff's assertion that Harris was unable to remember *precisely* where in the parking lot McCree headbutted him, (id. at 36), a detail that has no bearing on whether Harris's use of force was reasonable.  And Plaintiff's assertion that Harris could not recall the gun's orientation—that is, whether or not it was tilted—at the time McCree pointed it at

Harris makes no difference as to whether McCree had probable cause to use deadly force.[8]  Even accepting Plaintiff's criticism of Harris's testimony, Plaintiff fails to present any evidence that undermines Harris's testimony that McCree pointed a gun at him.

Plaintiff also argues that a jury could reasonably infer that McCree never possessed the gun.  Citing purported evidence of Harris's character,[9] Plaintiff's dubious interpretation of the DNA evidence, Harris's remark that McCree had the gun "in his ass,"[10] and Plaintiff's skepticism of other evidence in the record, Plaintiff suggests that Harris may have planted the gun on McCree. (Pl.'s Resp., ECF No. 170 at 43.)  As Harris argues in his reply brief (ECF No. 197 at 3-5), there is a complete absence of actual, admissible evidence to support that theory, and the record is replete with evidence that McCree retrieved and was holding his *own* gun at the time the officers shot him.

---

[8] Additionally, where Plaintiff does attempt to point out inconsistencies or gaps in Harris's testimony, Plaintiff often misstates the facts in the record.  For example, Plaintiff claims, "When asked to describe the car he saw McCree standing near, Harris could not provide even the most basic details, such as whether it was a sedan or SUV."  (Pl.'s Resp., ECF No. 170 at 37.)  That is false.  When Harris was asked what kind of car McCree was standing behind, Harris testified that it was a car or sedan and proceeded to describe the shape of the car's back window relative to the trunk. (Harris Dep. at 262, ECF No. 174-28 at 68.)  In another example, Plaintiff asserts that Harris could not recall where on his head McCree's headbutts landed.  (Pl.'s Resp., ECF No. 170 at 36.)  Harris actually testified that he could not match each head injury with each head butt, but he knew that his head injuries all occurred when he was assaulted by McCree.  (Harris Dep. at 250, ECF No. 174-28 at 59.)

[9] The court questions whether evidence of Harris's character is even admissible here, and Plaintiff failed to provide any analysis of this issue under Federal Rule of Evidence 404.  As to the DNA evidence, as explained by Harris in his reply brief, Plaintiff fails to establish a proper foundation for the admissibility of the DNA evidence.  (Harris Reply, ECF No. 197 at 7-9.)  In any event, the SLED report eliminated Harris as a contributor to the DNA profile taken from the gun. (Pl.'s Resp., ECF No. 174-2 at 41.)

[10] Plaintiff argues that by "in his ass," Harris was stating that McCree never brandished the gun.  (Pl.'s Resp., ECF No. 170 at 16-17.)  Even accepting Plaintiff's interpretation of that statement, it would refute Plaintiff's theory that Harris planted the gun.  Plaintiff's conjecture about Harris's meaning cannot reasonably be accepted in lieu of the far more likely interpretation that Harris was concerned that McCree had more concealed weapons on him, as Harris previously searched him and found a pocketknife but no gun.

See Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party, however, cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Even if a reasonable jury were to find Harris's testimony unbelievable, there is not a shred of evidence in the record suggesting that Harris planted the gun. Plaintiff's argument is conjectural at best and, at worst, completely refuted by all of the other evidence in the record.

Relatedly, Plaintiff argues that evidence in the record suggests that McCree was shot before he obtained the gun. Plaintiff argues:

> The testimony of Harris and Baker that McCree was facing them with a gun is further contradicted by the gunshot wounds on McCree's body. The autopsy report identified three wounds:  one to [McCree's] right upper chest, one to the anterolateral triceps in the backside of his right arm, and one to his lateral left hip. (Ex. 3.)  The wounds to McCree's right arm and left hip strongly suggest that he was not facing Harris and Baker when those gunshots hit him.  This is consistent with an absence of any confrontation or threat from McCree and suggests that McCree had sustained gunshot wounds as he was running away from Harris.

(Pl.'s Resp., ECF No. 170 at 44.)  Again, the record flatly contradicts Plaintiff's argument. Plaintiff's own pathology expert, Kimberly Collins, M.D., testified that McCree was shot in "not the front of the left hip or the back, but to the direct side of the left hip."  (Collins Dep. at 56, Harris's Reply, ECF No. 197-1 at 2.)  As to the right arm injury, Collins testified that the bullet entered "toward the front of that arm," went through the arm, and exited through the back side of his arm.  (Id. at 57, ECF No. 197-1 at 3.)  The autopsy report confirms Collins's testimony and additionally shows that the gunshot to the chest entered from front to back.  (Autopsy Report, Ex. 3, Pl.'s Resp., ECF No. 174-3 at 1.)  Therefore, McCree fails to point to any evidence in the record

that actually supports his theory that McCree was shot as he was running away or before he grabbed his gun.

