IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | |
|---|---|
| Vickie J. McCree, as Personal Representative of the Estate of Ariane L. McCree,<br><br>Plaintiff,<br><br>v.<br><br>City of Chester; Nicholas A. Harris, in his individual capacity; Justin M. Baker, in his individual capacity; Walmart Inc.; and Walmart Stores East, L.P.,<br><br>Defendants. | Civil Action No. 0:20-cv-00867-JFA-PJG |

**PLAINTIFF'S OBJECTIONS TO REPORT AND RECOMMENDATION ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, Plaintiff Vickie J. McCree respectfully submits the following objections to the Report and Recommendation of United States Magistrate Judge Paige J. Gossett filed August 22, 2022, on Defendants' motions for summary judgment (hereinafter, "R&R"). For the reasons that follow, Plaintiff respectfully requests that the court reject the recommendations of the R&R and deny Defendants' motions for summary judgment in their entirety.

**PRELIMINARY STATEMENT**

We will never know what fully transpired in the Walmart parking lot where Ariane McCree was shot and killed by Defendants Nicholas Harris and Justin Baker because McCree is not alive to tell his side of the story. The facts in this case are, thus, incomplete. The disputed evidence and the competing inferences, however, are vast and far-reaching. Despite the Magistrate Judge's conclusions, a jury reviewing the same evidence could reasonably find that McCree posed no threat

of harm to anyone that morning. In cases such as this, it is the role of the jury to weigh the evidence, make credibility determinations, and decide what inferences to draw and believe.

The Magistrate Judge breached this important distinction between judge and jury. Contrary to the well-defined application of Federal Rule of Civil Procedure Rule 56(c), the Magistrate Judge improperly weighed the evidence, made credibility determinations, and construed the facts and inferences against the non-moving party—the Plaintiff. Perhaps most glaring is the Report's sheer reliance on evidence from only *one source*—the officers' self-serving testimony. This is precisely what the Fourth Circuit and Rule 56(c) counsel against. In cases such as this, "[c]ourts should be careful at summary judgment to avoid simply accepting an officer's self-serving statements and must consider all contradictory evidence."[1] Likewise, as the Fourth Circuit recently instructed, courts should not "overvalue the narrative testimony of an officer and [] undervalue potentially contradictory physical evidence."[2]

To warrant summary judgment, Defendants Harris and Baker must show that there is no genuine dispute of material fact that their conduct in shooting and killing a handcuffed man in a crowded parking lot was legally justified—in other words, that a jury would be <u>required</u> to find in their favor at trial. To carry this burden, Harris and Baker each offer only a single piece of evidence: their own testimony. This self-serving testimony alleges that McCree was purportedly brandishing a gun when they fired at him at least 29 times—even though the video evidence

---

[1] *Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022) (citing *Ingle ex rel. Est. of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006); *Brown ex rel. Lawhorn v. Elliott*, 876 F.3d 637, 641 (4th Cir. 2017) (emphasizing "the importance of drawing inferences in favor of the nonmovant, even when ... a court decides only the clearly-established prong").

[2] *Id.*

disputes their claim and even though McCree's hands were cuffed behind his back the entire time, and he had been searched for weapons minutes earlier.

The myriad evidence upon which a reasonable jury can determine the events preceding the shooting of McCree was set forth in Plaintiff's Memorandum in Opposition to Summary Judgement. (Dkt. 170, Plt. Memo. in Opp'n). Yet, for purposes of summary judgment, it makes no difference which party is right and which is wrong—only that there is a genuine dispute of material fact or, alternatively, a genuine dispute of fact over the inferences to be drawn from the facts, such that the case should proceed to a jury. The Magistrate Judge erred in repeatedly failing to apply this standard in reviewing the facts of the shooting and of the earlier unlawful arrest of McCree inside the Walmart store, including failing to review all the contradictory evidence that undermines the credibility of the officers' claims.

## SPECIFIC OBJECTIONS

### I. THE MAGISTRATE JUDGE OMITTED RELEVANT AND DISPUTED EVIDENCE IN THE REPORT'S PRESENTATION OF FACTS

The presentation of facts on pages 2-10 of the Report and Recommendation represents an incomplete and, therefore, inaccurate summary of the record. By omitting numerous facts that establish genuine disputes of material fact and inferences to be drawn from the evidence, the Report sequences and paints a factual narrative that merely supports its recommendation to grant summary judgment. Suffice to say, the Report omits substantial evidence and disputed facts bearing directly on the lawfulness of Defendants' detention of McCree inside the Walmart store and the subsequent shooting of him in the Walmart parking lot. Plaintiff provided a full presentation of these disputed facts in Plaintiff's Consolidated Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment, Dkt. 170 at 2-27. The key *omitted* facts of the events are set forth below:

### A. Unlawful Detention

The Report erred in omitting the following facts from its description of the relevant events of McCree's detention inside the Walmart store:

- McCree was well known to Walmart, its employees, and its customers. McCree's grandmother worked for Walmart in Chester for 25 years and throughout his life he visited her for lunch at the former Walmart store and at the present Walmart store where the events in this case took place. (Dkt. 174-7 at 117:20 – 120:6.)
- McCree greeted friends and Walmart employees as he walked through the store. (Dkt. 174-6, 174-8, 174-9.). According to a Walmart employee, McCree "came in smiling and speaking and asking where were the locks for a home door. He was pointed in the right direction and said thank you." (Dkt. 174-8.)
- Walmart video evidence does not show any customers or Walmart staff reacting to Stephenson's claim that he called out to McCree that "he forgot to pay." (Dkt. 174-10, 174-16, 174-17.)
- Stephenson admitted he did not approach McCree after he left the checkout. (Dkt. 174-12 at 33.)
- Stephenson's disciplinary history and performance evaluations. (Dkt. 174-18 & 19.)
- According to a statement from Walmart's loss prevention manager, McCree told Stephenson he was going to the bank. (Dkt. 174-13.)
- Williams-Tobias testified that McCree's offer to pay for the door lock set was "reasonable." (Dkt. 174-21.)
- No police officers personally witnessed McCree engage in misdemeanor shoplifting.
- Walmart's Loss Prevention Manager, Evelyn McManus made the decision to arrest McCree. (Dkt. 175-23.)
- Walmart tied shoplifter apprehension to annual performance reviews, which promoted a "quota/bounty" culture that drove competition among store personnel to "make more apprehensions in order to achieve a more favorable annual review." (Dkt. 175-33 at 16.)
- No one informed McCree he was under arrest. (Dkt. 174-21, 174-27.)
- McCree was not *Mirandized* after being detained. (Dkt. 174-27.)
- Richardson placed McCree in handcuffs and arrested him. (Dkt. 174-21, 174-27.)

- Richardson was an evidence technician, not a Class I law enforcement officer in South Carolina and he did not have the authority under South Carolina law to conduct an arrest. (Dkt. 174-27, 175-21, 176-14.)

- McCree was cooperative when he was placed in handcuffs. (Dkt. 174-28, 174-29.)

- Richardson stated that he detained McCree so McManus could determine what to do with him. (Dkt. 174-27.)

- Richardson left the loss prevention room to find out what Walmart wanted to do with McCree and so Walmart could take a picture of him and "put him in the system." (Dkt. 174-27, 174-33 at 11:50:53.)

- Chester police dispatch calls confirm McCree was being detained so he could be trespassed from the store, not for shoplifting. (Dkt. 174-34.)

- Video of the handcuffing of McCree in the Walmart vestibule directly contradicts Harris's testimony that McCree was behaving in a manner that presented a threat to safety of others that warranted his detention. (Dkt. 174-29.)

- Richardson told SLED McCree was "compliant with everything he was asked and advised of while [he] was present." (Dkt. 174-30.)

- McCree had been previously assaulted by a white police officer while attending a Chester High School football game. (Dkt. 174-36.)

**b. <u>Excessive Force</u>**

The Report and Recommendation omitted substantial facts in the record bearing on the objective reasonableness of Harris and Baker's shooting of handcuffed McCree.