Plaintiff also points to Baker's and Richardson's statements to their captain on a phone call immediately following the shooting that McCree had been shooting as evidence that the officers are lying that McCree ever posed a threat to them. First, considering the number of shots fired during the incident, it is not unreasonable that officers who did not observe the entire incident may have mistakenly believed in the immediate aftermath that an armed suspect also fired some of the shots, especially given the ambiguity of Harris's statement over the radio that shots had been fired. Notably, other witnesses to the incident, including store customers, also thought that McCree had fired his gun. (Pl.'s Resp., ECF No. 174-2 at 7, 10-11.) More importantly, Richardson did not draw a gun or shoot McCree, so his perception of whether McCree ever fired his gun is not material to whether the other officers reasonably perceived a threat to their safety. As to Baker, his testimony has been consistent that McCree never fired his gun at *Baker himself*, and his statement to the captain that he thought McCree fired his gun too does not contradict Baker's clear testimony that he only shot McCree when McCree pointed the gun at him and did not comply with his order to drop the gun.

Plaintiff further argues that Baker's testimony is not credible and leaves issues to be resolved by a jury. Specifically, Plaintiff argues that whether McCree had a weapon and was pointing it at Baker at the time Baker shot McCree is a "highly disputed fact" that is supported only by Baker's own testimony. (Pl.'s Resp., ECF No. 170 at 45.) Plaintiff also argues that Baker's claim that McCree was walking toward him when he opened fire is disputed. As previously explained, Plaintiff cannot create a genuine issue of fact by merely questioning the

truthfulness of a witness's uncontradicted statements. Nothing in the record undermines Baker's version of the events. See Anderson, 477 U.S. at 256.

In fact, other evidence in the record corroborates Baker's testimony. Baker's body camera video shows that McCree was walking toward Baker with a light-colored object at his side when Baker opened fire. (See Baker Body Camera at 00:21.) The body camera video also shows that when Baker approached McCree after shooting him, while McCree lay on his side and on the ground, McCree was either holding or laying on top of a silver and black handgun, and Baker struggled to pull the gun away from him. (Id. at 00:28, 00:34-00:44.) No reasonable jury could view Baker's body camera video and conclude that McCree was not holding a gun at the time Baker opened fire. See Witt v. W. Virginia State Police, Troop 2, 633 F.3d 272, 276-77 (4th Cir. 2011) (stating that when documentary evidence, such as a video, "blatantly contradicts a plaintiff's account so that no reasonable jury could believe it, a court should not credit the plaintiff's version on summary judgment") (internal alterations and quotations omitted) (quoting Scott, 550 U.S. at 380).

While considering the account of the officers who shot McCree, the court is cognizant of the Fourth Circuit's recent admonishment in Stanton that courts should not be overzealous in crediting the testimony of law enforcement officers over other evidence in deadly force cases. The Fourth Circuit stated:

> With deadly force cases, special difficulties can arise during summary judgment. Often, the officer has killed the only other potential witness. Courts should be careful at summary judgment to avoid simply accepting an officer's self-serving statements and must consider all contradictory evidence. Speculation alone cannot create a factual dispute. But in these cases, it would be easy to overvalue the narrative testimony of an officer and to undervalue potentially contradictory physical evidence. So we should be cautious to avoid simply accepting officer testimony as true. But neither does caution lead us to be especially critical of officer testimony in these cases. We need only apply our normal summary-judgment rules,

which ask whether reasonable juries might disagree over some material factual dispute.

Stanton, 25 F.4th at 234 (internal citations omitted). Here, even if the court assumes that a jury would skeptically evaluate Harris's and Baker's accounts as self-serving, as previously explained, their accounts are generally corroborated by other witnesses, physical evidence, and video evidence. And crucially, Plaintiff does not come forward with affirmative evidence to contradict the overwhelming evidence showing that McCree was armed and pointing a gun at the officers, as is her burden.[11]

Plaintiff also argues that affidavits from witnesses Jeffery Wallace and Diane Smith, as well as testimony from Williams-Tobias, which appear to corroborate the officers' statements, do not actually support Harris's and Baker's testimony that McCree posed a threat to their safety. Plaintiff argues that though Wallace testified that he saw a suspect running from the police, and that the suspect retrieved a gun from his car, Wallace should not be believed because his testimony makes no mention of handcuffs. Plaintiff also argues that Wallace's testimony cannot be believed because Wallace provided a statement to SLED immediately after the shooting in which Wallace claimed that the suspect was holding a gun up toward his shoulder, and in which—unlike his affidavit submitted here—Wallace did not mention that he saw a suspect running from officers or