- Harris claimed that McCree stopped, turned, and headbutted him twice in the parking lot. Walmart surveillance video shows Harris catching up to McCree twice in the parking lot but McCree continuing to run away from Harris both times. (Dkt. 174-39, 174-40, 175-1.)

- After Harris first shot McCree and he fell to the ground, Harris claimed a Walmart customer warned him that McCree "was getting up." (Dkt. Ex. 174-28, 175-5.) The customer later denied this to SLED. (Dkt. 175-8.)

- None of the Walmart video surveillance evidence of the parking lot corroborates Harris's claim of being headbutted by McCree. (Dkt. 39, 40, 41.)

- McCree's hands were cuffed the entire time actions were attributed to him by Harris and Baker, such as standing up in the parking lot pointing and presented a gun at them. (Dkt. 174-33)

- Video and photographs of Harris after the shooting do not show any injury to his face from any alleged assault. (Dkt. 174-33, 175-35.)

- Wallace stated he saw a black man enter and exit a car with a gun, but he did not state that this person had his hands bound behind his back in cuffs, (Dkt. 143-9); Wallace and Smith previously provided false and/or grossly inaccurate statements to police regarding what they claimed to have witnessed, (Dkt. 175-8, 176-7, 176-8, 176-9, 174-2 at 42.)

- Baker offered materially conflicting statements as to what he witnessed in the parking lot. (Dkt. 175-10, 175-11 at 191:25-192:10, 258:17-23.)

- Baker was instructed by law enforcement how to answer questions regarding McCree "presenting" a gun at him, (Dkt. 175-28 at 13:43, 13:54, 13:55; Dkt. 175-10.)

- Testimony that placed McCree 600 miles away when the gun was allegedly purchased by him in Rock Hill and that McCree only owned one gun and it was purchased in 2018. (Dkt. 174-6.)

- Video evidence of the gun owner informing SLED agents he did not sell the gun to a black man. (Dkt. 175-18, 175-19 at 3:15.)

- Harris was previously fired from the Chester Police Department in 2013. Harris's personnel file includes a letter from the Chester Chief of Police to SLED requesting an investigation regarding a "stolen gun" and a "former law enforcement officer." (Dkt. 175-16 at 5.)

- Richardson activated his bodycam in the parking lot but his bodycam footage is missing.

- SLED could not substantiate Harris's claim of being headbutted by McCree (Dkt. 174-2 at 17) or Baker's claim of ordering McCree to "drop your gun." (*Id.* at 29.)

- Baker circled the perimeter of the Walmart store after he arrived. His vehicle dash camera recorded events in the parking lot. Baker's dash camera video does not substantiate any of Harris's claims. (Dkt. 175-11, 175-14, 175-2, 175-3, 175-4.)

- Baker's dash cam audio establishes he instructed McCree to put his hands up, contrary to his testimony, and Baker opened fire less than one second after ordering McCree to put his hands up in the air. (Dkt. 175-4.)

- Baker was unable to identify any gun in McCree's hands in his bodycam video. (Dkt. 175-11 at 165:13 – 174:10.)

- SLED's DNA analysis did not eliminate Harris as a contributor to the DNA mixture found on the gun's slide. (Dkt. 175-20, 176-12, 176-13.)

- Harris was not in physical contact with McCree from the point that Harris claimed he returned with a gun such that Harris's DNA could be transferred to it. (Dkt. 174-38 at 48:9-11.)
- Harris was never in contact with the gun after the shooting as reflected on numerous video recordings. (*E.g.*, Dkt. 174-33.)
- Harris and Baker collectively fired at least 29 rounds at McCree. (Dkt. 174-2 at 34-35.)
- McCree did not once fire the gun alleged to be in his hands, either offensively or in self-defense in response to the 29 bullets fired at him. (Dkt. 174-2 at 34-35, 41.)

## II. THE MAGISTRATE JUDGE MISAPPLIED THE RULE 56 STANDARD WHEN RECOMMENDING SUMMARY JUDGMENT ON PLAINTIFF'S EXCESSIVE FORCE CLAIM

Whether it was objectively reasonable for the officers to shoot and kill Ariane McCree—while his hands were bound in cuffs behind his back—is a fact-dependent inquiry that includes properly assessing witness credibility. Yet the Report improperly credits the officers' uncorroborated testimony as the only affirmative evidence in the record and ignores Plaintiff's contrary evidence, including: 1) physical evidence disputing Defendants' claims that McCree was pointing and presenting a firearm; and 2) the officers' own conflicting testimony and prior false statements casting doubt on the reliability and veracity of their version of the story.

The Fourth Circuit has repeatedly counseled against crediting an officer's uncorroborated testimony in cases where the only witness who can dispute the officer's narrative was the one killed.[3] The seminal factor in the Fourth Circuit's rationale is the repeated failure of lower courts to consider *all* contradictory evidence.[4] The Magistrate Judge, however, failed to appropriately heed to the Fourth Circuit's directive and failed to consider critical and material contradictory

[3] In a very recent line of decisions, the Fourth Circuit has made a habit of reversing the premature grant of summary judgment on disputed factual scenarios not unlike those of the instant case. *See e.g.*, *Stanton v. Elliott*, 25 F.4th 227 (4th Cir. 2022); *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022); *United States v. McClellan*, 44 F.4th 200 (4th Cir. 2022).

[4] *Id.*

evidence which, if appropriately considered, could lead a reasonable jury to reach a different conclusion than that supported by the officers' self-serving testimony. This crucial error infects the entirety of the Report's analysis and its resulting recommendation to grant summary judgment.

### A. The Magistrate Erred in Disregarding Evidence Establishing the Unreliability of Harris's Testimony

The Magistrate Judge erred in categorically rejecting Plaintiff's evidence demonstrating the unreliability of Harris's testimony regarding his version of events surrounding McCree's death by police shooting in the parking lot. Instead of examining the evidence contradicting Harris's testimony, the Magistrate concluded that even though Harris "could not remember certain facts," his "inability to recall every detail about the incident does not render the facts he can remember inadmissible or irrelevant." (Dkt. 211, p. 25). This finding ignores the necessary and obvious fact that the reliability of Harris's account, based on his admitted memory issues, is called into doubt. On summary judgement, this evidence should be viewed in the light most favorable to Plaintiff—not discounted or minimized. Likewise, the proper inference to be drawn from it, which is discussed at length in Plaintiff's memorandum in opposition to summary judgment (Dkt. 170 at 30-37), is that Harris's recollection of the events he claims to remember is unreliable.

Plaintiff's memorandum in opposition described in detail this and other contradictory evidence, which the Magistrate Court failed to properly consider. (Dkt. 170 at 30-37.) There is no dispute that Harris's own testimony casts doubt on his reliability as a witness on the events that occurred in the parking lot. He testified at length in two depositions about the inherent *unreliability* of his memory of interacting with McCree and he confessed to significant memory impairments. Below is just a sample of the conflicting testimony that the Magistrate Judge apparently failed to consider:

- "*I can't be a detective if I can't remember where I picked up that bloody knife from, what I had a conversation with this person about.* I can't – I can't do my job correctly with the amount of issue and blunders that I make, whether it's through my coordination, my memory. *My recall is really, really bad sometimes. I put things in different orders that it happened, and you can't have that where you're in court trying to do things*." (Dkt. 174-28, Harris WC Tr. 65:11-66:1, 66:21-67:13 (emphasis added).)

- "So another problem with my memory is the order of things is sometimes garbled." (*Id.* 92:8-9.)

- Harris also testified that in the moments immediately after the alleged headbutting incident that he "was dazed pretty good," that his mind was "foggy," that he "was going in and out to where I felt like I was losing consciousness," that he "couldn't focus [his] gun and aim correctly," and despite being just feet away from McCree he did not know if he shot him. (*See* Dkt. 170, pp. 34-35, citing Harris's deposition testimony.)