---

[11] The facts and analysis in Stanton provide sharp contrast to this case. In Stanton, the Fourth Circuit found that a district court erred in granting summary judgment to a police officer who was sued for excessive force after he shot and killed a suspect that the officer wrongly believed had a weapon and was about to shoot him. The Fourth Circuit stated that although the officer's version of events may not have shown a constitutional violation, the district court erred by accepting the officer's version in light of *contradictory physical evidence*. The Fourth Circuit explained that physical evidence—that the suspect was shot in the back—could have supported the officer's version of events but it also could have supported the plaintiff's version of events— that the unarmed suspect was shot while running away from the officer. Stanton, 25 F.4th at 235-37. Those facts strongly contrast with the facts in this case, where Plaintiff has pointed to no evidence that would support her theory that McCree was unarmed or not threatening the officers when he was shot.

going to a car to retrieve a gun.  Similarly, Plaintiff argues that witness Diane Smith's affidavit is not reliable because in a statement to SLED shortly after the shooting she stated that she saw a man in handcuffs shooting at the officers, whereas in Smith's affidavit in this case she testified that she saw a black male with a gun, heard gunfire, and therefore *believed* that he was shooting at the officers.  Plaintiff further argues that Williams-Tobias's testimony that she saw a gun in McCree's hand, next to his waist, while they were both in the parking lot after Williams-Tobias heard gunshots is not credible because Williams-Tobias did not respond in a manner consistent with seeing someone with a gun—for example, she did not command McCree to drop the gun, ask him if he had been shot, ask McCree who was shooting, or draw a gun herself.[12]  Plaintiff argues, "The material inconsistencies between these witnesses' affidavits and their unsworn statements to SLED undermines their credibility as witnesses, diminishes the weight of their proffered testimony, and provides a substantial basis for impeachment at trial, where they will both be subject to heavy cross-examination."  (Pl.'s Resp., ECF No. 170 at 58.)

As explained *ad nauseum* at this point, Plaintiff's arguments about the credibility of these witnesses or immaterial inconsistencies in their testimony are unsupported by any contradictory evidence that could create a genuine issue of material fact.  See Anderson, 477 U.S. at 256.  Additionally, the fact that all of the evidence in the record is not perfectly consistent does not create a triable issue of fact.  As the Fourth Circuit has explained:

> In a rapidly evolving scenario such as this one, a witness's account of the event will rarely, if ever, coincide perfectly with the officers' perceptions because the witness is typically viewing the event from a different angle than that of the officer.  For that reason, minor discrepancies in testimony do not create a material issue of fact

---

[12] Plaintiff again misstates or ignores evidence in the record to support her argument. Williams-Tobias testified she was not carrying a gun at the time but that she stated over the radio that McCree had a gun.  (Williams-Tobias Dep. at 155, Pl.'s Resp., ECF No. 174-21 at 23.)

in an excessive force claim, particularly when, as here, the witness views the event
from a worse vantage point than that of the officers.

Anderson v. Russell, 247 F.3d at 130-31. Plaintiff cannot solely rely on her skepticism of the

evidence relied upon by the defendants or specious inconsistencies. To avoid summary judgment,

she must put forth affirmative evidence that supports her claims. And she must identify a genuine

issue of fact *that matters*. She has not done so here. Uncontradicted evidence in this record shows

that McCree assaulted Harris, fled, retrieved a gun, reengaged with the officers pursuing him, and

pointed the gun at the officers. Though Plaintiff has exhaustively posited reasons why a factfinder

should not believe that evidence, she has identified no evidence supporting her theory that McCree

never held a weapon or never pointed it at the officers. Consequently, there is no genuine dispute

of fact as to whether Harris and Baker faced a serious threat of harm. See Tennessee v. Garner,

471 U.S. at 11. On this record, no reasonable jury could conclude that the officers' use of deadly

force when faced with that threat was unreasonable.[13] Harris and Baker are therefore entitled to

summary judgment as to Plaintiff's claims of excessive force pursuant to the Fourth Amendment.[14]

### 3.    Bystander Liability

Harris and Baker argue that Plaintiff's bystander liability claims fail as a matter of law

because Plaintiff cannot show an underlying constitutional violation. The court agrees.

"The concept of bystander liability is premised on a law officer's duty to uphold the law

and protect the public from illegal acts, regardless of who commits them." Randall v. Prince

---

[13] In light of the court's conclusion that the defendants are entitled to summary judgment
because of a lack of evidence of any constitutional violation for excessive force, the court need not
address the defendants' arguments that they would be entitled to qualified immunity on that claim.
See generally Pearson v. Callahan, 555 U.S. 223, 235, 242 (2009).

[14] Because the court previously concluded that probable cause existed to arrest McCree in
the first place, the court need not address Plaintiff's claim that McCree had the right to resist arrest
with force. (Pl.'s Resp., ECF No. 170 at 60.)