Harris claimed these memory impairments arose due to the alleged headbutting in the Walmart parking lot,[5] which according to Harris took place before McCree allegedly obtained a gun. This sequence of events is important (and was overlooked by the Magistrate Judge): McCree was searched for weapons inside the Walmart store and that search established he had no gun. Harris maintained constant sight of McCree from the time of the search until after the alleged headbutting incident in the parking lot. Harris was unequivocal that McCree remained unarmed through the alleged headbutting incident. (*See* Dkt. 170, pp. 30-31, "[H]e's still unarmed as far as I'm concerned at this time…") Harris then claimed he lost sight of McCree, who was still handcuffed, for less than 60 seconds, at which point he claims McCree inexplicably returned holding a gun.

That Harris's self-serving testimony cannot be accepted uncritically by the court is even more clear when compared with the myriad of evidence that a jury will have to consider in reconciling that testimony, including: (1) video showing McCree had been searched for weapons minutes earlier and none were found; (2) Harris's admitted memory deficits of the events in the

[5] The Magistrate Judge also erred in failing to consider Plaintiff's arguments regarding McCree's lawful right to resist his unlawful arrest. *See* Dkt. 211 at 32 n.14.

parking lot, including remembering events in the wrong sequence and his inability to recall events prior to when he claims McCree presented a gun; (3) Harris's admission immediately after the alleged headbutting (and before he lost sight of McCree) that he was dazed, his mind was foggy, and he was at the verge of losing consciousness; (4) Harris's admission in his Worker's Compensation deposition testimony that his memory is so unreliable that he cannot so much be trusted to testify accurately in a courtroom; (5) the wholesale lack of *any video evidence* supporting Harris's version of events despite ample video evidence of Harris chasing McCree throughout the parking lot and McCree *running away from Harris*; (6) the fact that no other witnesses in the parking lot saw McCree pointing a gun at Harris and none of the bystanders referenced in the Magistrate's Report provided evidence that McCree was pointing or threatening anyone with a weapon; (7) the sheer physical difficulty of McCree obtaining a gun from a car parked elsewhere in the parking lot while handcuffed and running back to Harris in less than 60 seconds; and (8) the fact that Harris would undoubtedly face criminal prosecution for shooting a handcuffed man for alleged shoplifting if McCree was, in fact, unarmed or not pointing or presenting a firearm in a threatening manner.[6]

This is precisely the quantum and quality of evidence that requires a credibility determination by a jury—not a judge on summary judgment. Yet, despite the breadth of this evidence, the Magistrate Judge improperly determined that "Plaintiff fails to point to any evidence that Harris's memory issues have caused him to misremember the facts material to this case."[7] To

---

[6] The unreliability of Harris's testimony is further demonstrated by his claim of watching a video of the alleged headbutting in the parking lot, *despite the non-existence of such video evidence*. (*See* Dkt. 170, p. 36.) In other words, Harris testified that his memory of events in the parking lot is bolstered from his viewing of video evidence that indisputably does not exist.

[7] The Magistrate also appears to have mistakenly viewed Plaintiff's evidence of the material inconsistencies and omissions in Harris's testimony as an argument on relevance or admissibility.

reach that conclusion, the Magistrate Judge had to disregard the substantial evidence referenced above while fully crediting the facts in Harris's favor and impermissibly drawing inferences against Plaintiff at every step—which is a plain misapplication of Rule 56. Indeed, despite the myriad evidence undermining Harris's self-serving testimony, the Report inappropriately discounted and minimized Plaintiff's contradictory evidence as a mere "liar, liar, pants on fire argument" lacking in any evidentiary support. (Dkt. 211, p. 24). This finding simply cannot be reconciled with the record, especially where a reasonable jury may not accept Harris's self-serving statements in light of his admitted memory defects.

As the Fourth Circuit has long held, in cases where the only other witness to a police shooting is the officer accused of wrongdoing, the court is required to carefully scrutinize the record. *See, e.g.*, *Stanton v. Elliott*, 25 F.4th at 234; *Ingle ex rel. Est. of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006) ("When there is contrary evidence, a 'court may not simply accept what may be a self-serving account by the police officer.'" (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir.1994)); *see also Blakely v. Kershaw Cnty. Sheriff's Off.*, No. 3:10-CV-707-JFA, 2012 WL 3306338, at *3 (D.S.C. Aug. 13, 2012) (denying summary judgment in a fatal excessive force case where "a properly charged jury could reasonably reject the officers' testimony"). Here, Plaintiff presented substantial evidence demonstrating the unreliability of Harris' self-serving testimony.

---

*See* Dkt. 211, p. 25 ("Harris's inability to recall every detail about the incident does not render the facts he can remember inadmissible or irrelevant.") Plaintiff is not arguing that Harris's testimony regarding what he claims to remember is inadmissible or irrelevant, nor has Plaintiff sought to exclude this testimony. Rather, it is the litany of inconsistencies and omissions in Harris's testimony regarding key events in the parking lot that relate to his claimed justification for shooting McCree, such as basic details of the alleged headbutting and of seeing McCree hiding behind with a gun in hand, that establish the unreliability of this testimony. In other words, the Magistrate Judge erred in picking apart inconvenient pieces of Harris's unreliable memory and rejecting each in isolation as irrelevant, without regard to the considerable cumulative force this evidence bears on his unreliability when viewed in its totality.

If there are competing inferences to be drawn from it, those inferences must be drawn in Plaintiff's favor. *See Kershaw*, 2012 WL 3306338 at *3. Thus, if a jury finds Harris suffered memory deficits due to the alleged headbutting, it may accept that portion of his testimony and still disregard his testimony of seeing a gun in McCree's hands as unreliable. Or it may accept his testimony of being foggy and close to losing consciousness and still conclude that whatever he thought he saw, his use of deadly force was not objectively reasonable given that he knew McCree was not armed when he searched him for weapons minutes earlier and McCree had nickel-plated handcuffs on his wrists. If a jury concludes that Harris's statements about seeing a gun in McCree's hand are not just mistaken but false, then it may properly view this portion of his testimony as evidence of his consciousness of guilt. *See United States v. McClellan*, 44 F.4th --, 2022 WL 3221230 at *7 (4th Cir. Aug. 10, 2022) ("When a defendant makes a false exculpatory statement, that statement is evidence of the defendant's consciousness of guilt."). At this stage, Harris's testimony regarding the facts material to this case—including his unsupported, self-serving allegation that handcuffed McCree was pointing and presenting a firearm at him in the parking lot—cannot be credited as accurate or reliable. And because Harris's testimony is the only evidence supporting his claim that a handcuffed, unarmed McCree threatened him with a gun, there is a material dispute of fact and a competing reasonable inference barring summary judgment on Plaintiff's excessive force claim.

### B. The Magistrate Judge Erred in Disregarding Material Evidence Regarding the Gun Harris Claimed McCree Pointed at Him

The Magistrate Judge erroneously concluded that "there is not a shred of evidence in the record suggesting that Harris planted the gun" and that any argument that he did is "conjectural at best and, at worst, completely refuted by all of the other evidence in the record." (Dkt. 211, p. 27.) However, the Report failed to identify the evidence that "completely refute[s]" this finding. Also omitted in the Report is any reference to the substantial, material evidence suggesting that the gun

did not belong to McCree. Whether the gun belonged to McCree or whether it was placed on him, such tucked in his waistband ("in his ass") in the parking lot at some point after he was shot by Harris is both disputed and material to Harris and Baker's defense in this case. The objective reasonableness of these officers' use of deadly force rises and falls on establishing that handcuffed McCree—who minutes before had been searched for weapons—had the opportunity to obtain a gun in the less than 60 seconds when Harris claims he temporarily lost sight of him.[8]