George's Cnty., Md., 302 F.3d 188, 203 (4th Cir. 2002). To succeed on a theory of bystander liability, a plaintiff must demonstrate that a law-enforcement officer (1) knew that a fellow officer was violating an individual's constitutional rights; (2) had a reasonable opportunity to prevent the harm; and (3) chose not to act. Stevenson v. City of Seat Pleasant, Md., 743 F.3d 411, 417 (4th Cir. 2014). Here, Plaintiff's claim necessarily fails because the court has already concluded that the evidence does not support a finding that Harris and Baker violated Plaintiff's Fourth Amendment rights. See, e.g., Wilson v. Town of Mount Jackson, No. 5:21-CV-00055, 2022 WL 819531, at *12 (W.D. Va. Mar. 17, 2022) (stating that the court's finding of probable cause precluded a bystander liability claim because there was no underlying constitutional violation upon which bystander liability could attach) (citing Brooks v. Johnson, 924 F.3d 104, 112 n.3 (4th Cir. 2019)). Consequently, Plaintiff cannot meet the first element to succeed on a bystander liability claim.

### 4.    Corporate Liability

Similarly, Walmart argues that Plaintiff's § 1983 Fourth Amendment claims against it fail as a matter of law because Plaintiff cannot show an underlying constitutional violation. The court agrees. Corporations can be held liable under § 1983 if an official policy or custom of the corporation causes a deprivation of federal rights by someone acting under color of state law. Austin v. Paramount Parks, Inc., 195 F.3d 715, 728 (4th Cir. 1999); see also Rodriguez v. Smithfield Packing Co., 338 F.3d 348, 355 (4th Cir. 2003) (stating that the principles of § 1983 municipal liability[15] can apply equally to private corporations that employ police officers). However, a policy or custom alone cannot sustain a § 1983 claim against a corporation absent an underlying constitutional violation. Cf. Young v. City of Mount Ranier, 238 F.3d 567, 579 (4th

---

[15] See Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978).

Cir. 2001) (stating that § 1983 municipal liability claim cannot be sustained where there is no underlying constitutional violation); Sigman v. Town of Chapel Hill, 161 F.3d 782, 788 (4th Cir. 1998) (declining to address claims of municipal liability in the absence of an underlying use of excessive force).  Again, Plaintiff cannot show that McCree's Fourth Amendment rights were violated.  Therefore, Plaintiff cannot maintain a § 1983 action against Walmart based on corporate liability.[16]

## C.    Plaintiff's State Law Claims

In light of the court's recommendation that the defendants' motions for summary judgment be granted as to Plaintiff's § 1983 claims, the court should exercise its discretion to remand the state law claims to the Chester County Court of Common Pleas.  See 28 U.S.C. § 1367(c) (authorizing a district court to decline to exercise jurisdiction over a supplemental claim); Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 349-50 (1988) (discussing the factors used in deciding whether to exercise supplemental jurisdiction after removal).  Here, Plaintiff raises numerous state law claims that, in the interest of comity, are more appropriate for consideration in South Carolina's courts because they include complex issues of state law.  See 28 U.S.C. § 1367(c) (listing bases for declining supplemental jurisdiction, including the presence of novel or complex issues of state law and the dismissal of federal claims); Hinson v. Nw. Fin. S.C, Inc., 239 F.3d 611, 617 (4th Cir. 2001) (finding the district court did not abuse its discretion to remand the case to state court where the federal claims were no longer at issue, the state claims predominated, and the

---

[16] A private corporation must also be considered a "state actor" to be liable under § 1983. See generally West v. Atkins, 487 U.S. 42, 48 (1988); White Coat Waste Project v. Greater Richmond Transit Co., 35 F.4th 179, 190 (4th Cir. 2022).  The court need not address Walmart's argument that it is not a state actor amenable to suit under § 1983 because that issue is moot in light of the court's finding that no underlying constitutional violation occurred.

state claims involved interpretations of complex state statutes on which there was no state precedent).

## RECOMMENDATION

With respect to her federal claims, Plaintiff has failed to identify a genuine issue of material fact or present affirmative evidence in opposition to the defendants' motions. The court therefore recommends the motions for summary judgment filed by Baker (ECF No. 139), Walmart (ECF No. 140), and Harris (ECF No. 144) be granted as to Plaintiff's federal civil rights claims pursuant to § 1983. Because the only claims remaining in this case are state law tort claims, including claims addressed by the City of Chester (ECF No. 143), the court should decline to exercise supplemental jurisdiction over those claims and remand this case to the Chester County Court of Common Pleas.

August 22, 2022
Columbia, South Carolina

Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

*The parties' attention is directed to the important notice on the next page.*

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' "  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).