The Magistrate erred in fully crediting Defendants' evidence purporting to establish McCree's ownership of the gun (*see, e.g.*, Dkt. 211, p. 26, "[T]he record is replete with evidence that McCree retrieved and was holding his *own* gun at the time the officers shot him.") while disregarding the evidence disputing this claim. Plaintiff offered evidence of an interview of the record owner of the gun, Chad Alley. (Dkt. 175-18.) In his videotaped interview with SLED, Alley was asked whether he sold this gun to an African American man. He responded, "Oh no, I've never dealt with a black man on a gun. No sir." (Dkt. 175-19 at 3:15.) Plaintiff also offered additional affirmative testimony from McCree's former college girlfriend and the mother of his son, Keira Davis. Ms. Davis testified that in April 2016, she and McCree were living together in Jackson, Mississippi while she finished college and they moved to Memphis, Tennessee the following month where they lived together for two years—locations 600 miles away from the Rock Hill pawnshop where Defendants' claim McCree purchased the gun in 2016. Ms. Davis further testified regarding a mugging incident that occurred at their Memphis apartment complex in 2018

[8] The Report erroneously concludes that "[e]ven if a reasonable jury were to find Harris's testimony unbelievable, there is not a shred of evidence in the record suggesting that Harris planted the gun." (Dkt. 211, p. 27.) Regardless of evidence suggesting Harris planted the gun, if a reasonable jury concludes that Harris's testimony is indeed unbelievable, it would necessarily conclude that McCree never threated Harris with a gun when Harris opened fire and thus find Harris liable for violating McCree's civil rights.

after their son was born, which prompted McCree to then purchase a gun to protect his family. According to Ms. Davis, the gun he purchased in 2018 was the only gun he owned. (Dkt. 170, pp. 15-18.)

A jury is not *required* to accept pawn shop records over testimonial evidence that disputes that the gun belonged to McCree. And while in other contexts the ownership of the gun may not be material to the issue of whether the use of deadly force was justified, this fact becomes material to Harris's liability where there is evidence suggesting the gun was placed on McCree at some point after Harris fired his first shot. Viewed in totality with Plaintiff's other evidence, including evidence from Harris's personnel file after he was terminated from Chester Police Department for insubordination and race issues, a jury can conclude that Harris played a role in placing the weapon on McCree while he was handcuffed

As for other explanations on how the gun came to be found with McCree, the Magistrate Judge erred in concluding SLED eliminated Harris as a contributor to the DNA profile taken from the gun found next to McCree's body after he was shot. (Dkt. 211, p. 26 n.9.) In doing so, the Magistrate Judge overlooked the contrary testimony of SLED Agent Brian Tolbert, who authored SLED's Investigative Report, and testified that the Report's conclusion regarding Harris being eliminated as the third source of DNA on the gun's slide was erroneous. (Dkt. 175-20, Tolbert Tr. 106:11 – 107:24, *see also* Dkt. 176-12, 176-13.)

The DNA evidence is material to the issue of how the gun came to find its way to unarmed, handcuffed McCree, as supported by other evidence not considered in the Report. First, as explained at length in Plaintiff's Memorandum (Dkt. 170, pp. 15-18), after the point in time Harris claimed McCree somehow obtained a gun, Harris was never in proximity to McCree such that his DNA could be transferred to the weapon. Second, although SLED's DNA analysis affirmatively

ruled out Harris as a contributor to the DNA mixture found on the gun's trigger, *it did not rule out Harris as a contributor to the DNA on the gun's slide*. Nor did the Magistrate consider evidence that McCree's DNA was not found on any of the cartridge headstamps, which is evidence supporting the inference that it was not his. (*See* Dkt. 170, p. 17.) The Magistrate erred in omitting this evidence.

Indeed, from this, a jury can reasonably infer that Harris touched the weapon at some time prior to it being found next to McCree, as it is undisputed that Harris never touched it after McCree fell to the ground. Additional evidence supports this conclusion: (1) the letter from Chester Police Department Chief Andrė Williams to SLED Chief Mark Keel requesting assistance regarding "a stolen gun with a former employee" that was placed in Harris's personnel file after his termination, (*id.* at 16); (2) Harris's statement to Baker immediately after the shooting that "he had that gun in his ass"—a statement that contradicts Harris's claim that McCree was holding a gun in his hands and one from which a jury can infer that Harris knew a gun was elsewhere on McCree's person;[9] (3) the gun was never fired once by McCree, offensively or defensively, in response to the hail of gunfire fired by Harris; and (4) the Magistrate Judge's correct observation that "[i]t is unclear from Baker's body camera video whether Baker pulled the gun from McCree's hands or whether it was lodged or wedged between some other part of McCree's body or the ground." (Dkt. 211, p. 8 n.5.)

[9] The Magistrate Judge's error is compounded by the unfavorable inference she made about Harris's statement that McCree purportedly "had the gun in his ass." *See* R&R at 26, n.10 ("Plaintiff's conjecture about Harris's meaning cannot reasonably be accepted in lieu of the far more likely interpretation that Harris was concerned that McCree had more concealed weapons on him, as Harris previously searched him and found a pocketknife but not gun."). The court's role on summary judgment is to view evidence and draw inferences in the non-moving party's favor. It was error for the Magistrate Judge to recognize multiple inferences to be drawn from this evidence, but adopt the one that fully credited Harris.

The Magistrate further erred in challenging the admissibility of the portions of the SLED Report addressing Harris's DNA. SLED agent Tolbert testified that he authored the Investigative Report, the relevant portions of which constitute a business record under Fed. R. Evid. 803(6). Additionally, SLED's forensic scientist who performed the DNA analysis, Catherine Leisy, was identified as a trial witness by the City of Chester, which described her knowledge as follows:

> [Ms. Leisy] is the forensic scientist that prepared the DNA report Plaintiff inquired about in the interrogation of Brian Tolbert on February 15, 2022. She is expected to testify as to that report, the basis of that report and the interpretation of that information. She will also testify generally about DNA investigation, analysis and interpretation and any other matters relevant to any inquire about the DNA information, report or analysis.

(*See* Ex. 1, Chester Supp. Resp. to Pl's Interrogatories). Plaintiff agrees with the City of Chester that Ms. Leisy will be able to provide a foundation for Tolbert's conclusions at trial, which is all that is required at this stage under Fed. R. Civ. P. 56(c)(2). To the extent Harris wishes to challenge the DNA results, the evidentiary burden of doing so rests with him. As for Plaintiff, her argument at trial may be a simple one: SLED concluded Harris was not a contributor to the DNA mixture on the gun's trigger, but SLED could not rule him out as a contributor to the DNA mixture on the gun's slide. Any argument to the contrary goes to the weight that should be afforded the DNA evidence, not to its admissibility.

### C. The Magistrate Judge Erred in Fully Crediting Harris's Uncorroborated Testimony of Being Headbutted and Disregarded Conflicting Evidence

The Magistrate erred in fully crediting Harris's uncorroborated claim that McCree assaulted him in the parking lot by repeatedly headbutting him and in characterizing Harris's claim as uncontradicted by any evidence. Plaintiff offered evidence that contradicts Harris's testimony: (1) video evidence of Harris in the minutes after the alleged headbutting that does not show any injury to his head; (2) photographs of Harris's face taken by SLED the evening of the shooting

that similarly do not substantiate his claim; (3) substantial video evidence of Harris and McCree recorded in the Walmart parking lot by surveillance video that does not show any headbutting; (4) a police dashboard camera that does not show any headbutting; (5) bodycam video that also does not show any such assault by McCree; and (6) the sheer absence of any witnesses to this alleged assault despite the Magistrate Judge's observation that "[m]ultiple bystanders observed the chase in the parking lot," *see* Dkt. 211 at 6, and (7) Harris's testimony that he did not seek any medical care for his alleged headbutting injuries for several days—injuries he later claimed were so severe that they permanently rendered him incapable of performing work as a police officer. SLED likewise concluded that the "cause and origin" of the injury on Harris's face depicted in the photograph taken days later at his criminal attorney's office "could not be verified." (Dkt. 174-2 at 7.) Further, Harris was unable to recall basic facts of his claim of being headbutted, which the Magistrate Judge incorrectly construed as having no bearing on whether his use of force was reasonable despite crediting Harris's headbutting claims a supporting a reasonable justification for shooting McCree. *See* Dkt. 211, p. 19 ("Harris reasonably believed that McCree intended to shoot him because, rather than fleeing the scene after assaulting Harris in the parking lot, McCree reengaged with a gun and pointed it at Harris.").

The Magistrate erred in disregarding this contrary evidence (discussed on page 31 of Plaintiff's memorandum) and in fully crediting Harris's uncorroborated testimony. A reasonable jury could view this evidence and decide the alleged headbutting never occurred. If it does, a jury can readily conclude that a false assertion of being assaulted by McCree is evidence of his consciousness of guilt in shooting an unarmed, handcuffed man—that the justification for claiming it occurred was simply to provide Harris with an excuse for permitting the unsupported inference that McCree ran away while Harris was dizzy, retrieved a gun from his car, and then ran back to

Harris to point it at him. Or the jury can find that some degree of headbutting occurred but disregard Harris's claim that it injured him to the degree that he lost sight of McCree. Ultimately, these issues are for the jury to resolve. On summary judgment, the law requires the Magistrate Judge to determine only whether there is a genuine dispute of material fact on whether the headbutting occurred, not to find that it occurred.

### D. The Magistrate Erred in Overlooking Facts and Evidence Contradicting Baker's Testimony that McCree Pointed a Gun at Him

As for Baker, the only evidence in the record supporting his claim that McCree was threatening him with a gun when he opened fire is his own testimony. No other evidence supports this self-serving claim. The Report and Recommendation erroneously and repeatedly stated that Baker's testimony on this point is "uncontradicted" by any evidence. (*See, e.g.*, Dkt. 211, p. 29, "Nothing in the record undermines Baker's version of the events.") And it criticized Plaintiff for purportedly failing to contradict this claim. (*See id.* at 32, "Though Plaintiff has exhaustively posited reasons why a factfinder should not believe this evidence, she has identified no evidence supporting her theory that McCree never held a weapon or never pointed it at the officers."). Yet, Plaintiff offered substantial evidence directly contradicting Baker's testimony—most critically, Baker's bodycam video. Even Baker was forced to concede in his deposition that the gun he claimed McCree was holding in his hand *cannot be seen* in his bodycam video or in the still frame images taken from that video. (Dkt. 175-11 at 165:13 – 174:10.)

In addition to this video evidence creating a material dispute of fact as to whether there was a gun, the Magistrate Judge failed to draw the proper inference from it; namely, that the video accurately depicts that McCree was not holding a weapon in his handcuffed hands when Baker opened fire. *See McClellan* at 7 ("Even when the facts themselves are not in dispute, a genuine

dispute of material fact about the inferences to be drawn from those facts precludes summary judgment.”).[10]

The Magistrate Judge implicitly conceded that the video does not show a gun in McCree’s hand, instead characterizing what is depicted as “a light-colored object at [McCree’s] side when Baker opened fire.” (Dkt. 211, p. 29). A “light-colored object” at someone’s side is hardly legal justification to shoot at someone thirteen times—and Baker’s defense is not based on mistaking an innocuous item for a gun. Even still, the Magistrate Judge erred in failing to credit Plaintiff’s evidence demonstrating that this “light-colored” object was either McCree’s reflective clothing or faded jeans or the nickel-plated handcuffs placed on him inside the Walmart store. (*See* Dkt 170, p. 42, citing photographic and video evidence showing the Nike sweatshirt McCree was wearing that day had large reflective patches on the sleeves near the wrists, and the pair of jeans he wore had a large white faded area on the right pant leg in the area where Baker contends he saw a gun.)

Although the Magistrate correctly noted that “when documentary evidence, such as a video, ‘blatantly contradicts a plaintiff’s account so that no reasonable jury could believe it, a court should not credit the plaintiff’s version on summary judgment,”[11] the same legal principle must hold true for a defendant’s account of what happened. A jury might credit Baker’s subjective testimony and find he was justified in shooting McCree, or it could credit the objective bodycam video (and all other surveillance video that recorded his shooting of McCree in the parking lot) as

---

[10] Similarly, none of the Walmart parking lot surveillance video in the record depicting Baker approaching McCree in the parking lot shows any gun in McCree’s hands. (*See* Pl’s Mem. in Opp’n at 40.) The Magistrate Judge erred failing to consider that this additional video evidence disputes Baker’s testimony.

[11] *See* Dkt. 211, p. 29 quoting *Witt v. W. Virginia State Police, Troop 2*, 633 F.2d 272, 276-77 (4th Cir. 2011).

evidence that McCree was not holding or presenting a gun when Baker opened fire. It was error for the Magistrate Judge to usurp the role of a jury in this regard.

Additionally, the Magistrate failed to consider Baker's own estimation that he was 45 yards away from McCree at the time he claimed to see "the black hole" of a gun barrel contrasting with the silver side of a gun against the background of McCree's black sweatshirt while McCree's hands were cuffed in nickel-plated handcuffs. (*See* Dkt. 170, p. 42.) This additional affirmative evidence does not support Baker's testimony, but rather creates a material dispute of fact over whether it was reasonable for Baker to conclude that he saw a gun in McCree's hands at a distance of almost *half a football field away*.

**E. The Magistrate Judge Erred in Favorably Assessing Baker's Credibility**

The Magistrate Judge also erred in assessing Baker's credibility when evaluating the false exculpatory statements he made in the minutes after the shooting, claiming McCree had earlier "pulled a gun and started shooting people." (Dkt. 174-33.) Rather than properly find that this demonstrably false statement is evidence for a jury's consideration of consciousness of guilt, as the Fourth Circuit requires, the Magistrate Judge improperly credited Baker's false statement in the light most favorable to him. (*See* Dkt. 211, p. 28, "[I]t is not unreasonable that officers who did not observe the entire incident may have mistakenly believe in the immediate aftermath than an armed suspect also fired some of the shots, especially given the ambiguity of Harris's statement over the radio that shots had been fired."). This conclusion is a quintessential example of a court improperly drawing an inference favorable to the moving party and simultaneously giving the moving party the benefit of the doubt. *Cf. McClellan*, 44 F.4th at --, 2022 WL 3221230 at *7 (4th Cir. Aug. 10, 2022) ("When a defendant makes a false exculpatory statement, that statement is evidence of the defendant's consciousness of guilt." (citing *United States v. McDougald*, 650 F.2d

532, 533 (4th Cir. 1981) (per curiam)). Whether in the minutes after firing thirteen rounds at a handcuffed man it was reasonable or not for Baker to tell a witness and fellow law enforcement officer that McCree "pulled a gun and started shooting at people" is exclusively a determination for a jury after hearing the entirety of the evidence. *Id.* ("[I]t is the jury's role to determine what inferences to draw from someone's false exculpatory statements."). And if a jury concludes Baker's statement was not merely the product of confusion or mistake, as the Magistrate Judge did, but rather a false statement designed to exculpate him from potential criminal and civil liability, the jury may properly view it as evidence of his guilt in shooting an unarmed, handcuffed man. And if it does, it may question the credibility of his similar self-serving and uncorroborated testimony that McCree was allegedly pointing and presenting a gun at him when he opened fire.

Additionally, Baker's inconsistencies went beyond his claim of seeing McCree shoot a firearm. In an affidavit dated November 27, 2019, Baker stated he "did not see anyone." (Dkt. 175-10.) After an interview with SLED later that day, Baker changed his story and said he "saw a subject wearing a black hoodie running in the parking lot of Walmart." (*Id.* at 6.) In his October 2021 deposition testimony, Baker's story changed yet again, this time claim he saw McCree *running away from Harris*. (Dkt. 175-11 at 191:25-192:10.) Yet Baker also maintains he never saw Harris in the parking lot at any time until after the shooting ended. (*Id.* 258:17-23.) While a jury may make little of these consistencies, that same jury might consider Baker's conflicting story alongside the video evidence that disputes his testimony and conclude that a different version of events took place. *See Stanton*, 25 F.4th at 237.

### F. The Magistrate Judge Erred in Disregarding Evidence of Law Enforcement Improperly Instructing Baker on How to Answer Material Questions Regarding the Alleged Gun in McCree's Hands

The Magistrate erred in failing to consider evidence of Baker's videotaped interview with SLED agents, during which an agent instructed Baker how to answer their questions, going so far as to propose first-person narrative answers for Baker to copy in his written statement, which he did. (*See* Dkt 170, pp. 47-48.) The coaching included instructions to state that McCree was "pointing a gun at me" and "advancing toward me." (Dkt. 175-28 at 13:54 – 13:56.) After watching this video evidence, a reasonable jury could conclude the coaching Baker received on how to craft a favorable response for his interaction with McCree influenced Baker's testimony. The fact of the verbal instruction provided to Baker on how to describe McCree's conduct in the parking lot is evidence that his uncorroborated testimony may be untruthful, and it was improper for the Magistrate Judge to ignore this evidence.

**G. The Magistrate Judge Disregarded Evidence that the Gun was Never Fired**

The physical evidence of the alleged gun in McCree's hand never being fired is further evidence disputing this allegation. If it were true that McCree was assaulting Harris and threatening both Harris and Baker with a gun in the Walmart parking lot, it is hard to conceive of a variation of events where McCree would not also fire it—either offensively if he was threatening officers or defensively in response to the 29 gunshots fired at him. In other words, the physical evidence from SLED's crime scene investigation that the gun found next to McCree was never once fired is evidence from which a jury can conclude that it was never in McCree's hands or, if it was on his person, it was not accessible to him. On the other hand, a jury could simply discount this evidence and conclude for one reason or another McCree had a gun in his hand but was determined not to fire even a single shot in aggression or self-defense despite video and testimonial evidence that McCree was in good spirits and had plans with his family later in the day. The point

is this evidence is one of several upon which a jury can conclude that it was never in McCree's hands when Harris and Baker repeatedly shot him.

### H. The Magistrate Judge Improperly Credited Baker's Testimony Over Conflicting Audio Evidence

The Magistrate further erred in failed in misconstruing audio evidence from Baker's police car dashboard camera video on which Baker is heard yelling "put your hands up!" less than a second before firing at McCree. (*See* Dkt. 170, pp 42-43.)[12] Words matter, and as explained in Plaintiff's memorandum, a reasonable jury can listen to this evidence and conclude that had Baker seen a gun as he claimed, he would not have ordered McCree to raise it in the air. The Magistrate similarly improperly credited the inference that McCree's apparent "refus[al] to drop the gun when ordered by Baker" was further justification for Baker shooting him. (Dkt. 211, p. 20.) Aside from there being a genuine dispute whether McCree was even holding a gun, and aside from the audio evidence that contradicts Baker's claim of giving such an order, to credit Baker the Magistrate Judge also had to disregard evidence that less than one second passed from the time he ordered McCree to put his hands up in the air to the time Baker shot at McCree 13 times—hardly sufficient time to comply with any order. (Dkt 175-4.)

The Magistrate further erred in crediting the narrative that after McCree failed to comply with Baker's order (an impossible task given that he was handcuffed), Baker reasonably feared for his life. (*See* Dkt. 211 p. 8, "McCree did not stop walking toward Baker until McCree fell.") A competing reasonable inference from this evidence overlooked by the Magistrate is that McCree—with his hands cuffed behind his back and having been shot twice and fired at least 16 times by Harris—saw the only uniformed officer in the parking lot, Baker, as a beacon of safety. McCree

---

[12] SLED concluded that Baker's claim of instructing McCree to 'drop the weapon' could not be verified. (Dkt. 174-2 at 29.)

was not running, bobbing or weaving, or firing a gun. A jury viewing the body cam and parking lot surveillance videos can reasonably conclude McCree was seeking help. Yet the Magistrate Judge apparently viewed this fact as evidence as further justification for Baker opening fire.

**I. The Magistrate Judge Erred in Disregarding Evidence of Baker's Consciousness of Guilt**

The Magistrate further erred in disregarding evidence of Baker's post-shooting suicide ideation discussed in both Plaintiff's opposition memorandum (Dkt. 170) and in Baker's reply brief. As explained in Plaintiff's memorandum at pp. 49-50, a suicide ideation like Baker's, which arose in the context of testifying in this case, has long been recognized in the Fourth Circuit as circumstantial evidence of consciousness of guilt. When presented alongside Baker's uncorroborated testimony and coaching on how to answer questions, Baker's suicide ideation is strong evidence of his consciousness of guilt from shooting an unarmed, handcuffed man. A jury is free to accept or reject this evidence as it sees fit, but it was improper for the Magistrate to disregard it.

**J. The Magistrate Judge Erred in Fully Crediting Witness Affidavit Statements While Disregarding Those Witnesses' Conflicting Statements.**

The Magistrate erred in fully crediting affidavit statements of Jeffery Wallace and Diane Smith in finding McCree "retrieved a gun" despite evidence demonstrating that those affidavits contradict prior statements made by these witnesses to SLED agents after the shooting. (*See* Dkt. 170, pp. 50-53.) As for the Wallace affidavit, it was devoid of any affirmative evidence establishing that the person Wallace claimed to see enter a car and emerge with a gun was, in fact, McCree. As explained is Plaintiff's opposition, Wallace stated that he saw "a black man" but he could not affirmatively connect who he saw to McCree—who's image and identity was well

known in Chester after the shooting and certainly available to him when he provided the affidavit to Defense counsel.[13]

Second, his affidavit omits the most critical and obvious identifying features of McCree, *i.e.*, that his hands were cuffed behind his back. "That detail seems important enough to mention." *Stanton v. Elliott*, 25 F.4th 227, 236 (4th Cir. 2022). A jury can readily infer from Wallace's failure to call out McCree's handcuffed hands in his affidavit that it was not McCree that he saw—not simply because that would be the most prominent feature but also because McCree's hands being cuffed behind his back would severely handicap if not prohibit his ability to open a car door, get in, retrieve an item, and then exit. (*See* Dkt. 170, p. 51.)

Third, in Wallace's January 20, 2020 telephone interview with SLED, which occurred over two years prior to his affidavit, Wallace told SLED investigators that he heard gun fire and ducked down. (*See* Dkt. 170, p. 52.) Critically, in speaking with police, Wallace made no mention of seeing anyone being chased or a "suspect" running past him toward a car, entering it, and then emerging "with a gun in his hand" as he did in his affidavit. These prior statements to SLED are evidence undermining the credibility of the statements in the affidavit Defendants secured from him on the eve of filing their motions for summary judgment. The Magistrate Judge erred in failing to consider this evidence and in fully crediting Defendants' narrative on these facts.

Similarly, the Magistrate erred in declining to consider evidence of the numerous conflicting statements provided to SLED by Wallace and Smith—such as Wallace's prior claim that the black man he saw was "holding [the gun] up toward his shoulder"—a fact that cannot be

[13] The Wallace affidavit was created after the close of discovery, apparently just 48 hours prior to the City of Chester filing its motion for summary judgment, and it was notarized by an employee of the law firm representing the City of Chester. The circumstances under which Wallace provided this affidavit are appropriate matters for cross-examination at trial.

reconciled with the physical evidence of McCree being handcuffed and would further demonstrate that the person he saw was not McCree. Or the materially conflicting statements offered by affiant Diane Smith, including her incredulous prior statement that the person she claimed to see holding a gun fired it upwards of 15 times, a claim easily disproven by the ballistic evidence that the gun recovered next to McCree had not been fired. This statement, if believed, makes clear that the individual Smith claims to have seen was not McCree.

In circumstances, such as this, where witness statements fail to align with other evidence, the Fourth Circuit has recognized that a jury may reasonably conclude that "a different version of events took place." *Stanton*, 25 F.4th at 237. The Magistrate erred in wholly disregarding this conflicting evidence that called these witnesses' affidavits into doubt. Absent these two affidavits, there is no other admissible evidence supporting Harris's claim that McCree obtained a gun during 60 second period he claimed to have lost sight of McCree in the parking lot—and certainly none of the video evidence substantiates this incredulous claim.

The Magistrate further erred in crediting apparent hearsay statements from unidentified witnesses as the source of facts upon which she relied in reaching her summary judgment ruling. (*See, e.g.*, Dkt. 211 p. 7, "The bystander then warned Harris that McCree was getting up."; *id.* at p. 30 "Harris's and Baker's accounts . . . are generally corroborated by other witnesses.") As to the "bystander warning Harris," that statement comes solely from Harris's deposition testimony and is hearsay. As for the "other witnesses," the accounts of Wallace and Smith cannot be taken as fact at this stage for the reasons addressed above. No other witnesses are addressed nor are there any who can affirmatively identify McCree with a gun or testify as to Baker's engagement with McCree. To the extent the Magistrate inferred those witness statements did, that was both impermissible and mistaken.

### K. The Magistrate Erred in Reviewing Dr. Kim Collins's Testimony

Examining the forensic pathology testimony from Dr. Kim Collins, M.D., the Magistrate Judge incorrectly concluded that "the record flatly contradicts Plaintiff's argument" that "evidence in the record suggests that McCree was shot before he obtained the gun." (Dkt. 211, p. 27.) In support of this conclusion, the Magistrate Judge noted that "Plaintiff's own pathology expert, Kim Collins, M.D., testified that McCree was shot "not [in] the front of the left hip or the back, but to the direct side of the left hip." *Id.* However, the Magistrate Judge ignored the full scope of Plaintiff's argument. Plaintiff is not merely arguing that this evidence creates the inference that McCree was shot before allegedly obtaining a weapon (which, again, is disputed) but also that it suggests McCree was shot at a time when he did not reasonably present an imminent threat of death or serious bodily injury. In concluding the evidence contradicts Plaintiff's argument, the Magistrate Judge did not have, and therefore was not able to consider, the full context of Dr. Collins's testimony.[14] Dr. Collins analyzed the evidence from the scene, reviewed available video, applied her training, knowledge, and experience in the field of forensic pathology, and concluded the first two gunshot wounds were the ones to the right arm and left hip. (Ex. 2, Collins Tr. at 13-22.) Dr. Collins also concluded that Harris most likely fired the shots that resulted in the left hip wound and the arm wound. (*Id.* at 21:20 – 22:5.) This testimony coupled with the SLED analysis identifying the multiple sets of shell casings from the scene creates a reasonable inference that McCree was shot before the 60 second period in which Harris claims to have lost sight of him wherein Defendants allege McCree obtained a weapon. (Dkt. 174-25, SLED Shell Casing Diagrams.)

---

[14] Plaintiff is supplementing the record with additional pages from Dr. Collins's deposition transcript. *See* Ex. 2 (Tr. pages 13-22.)

Alternatively, assuming Baker shot McCree in the left hip, that wound would have been sustained when McCree was walking perpendicular to Baker as seen on Baker's body worn camera. (Dkt. 174-33). Baker's video shows him shooting his first shot at 11:34:49 a.m,, when the recoil of Baker's handgun is observed upon discharge of the weapon. (Dkt. 174-2, at 20). At this time, McCree was walking from Baker's right to left, exposing his left side to Baker with his right side (and the alleged gun in it) *facing away from Baker*. It was only after the shooting begins that McCree turns toward Baker. (Dkt. 174-33.) Baker then continues to fire rounds at McCree. *Id*. The Magistrate Judge appeared to construe this evidence to contradict Plaintiff's evidence that McCree was shot before he allegedly became a threat. However, the final gunshot wound to the chest does not negate the reasonable inferences drawn from the other gunshot wound evidence. Instead, because of the severity of the chest wound, it suggests that McCree was shot twice before the chest wound was sustained. That is, McCree was shot twice before he turned and faced Baker to point a gun at him as Baker alleges.

Similarly, the Magistrate Judge misapplied the facts and inferences drawn from the gunshot wound to McCree's right arm. (Dkt. 211, p. 27.) The point of Dr. Collins' testimony on that wound is not that the bullet entered through the front of the arm, but that the wound would have made it "improbable that he was able to use the arm and fire a weapon." (Ex. 2, Tr. 18:16-23.) Dr. Collins testified, "to actually turn around and aim the gun and then fire it, I think would've been extremely difficult with the handcuffs on and with the damage to his triceps muscle . . . on the right." (*Id.* Tr. 20:7-12.) The reasonable inference to be drawn from these facts is that McCree did not present a threat of death or serious bodily injury at the time Baker shot him in the chest.

These disputes of fact are material to the ultimate question of whether McCree posed a threat of death or serious bodily injury to anyone at the time he was shot. If McCree was shot

either before he alleged retrieved a handgun, or when walking from Baker's right to his left while handcuffed behind his back, Baker would have seen he was handcuffed, would not have been in a position to see any gun on his right side as alleged, and would certainly not have been in position to see "the black hole [of a gun barrel] contrasting with the silver slide pointed at [him]." (Dkt. 175-11 at 199:25-200:23.)

## III. THE MAGISTRATE JUDGE MISAPPLIED THE RULE 56 SUMMARY JUDGMENT STANDARD WHEN RECOMMENDING SUMMARY JUDGMENT ON PLAINTIFF'S FALSE ARREST CLAIM

Summary judgment is rarely appropriate in false arrest claims involving an element of intent. *See Gathers v. Harris Teeter Supermarket,* 317 S.E.2d 748, 753-54 (Ct. App. 1984) ("The issue of probable cause is essentially a question of fact and ordinarily for the determination of the jury."). This case is no different. Summary judgment is especially inappropriate here because there is *no direct evidence* of any intent to shoplift or to commit any other crime. Rather, the uncontested evidence shows McCree at all times intended to pay for the lock set and, in fact, returned to the store with cash in hand and tried to do just that before he was arrested. The Magistrate's report fails to appropriately consider this critical and material evidence, much less construe the facts and inferences in Plaintiff's favor.

Instead, the Report and Recommendation improperly rested its recommendation of summary judgment on the irrelevant fact that "before McCree returned, the officers already reasonably believed that McCree shoplifted the door lock set and Walmart already decided to press charges." (Dkt. 211, p. 14). This finding reflects both (1) legal error in failing to consider the facts known *at the time of the arrest*, and (2) factual error in overlooking at least four critical material facts, which when viewed in the light most favorable to Plaintiff, mandate a different outcome.

First, the Magistrate Judge completely discounts the crucial fact that at the time of the arrest, Harris (and Richardson) knew McCree was attempting and had attempted to pay for the lock set. This material fact unequivocally negates any inference of the required element of intent. But rather than credit McCree's efforts to pay and his cash in hand, the Magistrate takes the opposite position and finds "a reasonable officer could interpret McCree's offer to pay for the item upon return as a sign of guilt or contrition because he did not offer to pay for the item until he was confronted by the officers." (Dkt. 211, p. 14-15). This inference fails for two reasons: (1) it is improperly construed *against* the Plaintiff, and (2) it runs counter to the totality of the circumstances, all of which demonstrate that McCree intended to pay for the lock set. Even assuming McCree's offer to pay stemmed only due to his discussion with Walmart's security officers, which is an improper inference to make on summary judgment, then why did McCree return to the Walmart store with money to pay? The appropriate inference to draw from this evidence at this stage is that McCree always intended to pay, *i.e.*, that he lacked the requisite intent to deprive Walmart of the value of the door lock set necessary to for a reasonable officer to find probable cause for shoplifting or larceny. The true test of an objectively reasonable basis for probable cause considers the totality of the circumstances *at the time of the arrest*. *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer *at the time of the arrest*." (emphasis added)). And *at the time* of McCree's arrest, the Walmart security officers unquestionably knew he had returned to the store with cash to pay for the lock set.[15] What the officers may have believed prior to McCree's return to the store with payment became immaterial.

---

[15] The Magistrate notes on page 4 of the Report that Richardson testified he was not aware that McCree offered to pay for the door lock set. This testimony is in conflict with Williams-Tobias'

Second, none of the evidence of McCree's conduct that day demonstrated an intent to shoplift. Surveillance video shows McCree proceeding through the checkout line like any other customer. The cashier handed him a bag with the lock set and he casually walks out of the store. McCree's conduct on the video evinces no attempt at concealment and no other indicator that would support a reasonable inference of an intent to shoplift or steal. At best, his conduct infers that the cashier forgot to request payment, that McCree forgot to tender payment, or that some other mistake had occurred. That was evident from a review of the cash register video. On summary judgment, one of several proper inferences to be drawn from the video evidence is that this was a cashier error.

Third, that this was an innocent mistake is supported by another important fact omitted from the Magistrate's report: the cashier's disciplinary history. Considering this history, a reasonable jury could question the veracity of the cashier's self-serving testimony that he notified McCree of the error. Indeed, the surveillance video conflicts with the cashier's testimony—it shows no reaction from McCree or any other customer to the cashier Stephenson's claim that he called out to McCree that he "forgot to pay." (Dkt. 174-10, 174-16, 174-17). Though video shows the cashier with his arms raised, it is also clear that McCree was *facing away* from the cashier and could not have seen this gesture as his back was turned. Further, the cashier testified he never walked up to McCree after the transaction, a retraction from his prior claim that he did. (Dkt. 174-12 at 33). This evidence demonstrates a genuine dispute of fact material as to whether it was reasonable for any officer to find any objectively reasonable evidence of intent based on the video.

---

testimony that Richardson was aware that McCree had returned and requested to pay for the door lock set at which time McManus said Walmart would not accept payment. Dkt. 174-21 at 68.

Fourth, the Magistrate failed to appropriately consider the cashier's statement that McCree told him to "put it on his tab" and McManus' statement to SLED that McCree was going to the bank. Harris's testimony likewise confirms this version of events, a fact noted in the Magistrate's Report but seemingly ignored in the analysis. (*See* Dkt. 211, p. 4, noting Harris testified that when he approached McCree in the vestibule, McCree allegedly told the cashier he would return to make payment.) When viewed in the light most favorable to the Plaintiff, this evidence—material to the issue of intent—supports the inference that the Walmart security officers had knowledge that at no time did McCree intend to deprive the store of the value of the lock set. To the contrary, he attempted several times to do the opposite in their presence.

The Magistrate Judge not only failed to view this evidence in the light most favorable to the Plaintiff, she inappropriately discredited this explanation as "def[ying] common understanding of how modern retail stores operate." (Dkt. 211, pp. 14-15.) This sort of evidence weighing is strictly prohibited at the summary judgment stage. It also completely ignores the important contextual backdrop of the underlying events. The term "modern" does not come to mind when describing the small town of Chester, South Carolina. Indeed, with an estimated population of 5,377 in 2019, Chester is not just a small town, it's rural. So to assume that stores in Chester operate in the same way as "modern retail stores" in places like Columbia or Charleston is a gross mischaracterization of the facts. What's more, McCree was well known at this store, as video evidence shows him greeting friends and hugging a Walmart employee early that morning upon his arrival at Walmart, (Dkt. 174-6 at 1:05), testimony shows his grandmother worked there for twenty-five years and McCree often visited her at the store for lunch. (Dkt. 174-7 at 117:20-120:6.) Under these facts, which are not in dispute, it was not so unreasonable for McCree to place a hardware door lock set on a tab or other informal, temporary credit arrangement as he left to

retrieve cash. Perhaps modern retail stores in Columbia or Charleston may not operate this way, but it is not implausible that a retail store in the small town of Chester did. It was error for the Magistrate Judge to discredit this material evidence and not view it and the inferences therefrom in the light most favorable to Plaintiff.

When the above-referenced evidence is viewed in the light most favorable to the Plaintiff, the appropriate and obvious inference is that the element of intent was unequivocally lacking when McCree was placed under arrest. Whether a reasonable jury could arrive at such a conclusion based on the totality of these circumstances is the only appropriate question at this stage. And the answer to that question is, yes. As the Fourth Circuit has consistently stated, "[s]ummary judgment should not be granted unless the entire record shows a right to judgment with such clarity as to leave no room for controversy." *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967); *see also Scott v. Old Navy, LLC*, No. 20-1253, 2022 WL 2764415, at *8 (4th Cir. July 15, 2022). The only clarity that exists here is that the material element of intent at the time Walmart security officers arrested McCree is, at a minimum, genuinely disputed. Summary judgment on this disputed record is, therefore, improper. For these reasons as well as those further detailed in Plaintiff's initial brief, the Magistrate's analysis and conclusion as to Plaintiff's § 1983 false arrest claim should be rejected.[16]

[16] The Magistrate Judge also erred in neglecting to address the dispute of fact as to whether Harris and Richardson were acting solely as private security guards for Walmart at the time of McCree's arrest. This issue necessarily includes the argument that Richardson was not a Class I officer with lawful authority to conduct an arrest, that Walmart, by hiring off-duty police to perform arrests in its store solely under its direction, was acting as a state actor for purposes of § 1983 liability, and the substantial evidence that McCree's arrest was not for a crime, but to serve Walmart's private interests in deterring shoplifters ahead of the Black Friday shopping day. *See* Pl.'s Memo. in Opp'n, Dkt. 174 at pp. 18-26, 58-59, 61-63, and 67-68.

Finally, Plaintiff objects to the Magistrate's one-sentence, footnoted discussion granting Harris qualified immunity on the false arrest claim on the basis that he may have "incorrectly" believed that McCree intended to take the door lock set without paying. (Dkt. 211 at 16 n.7). As set forth above, the facts known to Harris do not suggest that he "incorrectly" believed McCree intended to take the door lock set without paying. Even if such inference can be drawn, there is an equally compelling and objective inference from the facts that Harris simply let Walmart's managers dictate the arrest decision without any regard to evidence of intent or probable cause. Likewise, as discussed above, the video evidence raises the inference of cashier error while the testimonial evidence raises the inference that Harris knew McCree intended to return to the store to pay—not after simply walking out but after an alleged discussion with Stepheson to put the item on the tab (i.e., I'll be right back to pay for it). And McCree did just that. Under either inference, the requisite element of intent is missing. Because resolution of this issue involves finding facts and rendering credibility determinations, it is inappropriate to resolve on summary judgment. *Blakely v. Kershaw Cnty. Sheriff's Off.*, No. 3:10-CV-707-JFA, 2012 WL 3306338, at *4 (D.S.C. Aug. 13, 2012). Further, it was error for the Magistrate Judge's truncated analysis to omit consideration of Plaintiff's arguments. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

## IV. THE MAGISTRATE JUDGE ERRED IN DECLINING TO CONSIDER PLAINTIFF'S REMAINING FEDERAL CLAIMS

Plaintiff objects to the Report and Recommendation to the extent it granted summary judgment on Plaintiff's bystander liability claims and § 1983 claim against Walmart on the basis that there was no underlying constitutional violation. Plaintiff respectfully requests that the District Court reconsider these claims and supporting arguments because there is a material dispute of fact on Plaintiff's underlying constitutional claims.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the District Court decline to accept the Report and Recommendation recommending summary judgment in favor of Defendants Harris and Baker on Plaintiff's federal constitutional claims for excessive force and false arrest.

Respectfully submitted,

**McLEOD LAW GROUP, LLC**

Post Office Box 21624
Charleston, South Carolina 29413
(843) 277-6655

*s/ Colin V. Ram*
Colin V. Ram, No. 12958
W. Mullins McLeod, Jr., No. 7142
Michael T. Cooper, No. 12198
colin@mcleod-lawgroup.com
*Attorneys for Plaintiff*

September 6, 2022
Charleston, South Carolina